# EXHIBIT 1

Doc ID: 001107820002 Type: LAN
BK 867 PG 662-663

After recording, return to:

## WARRANTY DEED · Survivorship

**TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, GREETING:**

KNOW YE, THAT BIRCH HILL PARTNERS, LLC, a Connecticut Limited Liability Company with an office in the Town of Simsbury, County of Hartford and State of Connecticut, acting herein by CAROLINE FINANCIAL GROUP, INC., a Delaware Corporation, acting herein by MATTHEW G. WESTCOTT, presently of Burlington, Connecticut, hereinafter referred to as Grantor, for the consideration of TWO HUNDRED FORTY THOUSAND AND NO/100 ($240,000.00) DOLLARS, received to its full satisfaction of STEVEN MECKEL and CAROLINE MECKEL, both presently of the Town of Simsbury, County of Hartford and State of Connecticut, hereinafter referred to as Grantees, do give, grant, bargain, sell and confirm unto the said Grantees, and the survivor of them, and the heirs and assigns of the survivor of them forever

### SEE SCHEDULE "A" ATTACHED HERETO AND MADE A PART HEREOF

Said premises are subject to any and all provisions of any ordinance, municipal regulation or public or private law, as of record more fully appear. Said premises are further subject to taxes due the Town of Southington on the Grand List of October 1, 2012, which taxes the Grantees hereby assumes and agrees to pay.

TO HAVE AND TO HOLD the above granted and bargained premises, with the appurtenances thereof, unto them, the said Grantees and the survivor of them, and the heirs and assigns of the survivor of them forever, and to their own proper use and behoof. And also, it, the said Grantor does for itself, its successors and assigns covenant with the said Grantees, their survivor and such survivor's heirs and assigns, that at and until the ensealing of these presents, it is well seized of the premises, as a good indefeasible estate in FEE SIMPLE; and have a good right to bargain and sell the same in manner and form as is above written; and that the same is free from all encumbrances whatsoever, except as above written.

AND FURTHERMORE, it, the said Grantor, does by these presents bind itself, its successor and assigns forever to WARRANT AND DEFEND the above granted and bargained premises to them, the said Grantees, and to the survivor of them and to such survivor's heirs and assigns, against all claims and demands whatsoever, except as above written.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 22nd of November 2013.

Signed, sealed and delivered
in the presence of:

**GRANTOR**
**BIRCH HILL PARTNERS, LLC**

Jason S. Famiglietti

By: _____
CAROLINE FINANCIAL GROUP, INC., Member/Manager
By: Matthew G. Westcott, duly authorized

Richard P. Roberts

STATE OF CONNECTICUT )
) ss: Hartford          November 22, 2013
COUNTY OF HARTFORD )

On this 22nd day of November 2013, before me, the undersigned officer, personally appeared Matthew G. Westcott, duly authorized signer for CAROLINE FINANCIAL GROUP, INC., Member/Manager of BIRCH HILL PARTNERS, LLC, and that he, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation, by himself.

Jason S. Famiglietti
Commissioner of the Superior Court

Grantees' Address: 41 Church Street, Simsbury, CT 06081

$ CONVEYANCE TAX RECEIVED
CT $ 1800.00    SIS 600.00
Annie C. Brady
ASST TOWN CLERK OF SIMSBURY CT
Book: 867 Page: 662 Seq: 1

### SCHEDULE A
### DESCRIPTION
### 41 Church Street


     A certain piece or parcel of land with the buildings thereon, situated in Simsbury, Connecticut, being known as No. 41-43 Church Street and designated as House #41 on a map entitled, "Plan Showing Property By or To Be Acquired By Bradford E. & Gertrude B. Wilkinson Church Street Tariffville, Conn. Henry Charles Cotton Land Surveyor Stardust Drive Granby, Conn. Scale 1" = 20' Date 8-15-1967", which map is on file In the Simsbury Town Clerk's Office and being more particularly bounded and described as follows:

Northerly    by land now or formerly of John J. Brown. 132 Feet:

Easterly    by Church Street, 85 feet:

Southerly    by House #45 as shown on said map, 132.72 feet, and;

Westerly    by land now or formerly of the Estate of Arthur J. Hayes and John J. Brown, partly by each, in all. 82 feet.

Received for Record at Simsbury, CT
On 11/25/2013 At 10:04:58 am

*Carolyn D. Kelly, Town Clerk*

**Book: 867 Page: 662 Seq: 2**

Doc ID: 00110763000B Type: LAN
BK **867** PG**664-671**

Return To:
**Village Mortgage Company**
**30 Tower Lane**
**Avon, CONNECTICUT 06001**

This instrument was prepared by:
**Village Mortgage Company**
**30 Tower Lane**
**Avon, CONNECTICUT 06001**
**860-482-7378**

———————————— {Space Above This Line For Recording Data} ————————————

**State of Connecticut**

# OPEN-END MORTGAGE

FHA Case Number:
**061-4550865-703**

MIN: **100451300000014130**
SIS Telephone #: **(888) 679-MERS**

THIS MORTGAGE ("Security Instrument") is given on **November 22, 2013**.

The Mortgagor is **Steven Meckel and Caroline Meckel, as joint tenants,** ("Borrower").

This Security Instrument is given to **Mortgage Electronic Registration Systems, Inc. ("MERS"),** (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns), as mortgagee. MERS is organized and existing under the laws of **Delaware,** and has an address and telephone number of **P.O. Box 2026, Flint, MICHIGAN 48501-2026,** tel. **(888) 679-MERS.**

**Village Mortgage Company, ("Lender")**
is organized and existing under the laws of **CONNECTICUT,**
and has an address of **30 Tower Lane , Avon, CONNECTICUT 06001.**

Borrower owes Lender the principal sum of **TWO HUNDRED THIRTY-FIVE THOUSAND SIX HUNDRED FIFTY-THREE AND NO/100** Dollars (U.S. **$235,653.00**). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on **December 1, 2043.** This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the Town of **Tariffville, Hartford County,** Connecticut:

**See Attached Exhibit 'A'**

which has the address of **41 Church Street**
**Tariffville, CONNECTICUT 06081,** ("Property Address");

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to

———————————————————————————————————

FHA Connecticut Open-End Mortgage with MERS – 4/96

Amended 2/01

Page 1 of 7

IDS, Inc.

Borrower(s) Initials _CM_ _SM_

exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest and Late Charge.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

**2. Monthly Payment of Taxes, Insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under Paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 *et seq.* and implementing regulations, 12 CFR Part 1024, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

**3. Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

**4. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires

---

insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**5. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**6. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**7. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

(a) **Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

(b) **Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

(ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

(c) **No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

(d) **Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

(e) **Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

---

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the

---

FHA Connecticut Open-End Mortgage with MERS – 4/96                 **Amended 2/01**

IDS, Inc.                                                     Borrower(s) Initials _CU_  _SM_

Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**18. Foreclosure Procedure. If Lender requires immediate payment in full under Paragraph 9, Lender may invoke any of the remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 *et seq.*) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.**

**19. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**20. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**21. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)].

☐ Condominium Rider                    ☐ Graduated Payment Rider          ☐ Adjustable Rate Rider
☐ Planned Unit Development Rider    ☐ Growing Equity Rider               ☐ Other:

---

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Richard P. Roberts      -Witness      Olivia M. Albanese      -Witness

_____ (Seal)      _____ (Seal)
Steven Meckel      -Borrower      Caroline Meckel      -Borrower

STATE OF CONNECTICUT, _____ Hartford _____ County ss:

The foregoing instrument was acknowledged before me this __22nd__ day of ____November____, _2013_ by **Steven Meckel and Caroline Meckel.**
Witness my hand and official seal.

My Commission Expires: _____
(Seal)

Richard P. Roberts, Esq.
Commissioner of the Superior Court

**SCHEDULE A**
**DESCRIPTION**
**41 Church Street**


A certain piece or parcel of land with the buildings thereon, situated in Simsbury. Connecticut, being known as No. 41-43 Church Street and designated as House #41 on a map entitled, "Plan Showing Property By or To Be Acquired By Bradford E. & Gertrude B. Wilkinson Church Street Tariffville, Conn. Henry Charles Cotton Land Surveyor Stardust Drive Granby. Conn. Scale 1" = 20' Date 8-15-1967", which map is on file In the Simsbury Town Clerk's Office and being more particularly bounded and described as follows:

Northerly    by land now or formerly of John J. Brown. 132 Feet:

Easterly    by Church Street, 85 feet:

Southerly    by House #45 as shown on said map, 132.72 feet, and;

Westerly    by land now or formerly of the Estate of Arthur J. Hayes and John J. Brown. partly by each, in all. 82 feet.

Received for Record at Simsbury, CT
On 11/25/2013 At 10:06:23 am

Carolyn D. Kelly, Town Clerk

RETURN TO:
Birch Hill Partners, LLC
41 Church Street
Simsbury, CT 06081

Doc ID: 000917280002 Type: LAN
BK 802 PG 216-217

(Individual)                           114SF                    CLEAVELAND inc.
                                                                Bloomfield, Connecticut
                                                                (203) 243-3456

## STATUTORY FORM WARRANTY DEED

WE, JEFFERY S. SELTZER a/k/a JEFFREY S. SELTZER AND DORANN H. SELTZER, of the Town of Simsbury, County of Hartford and State of Connecticut

for consideration paid, grant to BIRCH HILL PARTNERS, LLC, of the Town of Simsbury, County of Hartford and State of Connecticut

                                        with **WARRANTY COVENANTS**

A certain piece or parcel of land with all building and improvements thereon situated in the Town of Simsbury, known as 41 Church Street , being more particularly bounded and described on SCHEDULE A attached hereto and made a part hereof.

SAID PREMISES ARE BEING CONVEYED SUBJECT TO:

1.  Real property taxes on the current Grand list and any municipal liens or assessments becoming due and payable on or after the delivery of this Deed.

2.  Any and all provisions of any municipal, ordinance or regulation or public and private law with special reference to the provisions of any zoning regulations and regulations governing the said Premises.

Signed this 29th day of September, 2010

Witnessed by:

_Jacklyn Frappier_                      Jeffery S. Seltzer a/k/a Jeffrey S. Seltzer

DARLENE C. ARTER                        Dorann H. Seltzer

STATE OF CONNECTICUT          )
                             )   ss :   Simsbury   September 29, 2010
COUNTY OF HARTFORD           )

Personally Appeared JEFFERY S. SELTZER A/K/A JEFFREY S. SELTZER
Signer(s) of the foregoing Instrument, and acknowledged the same to be their free act and deed, before me

                    Notary Public / J. of Peace / Commissioner of Superior Court

                                        DARLENE C. ARTER
                                        NOTARY P
                                        MY COMMISSION EXP    5/31/04

$ CONVEYANCE TAX RECEIVED
CT$ 825.⁵    S/$ 412.⁵⁰
        Janet Carah
        ASST TOWN CLERK OF SIMSBURY CT

SCHEDULE A
DESCRIPTION

A certain piece or parcel of land with the buildings thereon, situated in Simsbury. Connecticut, being known as No. 41-43 Church Street and designated as House #41 on a map entitled, "Plan Showing Property By or To Be Acquired By Bradford E. & Gertrude B. Wilkinson Church Street Tariffville, Conn. Henry Charles Cotton Land Surveyor Stardust Drive Granby. Conn. Scale 1" = 20' Date 8-15-1967", which map is on file In the Simsbury Town Clerk's Office and being more particularly bounded and described as follows:

Northerly    by land now or formerly of John J. Brown. 132 Feet:

Easterly     by Church Street, 85 feet:

Southerly    by House #45 as shown on said map, 132.72 feet, and;

Westerly     by land now or formerly of the Estate of Arthur J. Hayes and John J. Brown. partly by each, in all. 82 feet.

Received for Record at Simsbury, CT
On 10/04/2010 At 1:52:40 pm
Carolyn D. Kelly. Town Clerk

# EXHIBIT 2

| | |
|---|---|
| **From:** | DCarpenter US Benefits <dcarpenter@usbgi.com> |
| **Sent:** | Wednesday, February 27, 2013 12:41 PM |
| **To:** | 'Bryan Reyhani' |
| **Cc:** | labelle@halloran-sage.com; tonysiano@aol.com; Paula Colbath; robinsonesq@aol.com; 'McGrath Jr., William J.' |
| **Subject:** | RE: Universitas v. Nova - Order to Show Cause with TRO on February 27, 2013 |

Bryan:

I did not "threaten" you.....I promised that I would be suing you and your firm for commercial defamation.....as well as for interference with our insurance carrier.

You are an attorney.....you know that I am represented by counsel.....yet you continue to contact me directly.....I promise you that I will be personally seeking YOUR disbarment as well as Ms. Colbath's for your unprofessional conduct to date and clearly outrageous behavior in going after non-judgment debtors not involved with the Charter Oak Trust or subject to the soon to be vacated Universitas judgment.

Please do not contact me directly ever again....and only contact my attorney Tony Siano whose email address you obviously have.

Please govern yourself accordingly before you find yourself in even more trouble.

Thanks,

Dan

---

**From:** Bryan Reyhani [mailto:bryan@rnlawfirm.com]
**Sent:** Wednesday, February 27, 2013 12:25 PM
**To:** DCarpenter US Benefits
**Cc:** Molly Carpenter; labelle@halloran-sage.com; tonysiano@aol.com; Paula Colbath; robinsonesq@aol.com
**Subject:** Re: Universitas v. Nova - Order to Show Cause with TRO on February 27, 2013

Mr. Carpenter,

We are disappointed by your inappropriate threats, and remind you that you are among those in contempt of a Court Order to disclose the whereabouts of Nova Group, Inc. and the Charter Oak Trust's assets, including the $30.7 million paid out by Lincoln National Life Insurance Company to the Charter Oak Trust regarding the Sash Spencer policies.

Also, as repeatedly set forth in Court papers, Nova Group and its principals can avoid the judgment enforcement process about which they unreasonably complain by satisfying the judgment, posting a bond for the judgment amount, or by identifying the assets that could be used to satisfy the judgment.

What you cannot do, however, is refuse to satisfy the judgment and then improperly threaten Universitas' counsel with baseless, retaliatory lawsuits when Universitas has located assets that belong to the Charter Oak Trust. Any lawsuit against Universitas' counsel would be frivolous since lawyers have an absolute privilege regarding statements made in court filings, and the TRO filings at issue simply discuss the money trail from the Charter Oak Trust to Grist Mill Capital to Moonstone. See also Kelly v. Albarino, 485 F.3d 664 (2d Cir. 2007) (discussing absolute privilege).

So you are aware, in anticipation of making a TRO application, we have ascertained from her Chambers that Judge Swain may be available to hear a TRO application tomorrow morning, February 28.

In the interim, in the interests of potentially avoiding a TRO application, we would be willing to meet and confer with you (and/or your counsel) by telephone to discuss the merits of the planned application, as well as an amicable resolution to Universitas' claim to the USAA proceeds at issue.

As part of the meet-and-confer process, we would need to immediately see the closing binder for the Rhode Island property transaction at issue, as well as a sworn affidavit, from either you or Ms. Carpenter (Moonstone's principals), addressing the following points:

- The origins of the money used to buy the Rhode Island property, including what individuals or entities had the money before it came into Moonstone's possession;
- An explanation of why money was transferred from the Charter Oak Trust to Grist Mill Capital to Moonstone Partners; and
- Any reasons you have for opposing Universitas' TRO application and Order to Show Cause.

Please let us know by no later than 3 p.m. today, February 27, whether you are available to meet and confer in an effort to avoid a TRO application. We remain ready to resolve the application and distribution of the USAA proceeds on an amicable basis.

Sincerely,

Bryan


Bryan I. Reyhani

 Reyhani
Nemirovsky LLP

200 Park Ave., FL 17 | New York, NY 10166
Direct: (212) 897-4022 | Cell: (917) 748-6580
Main: (212) 897-4030 | Fax: (212) 897-4031
bryan@rnlawfirm.com | rnlawfirm.com

On Feb 26, 2013, at 8:28 PM, DCarpenter US Benefits <dcarpenter@usbgi.com> wrote:


Bryan:

Just to let you know.......if you file this baseless action tomorrow or at any time, we will be suing you, your firm, Ms. Colbath and Loeb for a very long time to come.

Neither Moonstone, nor Molly......nor even Dan Carpenter are judgment debtors of Universitas and only the Charter Oak Trust is responsible for the payment of any death claims. Please read the Trust document for yourself. Additionally, you should know that this Friday the Second Circuit will rule that the Federal Courts do not have jurisdiction over this case, and you and Ms. Colbath will be forced to start your action over in state court.

Not that you appear to care about your professional status, but we will be filing grievance claims against you

and Ms. Colbath for your unconscionable conduct to date.

Therefore, please govern yourself accordingly. Filing this motion will be the single biggest mistake of your professional career, and since you have already commercially defamed us, you will need to apologize to us and USAA within the next 24 hours or face the consequences.

Thank you for your attention to correcting this matter immediately.

Dan

_____

From: Bryan Reyhani [bryan@rnlawfirm.com]
Sent: Tuesday, February 26, 2013 6:32 PM
To: DCarpenter US Benefits; Molly Carpenter; usaaclaims16841@usaa.com
Cc: labelle@halloran-sage.com; tonysiano@aol.com; Paula Colbath; robinsonesq@aol.com
Subject: Universitas v. Nova - Order to Show Cause with TRO on February 27, 2013

All --

Please find attached:

1. Notice re Order to Show Cause with TRO on February 27, 2013;

2. Draft Declaration of Bryan Reyhani; and

3. Draft OSC.

Yours truly,

Bryan

Bryan I. Reyhani

Confidentiality Notice:  The information in this email (including attachments, if any) is considered confidential and is intended only for the recipient(s) listed above.  Any review, use, disclosure, distribution or copying this email is prohibited except by or on behalf of the intended recipient.  If you have received this email in error, please notify me immediately by reply email, delete this email, and do not disclose its contents to anyone.

Reyhani Nemirovsky LLP Circular 230 Notice:  To ensure compliance with IRS requirements, we inform you that any U.S. federal tax advice contained in this communication is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding any federal tax penalties. Any legal advice expressed in this message is being delivered to you solely for your use in connection with the matters addressed herein and may not be relied on by any other person or entity or used for any other purpose without our prior written consent.

Confidentiality Notice: ?The information in this email (including attachments, if any) is considered confidential and is intended only for the recipient(s) listed above. ?Any review, use, disclosure, distribution or copying this email is prohibited except by or on behalf of the intended recipient. ?If you have received this email in error, please notify me immediately by reply email, delete this email, and do not disclose its contents to anyone.

Reyhani Nemirovsky LLP Circular 230 Notice: ?To ensure compliance with IRS requirements, we inform you that any U.S. federal tax advice contained in this communication is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding any federal tax penalties. Any legal advice

expressed in this message is being delivered to you solely for your use in connection with the matters addressed herein and may not be relied on by any other person or entity or used for any other purpose without our prior written consent.

# EXHIBIT
# 3

Arthur L. Porter, Jr. (ALP 2322)
Fischer Porter Masi & Thomas
A Partnership of Professional Corporations
440 Sylvan Avenue, Suite 130
Englewood Cliffs, New Jersey 07632
(201) 569 - 5959
Attorneys for Donald Israel and Mark Taylor
  Named as Creditors

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT | Return Date:   August 26, 2004 |
| SOUTHERN DISTRICT OF NEW YORK | Return Time:   2:00 p.m. |

-----------------------------------------------------------x

In re:

CONSTANCE A. CARPENTER,                         Chapter 13
                                                                      Case No. 04 - 42001 (CB)

                                            Debtor.

-----------------------------------------------------------x

To the Honorable Cornelius Blackshear:

## APPLICATION
## IN SUPPORT OF MOTION
## FOR RELIEF FROM THE AUTOMATIC STAY
## PURSUANT TO 11 U.S.C. §362 AND F.R.BANKR.P. 4001

Donald M. Israel and Mark Taylor, by and through their undersigned counsel, hereby move for relief from the automatic stay pursuant to 11 U.S.C. §362(d), Fed.R.Bank.P, 4001 and Local Bankruptcy Rule 4001-1, and in support thereof, respectfully state:

## I.  INTRODUCTION

1.       On July 7, 2004 (the "Petition Date"), the Debtor, Constance A. Carpenter ("C.Carpenter" or the "Debtor") filed a voluntary petition for relief pursuant to Chapter 13, Title 11 of the United States Code ("United States Bankruptcy Code") before this Court *pro se.*

2.       This voluntary bankruptcy filing is the latest in a series of cases commencing in 1993, and that have spanned nine (9) different state and federal trial and appellate level courts. All of these cases concern (a) liability for the conversion of money by the Debtor's brother,

1

Daniel Carpenter (hereafter "D.Carpenter"); (b) enforcement of a federal District Court

Judgment against D.Carpenter by Donald Israel and Mark Taylor (collectively referred to

hereafter as "Israel and Taylor"); and (c) an apparent never ending series of machinations and

diversions by D.Carpenter and now C.Carpenter to avoid execution sale, including the latest

gambit, a last minute transfer of D.Carpenter's Florida vacation home to his sister, C.Carpenter,

the Debtor herein.

3.     For the reasons that will be set forth herein, Israel and Taylor are entitled to relief

from the bankruptcy stay, 11 U.S.C. Section 362, pursuant to 11 U.S.C. §362(b), for cause,

including the lack of adequate protection of an interest in property, and because the Debtor does

not have any equity in the property, and because such property is not necessary to an effective

reorganization under Chapter 13.


## II.  HISTORY – UNFORTUNATELY, NOT BRIEF

4.     Israel and Taylor were D.Carpenter's business partners. In or about 1992, they

entered into a separation agreement.  In 1993, it was discovered that D.Carpenter had failed to

forward them approximately $330,000 required pursuant to the terms of their separation

agreement.  Israel and Carpenter were compelled to institute suit in Massachusetts State Court

where D.Carpenter's offices were located. Thereafter, by agreement, the action was dismissed in

Massachusetts and refiled in the New York State Courts. D.Carpenter then removed the matter to

the United States District Court for the Southern District of New York (hereafter "USDC-NY")

alleging diversity jurisdiction and the case finally went to trial in the USDC-NY.  The

USDC-NY entered a judgment in favor of Israel and Taylor and D.Carpenter appealed to the

United States Court of Appeals for the Second Circuit.  The Second Circuit Curt of Appeals

remanded the matter back to the USDC-NY for certain recalculations of interest and, finally on

September 6, 2001, final judgment was entered in favor of Israel and Taylor against D. Carpenter

as follows (a copy of the final judgment is attached hereto as **Exhibit "A"** and shall hereafter be referred to as the "Final Judgment"):

a.        In favor of Donald Israel against D.Carpenter in the amount of $338,812.95; and

b.        In favor of Mark Taylor against D.Carpenter in the amount of $152,826.31.[1]

5.        In 1988 D.Carpenter purchased a luxury ocean front two bedroom condominium, located at 1009 Captain's Court, Amelia Island Plantation, Amelia Island, Fernandina Beach, Florida 32034 (hereafter the "Condominium Property").  He has never lived there, but vacations there two or three weekends a year.[2]

6.        On May 7, 2002, the Judgment was domesticated in Nassau County, Florida, the location of the Condominium Property and became a lien on the property.  Thereafter, D.Carpenter filed a separate action in the Florida Circuit Court as permitted under the Florida Uniform Enforcement of Foreign Judgment Act, F.S. § 501 *et. seq.* challenging the domestication of the Judgment.  D.Carpenter argued that, notwithstanding the fact that he himself removed the matter from the New York State Courts to the USDC-NY, and then appealed the initial judgment entered against him to the United States Court of Appeals for the Second Circuit, that he made an "inadvertent mistake" in his removal request to the USDC-NY, and that the New York Federal Courts were retroactively without jurisdiction.  The Florida Circuit Court dismissed D.Carpenter's Complaint objecting to domestication of the Judgment based upon the doctrine of judicial estoppel.  D.Carpenter has appealed from that ruling to the Florida First District Court of Appeal.  No stay is in effect.

7.        An execution sale of the Condominium Property was scheduled to be held on May 24, 2004 pursuant to Florida law.  However, on April 14, 2004, D.Carpenter filed a

---

[1]   D.Carpenter is an unlicensed Connecticut attorney, having voluntarily relinquished his license while under investigation within the last two (2) years.  D.Carpenter is presently under indictment by the United States Attorney for the District of Massachusetts for conversion of in excess of $9 million dollars of his clients' funds. See attached **Exhibit "B"**.  The judgment of Israel and Taylor against D. Carpenter, however, evolved from different conversions and they would not be entitled to restitution as part of the pending criminal matter.

[2]As set forth in Final Judgment, Decision and Order of the Florida Circuit Court, referenced and attached hereafter.

Designation of Homestead pursuant to F.S.§ 22.02.  The Florida Constitution provides for an unlimited homestead exemption to Florida residents.  Because D.Carpenter filed a Designation of Homestead under Florida Statutes, the execution sale was automatically stayed pending further order of the Florida Court.  Israel and Taylor thereafter immediately filed a Creditors' Bill seeking to strike the Designation of Homestead and to reset the execution sale.  That matter proceeded through discovery and trial on an emergency basis in the Florida Circuit Court, which found that D.Carpenter was not a *bona fide* Florida resident entitled to claim the Florida homestead exemption.  See attached Decision and Order: (1) Granting Creditor's Bill, et.al., ***Exhibit "C."*** The property remained scheduled for execution sale on May 24, 2004.

8.      D.Carpenter's efforts to frustrate the execution sale were not allayed. Unbeknownst to Israel and Taylor, during the week before the execution sale, D.Carpenter filed *ex part*e proceedings in the United States District Court for the Middle District of Florida seeking to restrain the Florida State Court execution sale based upon a collateral estoppel theory. D.Carpenter argued that the USDC-NY finding of diversity jurisdiction was inconsistent with the Florida Circuit Court's finding that D.Carpenter was not a Florida resident.  The matter was presented *ex parte* to Chief Judge Howell W. Melton. After the fact, Israel and Taylor were advised that Judge Melton denied the *ex parte* request for a temporary restraining order based upon, *inter alia*, the fact that the 1995 uncontested decision regarding diversity in the USDC-NY was not binding upon, nor dispositive of, D.Carpenter's right to claim a Florida homestead in 2004. A copy of Judge Melton's Order is attached hereto as ***Exhibit "D."*** The sale remained scheduled for May 24, 2004.

9.      Still not to be denied, and again without providing effective notice to Israel and Carpenter, D.Carpenter filed an emergency motion to stay the execution sale in the Florida First District Court of Appeal.  He did not advise the Florida First District Court of Appeal of the denial of a similar application the day before by Judge Melton. Taking advantage of the fact that the Decision and Order: (1) Granting Creditor's Bill, et.al., ***Exhibit "C,"*** had not been entered

4

yet, this time he argued very simply that the Florida Circuit Court denied him his Florida homestead rights.  The Florida First District Court of Appeal stayed the execution sale. The appellate court also provided Israel and Taylor with an opportunity to show cause why the sale should not be stayed.  Israel and Taylor then filed the Decision and Order, and explained the full history of this matter. The next day the stay was immediately lifted. The execution sale was then rescheduled to Friday, July 9, 2004.

10.     On Thursday, July 8, 2004, D.Carpenter's counsel advised the Sheriff of Nassau County, Florida that the Condominium Property had been transferred by D.Carpenter to C.Carpenter, that C.Carpenter had filed a Petition under Chapter 13 of the United States Bankruptcy Code in New York, and that C.Carpenter had scheduled the Condominium Property in her Bankruptcy Schedules.  Accordingly, the sale was stayed pursuant to 11 U.S.C. §362.  The Florida Nassau County Sheriff has canceled the execution sale.

### III.  CAUSE FOR RELIEF FOR THE AUTOMATIC STAY

11.     11 U.S.C. Section 362 provides:

On request of a party in interest and after notice and a hearing, the Court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

(1)      for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2)     with respect to a stay of an act against property under subsection (a) of this section, if –

(A)      the debtor does not have any equity in such property; and

(B)      such property is not necessary to an effective reorganization.

5

### a. Israel and Taylor are entitled to relief from stay for cause, including lack of adequate protection of their interest in the Condominium Property.

12.     Other than bare legal title transferred from her brother; it is manifestly clear that C.Carpenter has no interest in the Condominium Property.  The property is subject to the Judgment lien domesticated in Florida effective on June 8, 2002.  The judgment is for approximately $490,000 and continues to accrue interest to date from September 6, 2001 at the federal judgment rate.  The Condominium Property is scheduled in C.Carpenter's Schedule A as having a market value of $350,000.

13.     Under Fla. Stat. §§ 55.10 and 55.507 (2004), (and under the law of every other state for that matter) a judgment duly recorded pursuant to state law becomes a lien on the non-homestead real property owned by the judgment debtor. See ***Dade Fed. Sav. & Loan Ass'n v. Miami Title & Abstract Div.***, 217 So. 2d 873, 1969 Fla. App. LEXIS 6405 (3 DCA 1969). ***Diaz v. Plumhoff***, 742 So. 2d 846, 1999 Fla. App. LEXIS 12410, 24 Fla. L. Weekly D 2140 (2 DCA 1999). The judgment lien does not "evaporate" upon the transfer of the property, with or without consideration. ***General Trading v. Yale Materials Handling Corp***. 119 F.3d 1485 (11 Cir. 1997), Cert. denied, 1998 U.S. Lexis 2270.  Indeed, even before a judgment is entered and recorded, the law of fraudulent transfers permits the avoidability of transfers made with intent to hinder, delay or defraud creditors. See also, 11 U.S.C.§ 548.

14.     In addition, C.Carpenter has wholly failed to offer or provide any adequate protection payments to Israel and Taylor.  Israel and Taylor have not received any adequate protection offer or any adequate protection payments with regard to the Condominium Property.

15.     Israel and Taylor have no knowledge of whether there is property and casualty insurance on the property, whether condominium assessments have been paid timely, whether taxes have been paid and/or whether the property is being maintained.

6

### b.  The Debtor has no equity in the property and the property is not necessary to an effective reorganization.

16.     Israel and Taylor have an informal written appraisal of the property in the amount of $450,000.  The same condominium type as the Condominium Property, in the same or adjoining buildings, have recently sold for $450,000, and are presently listed for $450,000.[3] There is a first mortgage on the property of approximately $75,000. The Judgment today is in excess of $500,000. C.Carpenter has no equity in the property. Cases establishing cause for relief from the automatic stay based upon lack of equity include *In Re 160 Bleecker Street Associates*, 156 B.R. 405, 1993 U.S. Dist. LEXIS 8272,(SDNY 1993) *In re Immenhausen Corp*., 172 BR 344 (Bank. M.D. Fla. 1994), *In re Venice-Oxford Associates, Ltd. Partnership*, 236 BR 805 (Bank. M.D. Fla. 1998), *In re New Era Co*., 125 B.R. 725  (SDNY 1991).

### c.  Lack of Good Faith

17.     Like D.Carpenter, C. Carpenter does not live at the Condominium Property. In her voluntary petition and limited pleadings, she indicates that her address is 484 West 43rd Street, Apartment 17N, New York, NY 10036.

18.     It is manifestly clear that the Debtor was persuaded to accommodate her brother's latest efforts to avoid the Judgment. In her bankruptcy schedules, she indicates that she has about $960 in the bank, $12,000 in stock, and that her only creditors other than Israel and Taylor are the IRS, New York State Income Tax, and two credit cards which appear to be current and total $4,354.76. She has appeared *Pro Se* in this matter. There is no disclosure of the non-attorney Petition preparer in the Petition. She has not filed a Chapter 13 Plan to date. She has not filed Schedules C and D, nor her Statement of Income and Expenses.

---

[3]  The Florida Circuit Court required the posting of a supersedious bond in the amount of $450,000 to stay the execution pending appeal of the Decision and Order Granting Creditor's Bill, based on the value of the property. The Bond was not posted and D.Carpenter has dismissed his appeal of the Decision and Order Granting Creditor's Bill.

19.    There is ample cause to grant relief from the automatic stay in this case based
upon the obvious series of acts oriented to frustrate execution sale without justification or basis.
See *In re Grieshop* 63 BR 657(ND Ind 1986)( Lack of good faith is cause for lifting stay or for
dismissal of petition. In determining whether good faith exists, court must consider all facts and
circumstances; bad faith may exist where debtor has few or no unsecured creditors; prepetition
conduct of debtor has been improper; petition effectively allows debtor to evade court orders;
there are few debts to non-moving creditors; petition was filed on eve of foreclosure; foreclosed
property is sole or major asset of debtor; there is no possibility of reorganization; debtor's
income is not sufficient to operate; there is no pressure from non-moving creditors;
reorganization essentially involves resolution of two-party dispute; debtor received title to its
major asset immediately before petition was filed; debtor filed solely to create automatic stay.);
*Duggan v Highland-First Ave. Corp.* 25 BR 955 (BC CD Cal 1982) (Manifest bad faith of
debtor in instituting Chapter 11 case is ample grounds to vacate automatic stay for cause under
11 USCS § 362(d)(1).); *In re Ashton* 63 BR 244, 15 CBC2d 821 (BC DC ND 1986) (Cause for
relief from stay may include, in addition to lack of adequate protection, element of bad faith on
part of Chapter 13 debtor as well as flawed Chapter 13 plan, even though there has been no
confirmation hearing on plan; court need not wait until confirmation to consider motives for
filing petition or merits of proposed plan.); *In re Kornhauser,* 184 BR 425 (Bank'y SDNY
1995). (Bad faith filing of bankruptcy petition constitutes "cause" for relief from automatic stay
under 11 USCS § 362(d)(1).); *In re Nelson* (Relief from stay for cause will be granted to
mortgagee due to Chapter 13 debtor's bad faith where subject property was transferred to
Chapter 13 debtor in close proximity to her filing and debtor has failed to rebut prima facie
showing of bad faith that has consequently arisen; debtor has failed to demonstrate that her
successful reorganization is more likely now than it was prior to transfer.)

8

### III. CONCLUSION

20.    For the reasons set forth hereinabove, Israel and Taylor request an Order Granting

Relief from the bankruptcy automatic stay, 11 USC § 362(d), and any other relief that the Court

deems appropriate in the premises.

Dated:        July 28, 2004

                                FISCHER PORTER MASI & THOMAS
                                A Partnership of Professional Corporations


                        By:    _____
                                Arthur L. Porter, Jr. (ALP 2322)
                                Attorneys for Donald Israel and Mark Taylor
                                  Named as Creditors


L:\WP\ISRAEL\CONSTANCE\362\362APP

# EXHIBIT
# 4

NOTICE OF SHERIFF'S SALE
NOTICE IS HEREBY GIVEN That pursuant to a Writ of Execution issued in the Circuit
Court of Nassau County, Florida on the 2nd day of April, 2004, in the cause wherein
DONALD M. ISRAEL and MARK T. TAYLOR are Plaintiffs and DANIEL E.
CARPENTER, BENEFITS CONCEPTS OF NEW YORK, INC. and VOLUNTARY
BENEFITS SYSTEMS, INC., are defendants, being Case No. 02-132-CA in said Court.
I, W.R. "RAY" GEIGER, as Sheriff of Nassau County, Florida, have levied upon all the
right, title and interest of the above named defendant, DANIEL E. CARPENTER, in and
to the following described property, lying and situated in Nassau County, Florida, to-wit:
That certain condominium parcel located in Nassau County, Florida, composed of VILLA
UNIT NUMBER 1009, and an undivided share in those common elements appurtenant
thereto, as specified in, described in and subject to the covenants, conditions,
restrictions, terms and other provisions of that Declaration of Condominium for
CAPTAIN'S COURT VILLAS, A CONDOMINIUM, made by sponsor, Amelia Island
Company, a Delaware corporation qualified to conduct business in Florida, pursuant to
Chapter 711 of the Florida Statutes, which is recorded in the public records of Nassau
County, Florida, in Official Records Book 177, page 607, said Declaration of
Condominium being made a part hereof by specific reference.
On the 28th day of December, 2004, at the FRONT DOOR OF THE PATROL
HEADQUARTERS OF THE NASSAU COUNTY DETENTION FACILITY, located at
76001 BOBBY MOORE CIRCLE, in the City of Yulee, Nassau County, Florida, at the
hour of 1:00 p.m., or as soon possible thereafter, I will offer for sale all the defendant's
right, title and interest in said property at public outcry and will sell the same, subject to
all prior liens, encumbrances and judgments, if any, to the highest and best bidder or
bidders for CASH, the proceeds to be applied as far as may be to the payment of costs
and the satisfaction of the above described executions.
W.R. "RAY" GEIGER, AS SHERIFF
OF NASSAU COUNTY, FLORIDA
IN ACCORDANCE WITH THE AMERICANS WITH DISABILITIES ACT, PERSONS
WITH DISABILITIES ONLY NEEDING SPECIAL ACCOMMODATION TO
PARTICIPATE IN THIS PROCEEDING SHOULD CONTACT THE NASSAU COUNTY
SHERIFF'S OFFICE, 50 BOBBY MOORE CIRCLE, YULEE, FLORIDA 32097, (904)
225-0331, NOT LATER THAN SEVEN (7) DAYS PRIOR TO THE PROCEEDING. IF
HEARING IMPAIRED, PLEASE CONTACT (TDD) 1-800-955-8771, OR VOICE (V) 1-
800-955-8770, VIA FLORIDA RELAY SERVICE.
4t 12-01-08-15-22-2004
3948



Print Window | Close Window

Document 2 of 5
## *** THIS DATA IS FOR INFORMATION PURPOSES ONLY ***

### PROPERTY TRANSFER RECORD FOR NASSAU COUNTY, FL

**Buyer:** CARPENTER, CONSTANCE A (Individual(s))

**Buyer Mailing Address:** PO BOX 8087, **AMELIA ISLAND,** FL 32034

**Seller:** CARPENTER, DANIEL E

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND,** FL 32034

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **SALES INFORMATION** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Sale Date:** 5/20/2004

**Recorded Date:** 5/21/2004

County Transfer Tax: $ 0.70

**Book/Page:** 1232/615

**Document Number:** 200417838

**Deed Type:** INTRA-FAMILY TRANSACTION

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS; RECORDER'S MAP REFERENCE: OR177 PG607

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **PROPERTY DESCRIPTION** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Land Use:** CONDOMINIUM



Print Window | Close Window

Document 24 of 40

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

**CERTIFICATION CAN ONLY BE OBTAINED THROUGH THE ISSUING GOVERNMENT AGENCY**

FLORIDA DEPARTMENT OF STATE

**Company Name: NTS PROPERTIES,** INC.

**Mailing Address:**
1009 CAPTAIN'S COURT
FERNANDINA BEACH, FL 32034

**Type:** DOMESTIC FOR PROFIT

**Status:** ACTIVE

**Filing Date:** 8/25/2004

**State or Country of Incorporation:** FLORIDA

**Registered Agent:** CORPORATION SERVICE COMPANY

**Registered Office:**
1201 HAYS STREET
TALLAHASSEE, FL 32301

**Federal Employer ID Number:** 201550065

**Filing Number:** P04000123000

**Officers, Directors:**
CONSTANCE A CARPENTER
DIRECTOR
1009 CAPTAIN'S COURT
FERNANDINA BEACH, FL 32034

 **LexisNexis** *Print Delivery*

Print Window | Close Window

Document 5 of 5
**\*\*\* THIS DATA IS FOR INFORMATION PURPOSES ONLY \*\*\***

**PROPERTY TRANSFER RECORD FOR** NASSAU COUNTY, **FL**

**Buyer:** NTS PROPERTIES INC (Company/Corporation)

**Buyer Mailing Address: 1009 CAPTAINS CT, AMELIA ISLAND, FL 32034**

**Seller:** CARPENTER, CONSTANCE A

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND, FL 32034**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* SALES INFORMATION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Sale Date:** 9/23/2004

**Recorded Date:** 9/24/2004

**Book/Page:** 1261/1251

**Document Number:** 200432553

**Deed Type:** WARRANTY DEED

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS; RECORDER'S MAP REFERENCE: OR177 PG607

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* PROPERTY DESCRIPTION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Land Use:** CONDOMINIUM



Print Window | Close Window

Document 1 of 5
**\*\*\* THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY \*\*\***

**MORTGAGE RECORD FOR** NASSAU COUNTY, **FL**

**Borrower(s):** CARPENTER, CONSTANCE A

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND,** FL **32034**

**Property Use:** CONDOMINIUM UNIT

**\*\*\*\*\*\*\*\*\*\* RECORDER'S INFORMATION \*\*\*\*\*\*\*\*\*\***

**Recording Date:** 9/24/2004

**Book/Page:** 1261/1249

**Document Number:** 200432552

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS

**\*\*\*\*\*\*\*\*\*\* MORTGAGE INFORMATION \*\*\*\*\*\*\*\*\*\***

**Mortgage Type:** NON-PURCHASE MONEY

**Lender:** BENEFIT CONCEPTS NEW YORK INC

**Lender Type:** OTHER (COMPANY OR CORP.)

**Loan Amount:** $ 100,000

**Loan Type:** UNDETERMINED

**\*\*\*\*\*\*\*\*\*\* GEOGRAPHICAL INFORMATION \*\*\*\*\*\*\*\*\*\***

**MSA:** Jacksonville, FL MSA (3600)
Nassau County, Florida (FIPS=12089)
(360012089)



Print Window | Close Window

Document 4 of 5
**\*\*\* THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY \*\*\***

**MORTGAGE RECORD FOR** NASSAU COUNTY, **FL**

**Borrower(s):** NTS PROPERTIES INC (Company/Corporation)

**Property Address: 1009 CAPTAINS CT, AMELIA ISLAND,** FL **32034**

**Property Use:** CONDOMINIUM UNIT

**\*\*\*\*\*\*\*\*\*\* RECORDER'S INFORMATION \*\*\*\*\*\*\*\*\*\***

**Recording Date:** 12/23/2004

**Book/Page:** 1283/957

**Document Number:** 200443417

**Assessor's Parcel Number:** 01-6N-29-V14A-1009-0000

**Legal Description:** UNIT: 1009; SUBDIVISION: CAPTAINS COURT VILLAS

**\*\*\*\*\*\*\*\*\*\* MORTGAGE INFORMATION \*\*\*\*\*\*\*\*\*\***

**Mortgage Type:** NON-PURCHASE MONEY

**Lender:** BENEFIT CONCEPTS NEW YORK INC

**Lender Type:** OTHER (COMPANY OR CORP.)

**Loan Amount:** $ 500,000

**Loan Type:** UNDETERMINED

**\*\*\*\*\*\*\*\*\*\* GEOGRAPHICAL INFORMATION \*\*\*\*\*\*\*\*\*\***

**MSA:** Jacksonville, FL MSA (3600)
    Nassau County, Florida (FIPS=12089)
    (360012089)

# EXHIBIT
# 5

# ANTHONY J. SIANO, ESQ., PLLC

A PROFESSIONAL CORPORATION

333 WESTCHESTER AVENUE - SUITE 302

WHITE PLAINS, NEW YORK 10604

———

(914) 997-0100

FAX (914) 997-4179

ANTHONY J. SIANO

February 4, 2014

Michael Barnett, Esq.
Loeb & Loeb
345 Park Avenue
New York, New York 10154

Dear Mr. Barnett:

The following payments have been made on behalf of Mr. Carpenter.

| DATE | PAYEE | AMOUNT |
|------|-------|--------|
| 1/30/14 | AMERICAN EXPRESS | $4,517.74 |
| 1/30/14 | AMERICAN EXPRESS | $4,560.89 |
| 1/30/14 | AAA | $108.00 |
| 1/30/14 | BUTLER COMPANY | $6,707.00 |
| 1/30/14 | BUTLER COMPANY | $223.34 |
| 1/30/14 | BUTLER COMPANY | $941.19 |
| 1/30/14 | BUTLER COMPANY | $531.75 |
| 1/30/14 | BUTLER COMPANY | $531.75 |
| 1/30/14 | GALLET, DREYER & BERKEY, LLP | $450.00 |
| TOTAL: | | **$18,571.66** |

All payments were made from Carpenter Financial Group. No payments were made for Mr. Carpenter from any other source.

Very truly yours,

Anthony J. Siano, Esq.

# EXHIBIT 6

**3:14-mc-00125-RNC** Universitas Education, LLC v. Nova Group, Inc
Robert N. Chatigny, presiding
**Date filed:** 11/06/2014
**Date of last filing:** 11/13/2020

# Parties

**Carpenter Financial Group, Inc**
18 Pond Side Lane
West Simsbury, CT 06092
*Added: 11/13/2020*
*(Interested Party)*

represented by

**Grayson Colt Holmes**
Ouellette, Deganis, Gallagher and Grippe
143 Main Street
Cheshire, CT 06410
203-272-1157
203-250-1835 (fax)
gholmes@odglaw.com
*Assigned: 11/13/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grist Mill Partners, LLC**
*Added: 01/27/2016*
*(Interested Party)*

represented by

**Dan E. LaBelle**
Halloran & Sage
315 Post Rd. West
Westport, CT 06880
203-227-2855
labelle@halloran-sage.com
*Assigned: 01/27/2016*
*ATTORNEY TO BE NOTICED*

**Nova Group, Inc**
*Added: 11/06/2014*
*(Respondent)*

**Universitas Education, LLC**
*Added: 11/06/2014*

represented by

**Paula Kae Colbath**

# EXHIBIT 7

U.S. District Court
District of Connecticut
FILED AT NEW HAVEN

October 21 ,20 20

By Y. Gutierrez
Deputy Clerk

October 15, 2020

The Honorable Jeffrey A. Meyer
United States District Court Judge
Richard C. Lee United States Courthouse
141 Church Street
New Haven, CT 06510

*Re: Disbarment Referral for Attorneys Ilan Markus and Michael Caldwell*

Dear Judge Meyer:

I am not a party to the action entitled *Universitas v. Benistar, et al.*, Case No. 3:20-cv-00738, nor am I personally represented by counsel, and I have not been served as the Trustee of the named Defendant Trusts in this matter as required by Rule 4 of the Federal Rules of Civil Procedure. Therefore, it came as a shock to me that Attorneys Ilan Markus and Michael Caldwell would start their latest filing in the above-captioned case with: "Daniel Carpenter controls a criminal enterprise (hereinafter "Benistar"), that stole $30.6 million from Universitas. *See United States v. Carpenter*, 190 F.Supp.3d 260 (D. Conn. 2016)." See Dkt. 99 attached as Exhibit 1.

Not only is this libel *per se* as they are accusing me of a crime, it is extremely ironic that the Money Laundering Counts of my indictment in the Connecticut case are based on the fact that the proceeds Universitas accuses me of stealing are actually the "proceeds of fraud" from a life insurance application that I did not fill out, sign, or send in. Not only do I still contend that am I innocent of any theft, the insurance proceeds that Universitas keeps accusing me of stealing have been determined by this Court (the Honorable Robert N. Chatigny) to be the proceeds of fraud. So, not only did I not "steal" these proceeds, the Second Circuit has affirmed Judge Chatigny's determination that the proceeds were the result of a fraud perpetrated against Lincoln by Sash Spencer, his broker Bruce Mactas, and even the principals of Universitas (as will be discussed later). Suffice it to say, Sash Spencer was a billionaire who did not contribute any money to the

1

Charter Oak Trust to pay for the policies, and his widow Mary Spencer did not know anything about the $30 million of insurance on his life.

But, for the purposes of this request for Your Honor to recommend these two attorneys to the Bar Association for disbarment, anyone doing even a cursory search on Google or PACER would see that I have been under a constant state of investigation by the USDOJ, the FBI, the IRS, and the DOL since 2001 after I lost $8 million of client funds in the NASDAQ stock market crash of 2000 (The Dotcom Bubble). I was indicted in 2004 in Boston despite doing all of my trading in Connecticut and Manhattan, and then suffered through two trials in Boston in 2005 and 2008, and had two jury guilty verdicts overturned for egregious prosecutorial misconduct. In November 2013, my Second New Trial Order was overturned by the First Circuit and the Honorable Judge George A. O'Toole sentenced me in 2014 to 36 months based on the size of the alleged loss. Ironically, in that case, my alleged victims have now received about $50 million on their $8 million loss based on my legal victories over PaineWebber and Merrill Lynch, which I paid over to the Exchangors. Universitas actually "extorted" $900,000 from the Exchangors from one of those settlements while I was in prison, and I have since been released by the Exchangors, and even forgiven by some, for which I am eternally grateful.

Suffice it to say, I appear to be the only person in recent history to have current appeals pending before the First Circuit, Second Circuit, and the Supreme Court at the same time. It is very easy to Google my cases or read the dockets on PACER. But, if I really did run a "criminal enterprise," the FBI, SEC, IRS, and DOL would have found it by now. Benistar is 100% owned by its employees through an Employee Stock Ownership Plan (ESOP), and neither my Wife nor I own any stock in Benistar. Therefore, accusing my Wife, Daughter, or my Sister of fraud or being

2

an "alter ego" is not just absurd, it is defamation *per se*, and as Your Honor knows, the litigation privilege does not extend to protect attorneys of frivolous and vexatious filings.

Attorneys Markus and Caldwell do not just accuse me of theft in the vexatious motion, they accuse me of running a criminal enterprise. The allegedly false Sash Spencer applications were filled out and submitted to Lincoln in 2006. The Charter Oak Trust paid for the policies in 2007 with money from my company, Grist Mill Capital, LLC, and Sash Spencer died in 2008. Wayne Bursey, the Administrative Trustee of the Charter Oak Trust, had to sue Lincoln in 2009 to collect those proceeds. Eventually Lincoln paid the $30 million death benefit to the Trust, which in turn paid the proceeds to Grist Mill Capital. Contrary to Attorney Caldwell's lies, the beneficiary of the Sash Spencer policies was Grist Mill Capital, LLC, the company that supplied all of the premium payments. See the Beneficiary Form signed by Sash Spencer attached as Exhibit 2.

The Charter Oak Trust denied the Universitas claim for several reasons, not the least of which was that Universitas actually had an agreement with Mary Spencer to disclaim all payments from the Trust in exchange for a $5 million payment from **her** and not the Trust. See Agreement by and between Mary Spencer and Universitas as Exhibit 3. Following that denial came a long and drawn-out arbitration process, but for the purposes of these spurious and scurrilous allegations, Universitas voluntarily dismissed Grist Mill Capital **before** the Arbitration began (see Exhibit 4), and then proceeded to dismiss me after the Arbitration was over (see Exhibit 5).The reasons for this is discussed in detail in a motion before Judge Thompson eight years ago in 2012. See Motion to Dismiss attached as Exhibit 6.

Once again, this Exhibit shows that Mary Spencer did not know anything about these policies, and the policies were meant to be sold by Lincoln's broker, Bruce Mactas, to secretly pay Sash Spencer's mistress who ran the bogus "charity" known as Universitas. See Exhibit 6, page 2,

FN 1. For the purposes of *res judicata* or waiver and laches, this most recent claim by Universitas is fatally late and untimely. In fact, Universitas filed a charging order with Judge Chatigny against Carpenter Financial Group in October of 2015. See Exhibit 7. Despite the fact that I was in prison at the time, there was no mention of running a "criminal enterprise" in those filings.

But, if I truly "stole" the money, what was the basis for Universitas to go after the Charter Oak Trust's Insurance Trustee, Christiana Bank in 2015? Judge Vanessa Bryant does an excellent job of describing the history of this case in her decision in *WSFS v. Universitas*, which is attached as Exhibit 8. The original action was brought in 2015 and Judge Bryant denied reconsideration in March of 2017. WSFS, who bought Christiana Bank, settled the Universitas claim in February 2018 for $12 million. See Press Release attached as Exhibit 9. Once again, why is WSFS/Christiana Bank paying anything if I "stole" the money, and why is Universitas entitled to the "proceeds of fraud" 11 years after Lincoln begrudgingly paid the death benefits to the Charter Oak Trust and then the Trust paid the primary beneficiary of the policies listed on the Beneficiary Form that Sash Spencer himself signed, Grist Mill Capital, after Universitas had disclaimed all of the proceeds from the Trust in favor of Mary Spencer?

What makes the Markus-Caldwell filing even more egregious and offensive is that my offices were raided by the IRS-CID in April 2010 and the DOL in May of 2011. In the first raid, over 300 boxes were taken, and in the second raid, 200 boxes were taken. Both the Rule 41(g) motions and the *Bivens* actions are still *sub judice* in this Court in front of different judges, but the underlying investigations have been closed. The IRS investigation that was the basis of the April 20, 2010 raid was closed on June 9, 2016. The DOL investigation that was the subject of the May 26, 2011 raid was just closed in September 2020 by the Government in a letter sent to my attorney

in Washington, Jim Cole, the former Attorney General under President Obama and who has been representing me since he left the Government in 2017.

Moreover, as I recently filed in a new appeal in the First Circuit, a Massachusetts Judge recently determined that everyone at Merrill Lynch that testified at both of my trials lied in SEC investigations that I never heard about and which happened in 2001 and 2002, but which I obviously passed. That means I have been under a *virtually continuous* state of investigation by various agencies of the Government since 2001. I have endured multiple raids and investigations, three trials and numerous appeals, and yet none of these federal investigations have accused me of "stealing" anything, or running a criminal organization; and the Government has certainly not proven that I lied to anyone about anything at any time. Instead, my alleged crimes are ones of "nondisclosure," i.e. allegedly "what I did not tell" the Exchangors in Boston or the insurance carriers in Connecticut. However, as Your Honor knows, in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court stated that for there to be fraud, "the victim's loss of money or property suppl[ied] the mirror image of defendant's gain," and omissions and nondisclosures are "outside the bounds" of the fraud statutes." *Id.* at 400, 410.

For that reason, I am confident that I will eventually be exonerated, if not vindicated, in both cases. But, even if I am exonerated and victorious in the Courts of Appeals or the Supreme Court, I will still be branded by the lies and libel *per se* of Attorneys Markus and Caldwell for years to come. Litigating parties say all sorts of slanderous things in the heat of litigation, but the words of an attorney should be held to a higher standard because they necessarily carry more weight than the rantings of litigants in heated discussions. Although I am not a practicing lawyer, I graduated from law school and was a member of the Connecticut Bar until I resigned because of my legal difficulties. I am not a party to the current lawsuit, so I cannot ask for Rule 11 sanctions

or even Rule 1927 sanctions, but as an aggrieved innocent party, I can ask this Court to utilize Your Honor's inherent powers to sanction Officers of the Court when they happen to not govern themselves in a proper or appropriate manner. There is no doubt in my mind that if I had accused Universitas of being a criminal enterprise, I would have been sanctioned.

Therefore, I respectfully ask this Court to sanction Attorney Caldwell and Attorney Markus, strike their frivolous and vexatious filings, and dismiss their motions with prejudice under the Doctrines of Waiver and Laches and Res Judicata, and grant any other relief this Court deems just and proper.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

6

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

------------------------------------------------------

| | | |
|---|---|---|
| **UNIVERSITAS EDUCATION, LLC,** | : | |
| **Plaintiff,** | : | **Case No. 20-cv-00738-JAM** |
| | : | |
| **-against** | : | |
| | : | |
| **BENISTAR, et al.,** | : | **November 12, 2020** |
| **Defendants.** | : | |

------------------------------------------------------

**REPLY IN SUPPORT OF SANCTIONS**
**AGAINST ATTORNEYS MARKUS AND CALDWELL**

Great thanks and hopeful gratitude to the Court for posting the Complaint against Attorneys Markus and Caldwell. Once again, as they have done for 12 years since Sash Spencer's untimely death, the various attorneys for Universitas continue to make baseless accusations against Mr. Carpenter's family and associates in an effort to hide their own crimes. Make no mistake, Attorneys Markus and Caldwell should be investigated and disbarred for aiding and abetting Attorneys Manson and Chernow in their attempts to defraud the two women that run Universitas.

As the Court is well aware, all of the current claims made by new counsel for Universitas are barred by the Statute of Limitations under ERISA, the Doctrine of *Res Judicata*, Waiver and Laches, and the lack of subject matter jurisdiction as described by Judge Swain herself in citing *Peacock v. Thomas*, 516 U.S. 349 (1996). See Exhibit One. The only reason for Universitas to continue making these frivolous and vexatious claims that are clearly sanctionable under Rule 11 and Rule 1927, is to over-charge and plunder the $4 million remaining in Attorney Manson's Attorney Trust Account after he already took $4 million off-the-top from the WSFS settlement involving Christiana Bank, which was the Insurance Trustee for the Charter Oak Trust. See Attorney Manson's Motion for Interpleader attached as Exhibit Two.

The only way that the attorneys for Universitas can hide their crimes is to use the age-old "Orwellian" tactic of making Mr. Carpenter the ultimate villain, and to accuse him of being the "thief" while it is they who are plundering the accounts of the clueless and defenseless ladies of Universitas by filing baseless and meritless claims that have no hope of recovery in courts across the nation, including this Court. In their Response, Attorneys Markus and Caldwell miss the mark. Contrary to their claims, they are not being sued for defamation, but rather they are being accused of conduct unbecoming of an attorney and an officer of this Court. In this regard, the Second Circuit's conclusion in its recent decision in *Brown v. Maxwell*, 929 F.3d 41 (2d Cir. 2019) is very instructive:

> "District courts should exercise the full range of their substantial powers to ensure their files do not become vehicles for defamation." *Brown* at 53.

To be clear, not only are Attorneys Markus and Caldwell defaming Mr. Carpenter, his Wife, his Daughter, and his Sister and the company Benistar – which is wholly owned by its employees through an Employee Stock Ownership Plan – they are also engaged in a conspiracy to use mailings and wires to deprive the principals of Universitas from the $19 million they have received in settlement payments from various entities. Attached as Exhibit Three is Government Exhibit 2225 in Mr. Carpenter's own handwriting from May of 2009 showing his calculation of being willing to pay $19,800,000 to Universitas literally two weeks after the Sash Spencer insurance proceeds had been received by the Charter Oak Trust. These emails were unlawfully seized from Mr. Carpenter's office and computer in violation of the Fourth Amendment, and were used against him in his trial in front of Judge Chatigny in violation of the Fifth Amendment. But, as can be clearly seen, as of May 2009, Mr. Carpenter had the intent to pay Universitas $19,800,000 and that is certainly not the action or intent of a "thief," as everyone knows that his company Grist Mill Capital was the intended beneficiary of the insurance proceeds. See the Sash Spencer

Beneficiary Designation Form signed by Sash Spencer himself attached as Exhibit Four. Similarly, attached as Exhibit Five is the dismissal by Universitas of Grist Mill Capital before the Arbitration began. Also, attached as Exhibit Six is the dismissal of Mr. Carpenter after the Arbitration was over.

So, clearly, based on the ERISA three years Statute of Limitations and the requirement of establishing separate jurisdiction under *Peacock v. Thomas*, none of these claims brought by Universitas and their attorneys have any merit, so the question is why do they keep bringing these baseless actions? The simple reason is that Sharon Siebert and her partner Donna Vassar are being lied to by their attorneys and convinced to file these baseless actions against Mr. Carpenter when it is clear they have no hope of winning, and instead just keep draining the money from Attorney Manson's Attorney Trust Account. As evidence of this, please see attached as Exhibit Seven the Affidavit of Sharon Siebert from September 6, 2019 in another obviously baseless action against the Estate of Jack Robinson. Attorney Robinson died in 2017, and in September 2019 Ms. Siebert is saying under oath that Universitas has only received $4,703,621.64 million. See paragraph 18. In paragraph 17, she said she has spent more than $10 million on attorney's fees. While we will not accuse Ms. Siebert of outright perjury because the affidavit was probably drafted by her attorneys, it is very clear that, in addition to the $12 million they have received from WSFS, they received another $4,487,007.81 on or about June 19, 2018 from the Grist Mill Trust (see Exhibit Nine); $900,333.61 from BPETCO (see Exhibit Ten); and over $500,000 from USAA (see Exhibits Eleven and Twelve).

All told, Universitas has collected well over $19 million, so pursuant to the "One Satisfaction Rule" of the Second Circuit, there is no one they are suing now in the present action before this Court that they could collect from anyway. *See, e.g., Gerber v. MTC Elec. Techs. Co.,*

*Ltd.*, 329 F.3d 297, 303 (2d Cir. 2003) (*citing Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989)). *See, also, In re Facebook, Inc.*, 674 F. App'x 37, 39-40 (2d Cir. 2016). Therefore, the reason for these baseless filings that have no hope of recovery is that Attorneys Manson and Chernow can feed off the WSFS trough from Attorney Manson's Attorney Trust Account, where they have already siphoned off $8 million and are continuing to siphon through this action.

Once again, if we take a look at the Siebert Affidavit paragraph 13, she says that she knew that the Charter Oak Trust ("COT") was amended in January 2007 so that 20% of the death proceeds could be withheld by the COT. That means another $6 million that must come off of the judgment, but that is not the point of this Reply. The point is to show that in the Government Exhibit 2225, Mr. Carpenter puts in writing the 80% rule of Section 6.01; the very section that Sharon Siebert cites in her Affidavit of September 2019 in paragraph 13 - ten years after Mr. Carpenter hand-wrote the calculations of the Sash Spencer proceeds and notated them as the "amount to pay to Universitas." Cleary, this is not the writing and intention of a thief, but rather someone involved in the administration of an ERISA Welfare Benefit Trust. So, why is it that Universitas was never satisfied with that $19 million and instead has wasted the better part of 12 years on fruitless litigation where their attorneys have profited while they have collected nothing according to Ms. Siebert's Affidavit? Clearly this Court should be considering not just disbarment proceedings, but it should also order an investigation and full audit and accounting of Attorney Manson's Attorney Trust Account and all of the fees paid to Attorneys Markus and Caldwell, because they are not performing legal services; they are participating in a Mail and Wire Fraud Conspiracy pursuant to 18 US.C. §1349 to defraud the principals of Universitas.

Respectfully speaking, since Mr. Carpenter has been indicted four separate times in the past 20 years for alleged mail and wire fraud, he can state as an expert that what Attorneys Markus,

Caldwell, Manson, and Chernow have done is far worse than anything Mr. Carpenter has been accused of doing in his Boston or Connecticut cases, both of which are still on appeal. The reason that this is obvious, is that the Widow Mary Spencer never knew anything about these death proceeds or the insurance proceeds being paid out, and it was only afterwards that Mr. Carpenter learned why this was the case. See Motion to Dismiss filed in front of Judge Thompson eight years ago attached as Exhibit Thirteen, which stated in FN1 on page 2:

> Universitas and its affiliate Destination Universitas Foundation both comprise a sham and now defunct charity, as Universitas has recently admitted that Destination Universitas lost its 501(c)(3) federal tax exempt status. Universitas is headed by the former mistress of decedent S.A. "Sash" Spencer, a successful hedge fund manager who died unexpectedly in June 2008 at the time that he was a participant in the Charter Oak Trust. When Mr. Spencer's widow, Mary Spencer, discovered that a "charity" operated by her late husband's mistress was slated to split a substantial death benefit with Mr. Spencer's former employer Holding Capital Group, Inc. ("Holding Capital"), Mary Spencer threatened to sue Universitas, the former mistress, and Holding Capital. As a result, Mrs. Spencer, Universitas and Holding Capital negotiated a settlement agreement in July 2008 that they requested the Charter Oak Trust to sign whereby Mary Spencer would receive the entire death benefit in return for making a comparatively small "charitable contribution" to Universitas.

It wasn't until after the insurance proceeds were paid in 2009 and 2010 that Mr. Carpenter discovered there was an agreement between the Widow and Universitas, where Universitas would give up all claims to the $30 million in exchange for a "charitable" gift from Mary Spencer in the amount of $5 million. See Exhibit Fourteen. The important thing about this agreements is that Mrs. Spencer was questioning if Universitas had any right to the proceeds, and her attorneys threatened Wayne Bursey and Jack Robinson that they would be sued if even one dime was paid to the "two floozies" – those were the words of the attorneys for Mary Spencer, and not Wayne Bursey or Jack Robinson. Unfortunately, Mr. Bursey died in 2015 and could not speak in defense of Mr. Carpenter at Mr. Carpenter's trial, and Mr. Robinson died in 2017 and could not speak in Mr. Carpenter's defense at his sentencing. Interestingly enough, the Government does have copies of the emails

sent from Mr. Bursey and Mr. Robinson discussing meetings with attorneys for Spencer, so it is very clear that Mr. Spencer never expected to die in 2008, and the attorneys for Mary Spencer put pressure on Universitas to give up its claim on the funds in July 2008.

Now that we are in November of 2020, which is 12 years after the death of Sash Spencer and 12 years after Universitas made a deal with Mary Spencer, and a year after Ms. Siebert said she knew the Charter Oak Trust document was amended in January 2007, it is positively outrageous that Attorneys Markus and Caldwell are calling Mr. Carpenter a criminal, thief, and liar, when it is they who are defrauding their unsuspecting client into thinking that it's ok for the attorneys to collect $15 million and leave the client with only $4 million. So, who are the real criminals here? Once again, the Second Circuit's ruling in *Brown* is instructive, because not only does the Second Circuit quote Justice Sotomayor in her law review article (*Returning Majesty to the Law and Politics: A Modern Approach*, 30 Suffolk U. L. Rev. 35, 47 n.52 (1996) discussing the fact that courts should be aware of perjurious statements in filings, it goes on to state:

> "While common law courts have generally interpreted the litigation privilege broadly, they nevertheless maintain an important (if rarely implemented) limitation on its scope: to qualify for the privilege, a statement must be "material and pertinent to the questions involved." *Front*, 24 N.Y.3d at 718 (*quoting Youmans v. Smith*, 153 N.Y. 214, 219-20 (1897)). It follows, then, that immaterial and impertinent statements are (at least nominally) actionable, particularly when they are "so needlessly defamatory as to warrant the inference of express malice." *Id.* (same). It seems to us that when a district court strikes statements from the record pursuant to Fed.R.Civ.P. 12(f) on the ground that the matter is "impertinent" and "immaterial," it makes the very same determination that permits a defamation action under the common law. We think the judicial system would be well served were our common law courts to revitalize this crucial qualification to the litigation privilege." *Brown* at 53, FN47.

They go on to state that the defamation claims against the attorneys can go forward because it has been the rule for over 100 years that if you say something that is defamatory, it must be pertinent and material to the matters at hand. So, assuming Mr. Carpenter really was the head of a notorious crime family, which the Government has never alleged in the 20 years he has been under

investigation and supervised release, not only is that defamation *per se*, it is not pertinent or material to the case at hand. The key here is that Mr. Carpenter does not need to sue either Universitas or Attorneys Markus and Caldwell, even though he could under *Brown*, it is a much more fitting punishment that this court send this case to the Connecticut Bar Grievance Committee, and also send a copy of the order to the US attorney's office so they may investigate Attorneys Markus, Caldwell, Manson, and Chernow for mail and wire fraud crimes against their client Universitas. Since we know that every filing they have done in the last six years is time-barred and fraudulent, that means the massive bills they have charged Universitas and Universitas has paid as the client are equally fraudulent and deserving of punishment.

Therefore Mr. Carpenter respectfully requests that this Court order a full accounting and investigation, and grant any other penalties and sanctions against Attorneys Markus and Caldwell that this Court deems proper and appropriate including a referral for disbarment and a referral to the Department of Justice.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

# EXHIBIT
# 9

DANIEL E. CARPENTER
18 PONDSIDE LANE
WEST SIMSBURY, CT 06092

June 13, 2014

Honorable Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007



**RECEIVED**

JUN 19 2014

CHAMBERS OF
LAURA TAYLOR SWAIN
U.S.D.J.

   **Re: Please Remove Carpenter Injunction**

Dear Judge Swain:

   Next week I am scheduled to report to prison for a non-crime, that I certainly did not

commit fourteen years ago because I allegedly did not tell people that I never met how their

funds would be invested.  The reason?  Simply because the prosecutors in Boston have used

**<u>your</u>** negative words about me in two opinions to convince Judge O'Toole in Boston to revoke

my bail pending appeal because I am a "danger to society" simply because counsel for

Universitas has falsely accused me of effectively stealing life insurance proceeds from their

specious charity.  So that I may properly defend myself, I would respectfully beseech the Court

to immediately do three things:

  1. Please amend and reissue the Court's orders without the negative language about me,

   which is both unwarranted and based on false statements and misrepresentations

   given to the Court by Counsel for Universitas.

  2. Please rescind and revoke the letter order to Attorney Pastore dated March 12, 2014,

   holding up payment of the Merrill Lynch settlement proceeds, because Attorney

Honorable Laura Taylor Swain
United States District Judge
June 13, 2014
Page 2

Pastore has withdrawn from the case, settled with Universitas, and left me and my company Boston Property Exchange Transfer Company, Inc. (BPETCO) defenseless and unrepresented. Attorney Pastore had no basis for sending his letter to Your Honor in the first place, because the Universitas Injunction is very clear that it prevents me from **spending** more than $20,000 per month, which I have abided by religiously, but nowhere in the Injunction does it prohibit any Carpenter-controlled company from **receiving** money. Universitas has now twice tortiously interfered with companies not even listed in the original petition by simply sending letters to Your Honor. No service of process, no summons and complaint, and certainly no jurisdictional analysis. These are the fundamental cornerstones of due process.

3. I would also beg Your Honor to rescind and revoke the Injunction Order of January 13, 2014 for the reasons I will share with you below. As Your Honor knows well by now, all of the Charter Oak Trust money was spent by October of 2009. The last of the money was transferred to Grist Mill Capital, LLC, pursuant to a Confidential Settlement and Indemnity Agreement dated October 26, 2009 attached here as Exhibit One. Universitas has a copy of this document; as does the AUSA who recently indicted me on "money-laundering" charges because of the Sash Spencer death proceeds. The investigation of the Charter Oak Trust began on May 26, 2011 with a commando raid on our peaceful office in Simsbury, Connecticut. Judge Stefan Underhill of Connecticut remarked that there were three times as many **armed** federal agents at our offices than were used to take out Osama bin Laden.

Honorable Laura Taylor Swain
United States District Judge
June 13, 2014
Page 3

I would respectfully ask Your Honor to do these three things immediately in the interests

of justice pursuant to the Court's own supervisory powers, if for no other reason than so that I

might provide for my family and take care of any outstanding business issues before I have to

report. Moreover, let's make this a fair fight. If Universitas thinks I have done anything wrong,

let them come to Connecticut to sue me. Tony Zelle and the Boston Exchangors will not come

to Connecticut because I received a unanimous victory in the Connecticut Supreme Court against

them in 2006.

Also, please extend my sincerest apologies to Magistrate Pitman, who I know believes

that the people associated with the Charter Oak Trust were dilatory in every way possible

throughout discovery. But, it really wasn't anyone's fault, and now that Wayne Bursey and I

have both been indicted regarding the Charter Oak Trust and the government has threatened to

indict several other people, I feel that you could tell Magistrate Pitman that this is one time

where people were wise to take the Fifth. And, I totally understand why you feel that my

testimony was "self-serving" and "incredible" after me taking the Fifth, because that is what has

happened to me for 14 years in Boston. In fact, the same Exchangor clients that I lost $8 million

for in the stock market crash of 2000 have now been repaid over $50 million in my legal

victories against PaineWebber and Merrill Lynch. Merrill's attorney John Snyder referred to me

as the "Master of Deception," and Universitas had you quoting John Snyder's lies from 12 years

ago in Boston. Now, as of last Friday, Snyder and Bingham are facing $120 million in damages

and sanctions for their lies, withholding evidence, destruction of evidence, and coaching all the

Merrill witnesses to lie about me and the nature of BPETCO. It is clear from the Massachusetts

Honorable Laura Taylor Swain
United States District Judge
June 13, 2014
Page 4

decision that Merrill's John Snyder is the real "Master of Deception." I have attached a copy of the appeals court's decision as Exhibit Two.

In the same light, please read the Exchangors' lawsuit against Merrill filed in February of 2008 attached as Exhibit Three that I did not receive a copy of until July of 2009, a year after my second trial in Boston ended in 2008. You will see my name is not even mentioned, and that we were totally up front in our dealings with Merrill in saying that we were investing other people's money – not our own. This is important evidence that was withheld from us by not only the government, but the Exchangors, and Merrill Lynch as well. I never appeared at or testified at the trials in Boston, so it was easy for Merrill's attorneys to make me out as the "bad guy" and Universitas literally copied all of the bad things said about me by the Exchangors and Merrill Lynch. Suffice it to say, my indictment from 10 years ago would not pass the *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), tests for even a breach of contract. You yourself would dismiss the complaint for failure to plead fraud with particularity as required by Rule 9(b) – "the who, what, where, when" of fraud. Do you see any fraud in the Exchangors' February 2008 lawsuit? Neither do I.

The simple truth is that I was a victim of prosecutorial misconduct in my first trial in 2005 that was a part of the USA Today study of September 22, 2010 (*see Prosecutors' Conduct Can Tip Justice Scales*, USA Today, September 22, 2010). The prosecutorial misconduct was even more egregious in my second trial in 2008. So much so that I was awarded a new trial for a second time in 2011, which the government appealed and after several trips to the Supreme Court over a two year period, the government was able to overturn my new trial order at the end

Honorable Laura Taylor Swain
United States District Judge
June 13, 2014
Page 5

of November 2013.  This gave the AUSA in Connecticut courage to indict me for another non-crime a month later in December 2013 for events happening between 2006-2008.

My arraignment was on January 17, 2014, just days after Your Honor's Injunction of January 13th.  As Your Honor knows well, most arraignments take 5-10 minutes.  My arraignment took three hours because Mr. Barnett, counsel for Universitas, was passing up notes to the AUSA as if they were still in High School together.  Moreover, Ms. Colbath had sent a letter, attached as Exhibit Four, which literally threatened the government to not allow my own wife to post her family's old homestead, which she owns 100% of, as surety for her husband's bail. When the AUSA demanded more collateral for my bail, my daughter volunteered her newly-purchased home, bought by her new husband as collateral for my bail.  Your Honor, there was not a dry eye in the courtroom.  When the AUSA rose to demand more, Magistrate Martinez told him to sit down, and promptly said: "I refuse to believe that Mr. Carpenter is a flight risk that would leave his wife of 32 years or his only daughter homeless.  Bail is satisfied."

Mr. Barnett then sent up more notes to the AUSA in order to make sure that Your Honor's Injunction was included as one of the court orders I had to obey, as in all court orders by a federal court – and I have dutifully reported all expenditures according to the Injunction order.  But, that did not satisfy the counsel for Universitas.

The reason I am forced to correspond with Your Honor in this unorthodox manner is that I have no one helping me in New York.  My wife is paying for my legal representation in Boston and in Hartford, but **no one** will even speak to her, much less take money from her to represent me in New York for fear of being sued by Ms. Colbath and Loeb & Loeb.

Honorable Laura Taylor Swain
United States District Judge
June 13, 2014
Page 6

Because of the Universitas Injunction, I am unable to pay for **any** legal counsel and, more significantly, because of all of the restraining letters sent threatening legal action to recover any money paid to any of the 30 law firms that Ms. Colbath and Mr. Barnett have contacted, I cannot even get a return phone call from firms that I have paid significant sums to in the past. I have included one such letter (attached as Exhibit Five) to Gregory Garre of Latham & Watkins, who was a former Solicitor General of the United States. I tried several other Washington, D.C. firms to represent me in the Supreme Court appeal of the government overturning my new trial order, but it is clear that the Supreme Court community is small and tight-knit, and if Carpenter had used Latham four times in the past, why aren't they helping him now. Even attorneys who are friends of mine at big firms have politely turned me down.

I am not exaggerating that good friends at major law firms do not return my phone calls. Neither my wife nor I are kept up to date with the proceedings in Your Honor's own Court, even though the case is supposedly all about me. Please feel free to ask the attorneys that show up, whenever the hearing about my Injunction is, when was the last time you sat down with or talked to Mr. Carpenter? I believe Your Honor will be surprised to learn that I am not the "Master of Deception" that controls all of the companies of the world. I do not have PACER or ECF and no one returns my phone calls.

Finally, Your Honor, let me say that I am doubly hurt by the negative comments that you have made about me in your findings. First, because I believe with every fiber of my being that I am an honest businessman who has done nothing wrong, much less illegal. Second, I was the only person that testified at that hearing and I testified for four hours without anyone contradicting anything that I said. I even believe that Your Honor smiled at me several times

believing what I said, and nodding at me with judicial approval. I swore to tell the truth, and I believe that I have told the God's honest truth. Now it appears that I failed in Your Honor's estimation, and the government has used Your Honor's words against me in several different proceedings.

Therefore, if Your Honor would be kind enough to hit the "RESET" button and let us start over. Please rescind the Attorney Pastore letter as well as the January 13, 2014 Injunction order, I will then be happy to file a series of Rule 60(b)(1) motions to show the information that may have been incomplete or missing; a Rule 60(b)(3) Motion to show the blatant frauds on the Court committed by Ms. Colbath and Mr. Barnett, and finally a Rule 60(b)(4) motion based on the Supreme Court's January 2014 decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), because this Court does not have jurisdiction over **any** of the Carpenter Companies listed in the original petition – Carpenter Financial Group, Inc., and Grist Mill Capital, LLC. But, there is no way that Universitas can claim to have jurisdiction to interfere with the business dealings of Grist Mill Partners, LLC or BPETCO, which had nothing to do with Sash Spencer, the Charter Oak Trust, or Nova Group, Inc., or any other company not listed on the original petition.

This type of "vicarious jurisdiction" that Universitas recommends, i.e., Carpenter is a bad guy everywhere, so we can "pierce the corporate veil" for all of his companies, and we have jurisdiction over his companies anywhere, is not favored or approved anywhere in the United States, especially after *Goodyear Dunlop Tires Operations S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011), and now *Daimler*. For an excellent discussion on this subject, see the Journal of International Law article by Lonny Hoffman, *Further Thinking About Vicarious Justification:*

Honorable Laura Taylor Swain
United States District Judge
June 13, 2014
Page 8

*Reflecting on Goodyear v. Brown and Looking Ahead to Daimler Ag v. Bauman*, 34 J. Int'l L.

765 (). Available at: http://scholarship.law.upenn.edu/jil/vol34/iss4/4.

Therefore, just to remind the Court, the evidence adduced thus far is as follows:

1. I was not an officer of Nova Group, Inc. – See Exhibit Six.

2. Grist Mill Capital, LLC, the company that provided over $100 million in funding for the Charter Oak Trust to pay premiums, was dismissed from the Charter Oak Trust arbitration by Ms. Colbath.  See Exhibit Seven.

3. I was dismissed from the arbitration after it was over, so I, and not Universitas, should have the benefit of "*res judicata*" and "collateral estoppel."  See Exhibit Eight.

4. Grist Mill Capital, LLC was the **primary beneficiary** of the Sash Spencer policies. See the beneficiary form attached as Exhibit Nine.  The small print says: "I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums which remain unpaid pursuant to any other agreements I might have with Nova Group, Inc., and acknowledge that my beneficiaries as designated above will receive all death benefit proceeds in excess of the sums payable to Grist Mill Capital, LLC."

5. Sash Spencer agreed that Grist Mill Capital was a secured, collateralized funder.  See Funding Agreement attached as Exhibit Ten.

6. Spencer agreed to the two amounts taken out in May of 2009.  See Exhibit Eleven.

7. The remaining $19 million was covered by the Confidential Settlement Indemnity Agreement.  See Exhibit One.

8. It is Universitas' own fault that it did not take the $18 million when it was originally offered.  See Exhibit Eleven.

Honorable Laura Taylor Swain
United States District Judge
June 13, 2014
Page 9

9.  Universitas then renounced all of its claims to the death benefit for a payment of $5 million from Mary Spencer, who had no idea the insurance policies were even taken out on her husband.  See Exhibit Twelve.

10. Sash Spencer had a detailed agreement with Grist Mill Capital that he not only signed, but initialed in several places, laying out the terms of the agreement between the parties.  See Exhibit Thirteen.

Therefore, in conclusion, I would respectfully ask the Court to reconsider its previous opinions, rescind the letter order to Attorney Pastore and to end the Universitas reign of terror over me and my family.

Thank you for your time and thoughtful consideration on this matter.

Respectfully Submitted,

Daniel E. Carpenter

# EXHIBIT 10

 **Banknorth**

# CERTIFICATE OF RESOLUTION OF CORPORATION

**Depository Account**
**Authority to Open Account(s) and to Deposit and Withdraw Funds**

| To: | TD Bank, N.A. ("Depository") | From: | (Name/Address of Corporation) |
|---|---|---|---|
| | Drake Mill Mall, 714 Hopmeadow St | | CARPENTER FINANCIAL GROUP, INC. |
| | | | 100 GRIST MILL RD. |
| | Simsbury, CT 06070 | | SIMSBURY, CT 06070 |
| | Region: TDBN Mid-Atl CT | | |

I hereby certify that I am the duly elected and qualified Secretary/Clerk and keeper of the records of the Corporation named above, that the following is a true and complete copy of a Resolution duly adopted at a meeting of the Board of Directors or shareholders of said Corporation held on, or dated on the date shown below in accordance with law and the by-laws of, or by consent of, said Corporation, and that my delivery of this Certificate of Resolution to Depository certifies to Depository that such Resolution is still in full force and effect.

RESOLVED, the following officers, employees or agents of Corporation, whose names and signatures appear below, are hereby authorized, acting singly or jointly, for and on behalf of the Corporation, to open and maintain a deposit account or accounts of the Corporation with Depository, subject to the terms and conditions specified in the applicable Account Agreement(s), and to endorse and deposit with said Depository negotiable instruments or other orders for the payment of money, which endorsements may be made in writing or by stamp and without the designation of the person endorsing.

Be it further resolved, the undersigned officers, employees or agents of Corporation may sign checks or other orders for the payment of money, withdrawing funds from Corporation account(s) with Depository. Such signature may be in writing or by facsimile. In the event this Corporation uses facsimile signature(s) for these persons it shall promptly notify the Depository and execute any form(s) that may be requested by Depository in connection therewith. This Corporation assumes all responsibility for the use of actual or purported facsimile signature(s) and shall indemnify and hold harmless the Depository from any and all liability, costs, expenses, suits, claims, or actions arising out of any action or inaction taken by the Depository in good faith under the terms of this Resolution. The signature of any one the officers, employees, or agents indicated below is necessary to act under this Resolution.

RESOLVED, that the Depository be promptly notified in writing by the Secretary/Clerk or any officer of this Corporation of any change in this Resolution, such notice to be given to the Depository in which any account of this Corporation may be maintained, and that until it has actually so received such notice in writing it is authorized to act in reliance on this Resolution, and that until it has actually received such notice it shall be indemnified and held harmless from any loss suffered or liability incurred by it in continuing to act in reliance of this Resolution even though this Resolution may have been changed.

RESOLVED, that the Depository may, in its discretion, accept in lieu of an original signature, a legible facsimile or photocopy of a signature of any of the officers designated in the foregoing Resolution.

RESOLVED, that the Corporation shall be bound by the terms and conditions of the Account Agreement as it may be revised and or amended from time to time.

| Title | Name | Signature |
|---|---|---|
| Chairman + Secretary | DANIEL E CARPENTER | *[signature]* |
| Vice President | AMANDA ROSSI | *[signature]* |
| | | |
| | | |
| | | |

I further certify that the foregoing are titles, names and genuine signatures of the present officers, employees and agents of the Corporation authorized by the above Resolution.

In Witness thereof, I have hereunto subscribed my name as Secretary/Clerk and have affixed the seal of this Corporation, if any, on the date shown below.

*[signature]*

Secretary's/Clerk's Signature

Date of Resolution: 5-20-09

**Corporate Seal (if any)**
*[seal impression]*

Rev. 06/2008   TD Banknorth is a trade name of TD Bank, N.A.

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC, | : |
| | : Case No.: 11-CV-1590 (LTS) |
| Petitioner, | : |
| | : |
| v. | : |
| | : |
| NOVA GROUP, INC., as Trustee, Sponsor | : |
| And Named Fiduciary of the CHARTER OAK | : April 5, 2011 |
| TRUST WELFARE BENEFIT PLAN, | : |
| | : |
| Respondent. | : |

---------------------------------------------------------------------

## OPPOSITION TO PETITION TO CONFIRM AND
## CROSS MOTION TO VACATE ARBITRATION AWARD

Joseph M. Pastore III (JP 1717)
FOX ROTHSCHILD LLP
One Landmark Square, 21st Floor
Stamford, CT 06901
Telephone:  (203) 425-9500

and

100 Park Avenue, Suite 1500
New York, New York 10017
Telephone: (212) 878-7900
E-mail:   jpastore@foxrothschild.com

# TABLE OF CONTENTS

**Page**

SUMMARY

    Factual Background ............................................................................................ 6

ARGUMENT

    Point I ............................................................................................................... 11

    The Court Should First Resolve Nova's Motion to Dismiss ................................. 11

    Point II .............................................................................................................. 12

    Universitas' Attempt to Simultaneously Obtain Judicial Relief and Continue with the
    Arbitration Divests This Court of Jurisdiction Because the Award is Not Final...................... 12

    Point III ............................................................................................................. 13

    Universitas' Failure to Pay Filing Fees Renders Award a Nullity........................... 13

    Point IV ............................................................................................................. 15

    The Arbitrator Ignored the
    Multiple Legal Arguments for Denying the Claim................................................ 15

        A.   Universitas' Failure to Timely File a Claim Mandates Denial of any Death Benefit
        Under the Plan.................................................................................................. 16

            1.   Plan § 8.01 .......................................................................................... 19

            2.   Ivan Schinderman, Esq. ....................................................................... 20

            3.   Insurance Agent Bruce Mactas ............................................................. 20

            4.   Lack of Equivalent Substitutes for a Claim Form ................................... 22

            5.   Allowance of a "Provisional" Claim....................................................... 24

            6.   The Late Appeal................................................................................... 25

            7.   Additional Pertinent Legal Authority .................................................... 27

        B.   The Arbitrator Ignored the Plan Requirements of ERISA .............................. 29

            1.   The Award manifests an egregious or patently irrational application of the law
            because the Arbitrator failed to apply ERISA's preemption provision ............................ 29

i

a.    The Arbitrator manifestly disregarded the law by failing to apply ERISA and allowing Universitas to assert state law claims............................................................ 29

b.    The Arbitrator manifestly disregarded the law by failing to apply the most deferential standard of review to Nova's decisions and decision making process—the arbitrary and capricious standard of review .................................................................. 31

2.    The Award manifests an egregious or patently irrational application of the law because the Arbitrator failed to apply well established contract principles fatal to Universitas' claim .............................................................................................................. 38

C.    Illegal Sharing of Death Benefit. .................................................................................. 40

1.    Draft July 2008 Settlement Agreement......................................................... 40

2.    Illegal November 2008 Settlement Agreement............................................. 41

3.    Pertinent Legal Authority ............................................................................. 44

CONCLUSION...................................................................................................................... 46

ST1 27278v1 04/05/11

Respondent Nova Group, Inc. ("Nova"), as Trustee, Sponsor and Named Fiduciary of the Charter Oak Trust Welfare Benefit Plan (the "Plan") hereby submits this opposition to Petitioner Universitas Education LLC's ("Universitas") March 15, 2011 Petition to Confirm Arbitration Award (the "Petition") and cross-motion pursuant to 9 U.S.C. § 10 to vacate the arbitration award issued by the American Arbitration Association dated January 24, 2011 ("Award") through which Universitas was awarded certain death benefits (including attorneys' fees, interest and costs) against Nova.

At the outset, and without consideration of the merits addressed below, Nova incorporates and adopts the arguments set forth in its March 11, 2011 Motion to Dismiss this proceeding ("Motion to Dismiss") (Doc. No. 3) and respectfully suggests that the Court dispose of that motion first. The Motion to Dismiss is predicated on the existence of the prior pending Application to Vacate the Award that was filed by Nova with the Connecticut Superior Court for the Judicial District of Hartford on January 25, 2011 (the "Connecticut Application to Vacate").[1] This opposition and cross motion is made without waiver of Nova's Motion to Dismiss, and should the Court rule in Nova's favor on that motion, further consideration of the Petition and this cross motion will not be necessary. Indeed, should this Court rule in Nova's favor on the Motion to Dismiss, the District of Connecticut can and will rule on the merits of the Connecticut Application to Vacate and the Petition.

Additionally, Universitas' Petition should be denied for the simple reason that because of Universitas' actions, the Award is not final and the relief it seeks is premature. As explained in greater detail below, the arbitration was split into two phases, and the arbitrator effectively

---

[1] On or about March 3, 2011, Universitas removed the Connecticut Application to Vacate to the United States District Court for the District of Connecticut ("District of Connecticut").

offered Universitas two options in the event that it prevailed on its claims: (1) seek to enforce any phase I award through the court system and, if that process did not make it whole, return to the arbitration for phase II, or (2) immediately proceed to phase II without resort to the judicial system. At the present time, Universitas is attempting to double dip, as it has not only filed the Petition in New York, but it is seeking to immediately move to phase II of the arbitration. Without commenting on the merits of any phase II proceedings, Universitas' continuing actions with the arbitration reveal that the Award is not final and that this Petition is premature. The Petition should immediately be dismissed for this reason alone.

Were this Court to reach the merits of the Petition and the instant cross motion to vacate, Universitas, as a threshold matter, failed to pay the requisite filing fees to initiate and prosecute the arbitration. As a result, the Arbitrator lacked jurisdiction to issue the Award and the Award is a nullity. The Arbitrator was informed of the issue and the governing law on multiple occasions, yet refused to address the deficiency.

With regard to the underlying merits, Universitas failed to file a timely claim for benefits, which is a legal prerequisite under both Federal (the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and Connecticut state law for receiving any benefits,[2] and the Plan expressly states that a claim filed after the deadline must be denied. Thus, the Award manifests an egregious and patently irrational application of the law and violates clear public policy of Connecticut by granting death benefits to a claimant that failed to file a timely claim for death benefits or follow any of the required rules of the Plan.

Equally important, the Arbitrator also failed to apply ERISA appropriately as follows: (1) the Arbitrator failed to apply ERISA's preemption provision, providing that ERISA shall

---

[2] Reference is made to Connecticut law because the Plan provides that it "shall be construed, regulated and administered by and under the laws of the State of Connecticut, where the Trust is created." Plan § 13.06. (A copy of the Plan is attached hereto as Ex. A.)

2

supersede any and all state laws insofar as they relate to an employee benefit plan, thereby permitting Universitas to assert untenable state law claims against Nova and the Plan; (2) the Arbitrator failed to review the denial of Universitas' claim for benefits, and subsequent appeal thereof, under the "arbitrary and capricious" standard of review; and (3) the Arbitrator failed to apply well-established contract principles that are fatal to Universitas' claim for benefits. In each instance, Nova had made these legal requirements abundantly and repeatedly clear to the Arbitrator, yet the Arbitrator disregarded these clear legal principles in rendering the Award.

Thus, if the Court declines to dismiss this action, or alternatively, declines to transfer this action to the District of Connecticut, as will be demonstrated below, the Petition should be denied and the Award should be vacated

## SUMMARY

At bottom this is a very simple case. Mr. Sash Spencer ("Mr. Spencer") and his insurance agent, Bruce Mactas ("Mactas") schemed to defraud the Charter Oak Trust – which is a welfare benefit plan – and use its money to purchase insurance policies to secretly provide the proceeds from the prohibited sale of those life insurance policies held by the Trust (though fraudulently applied for and fraudulently obtained by Mr. Spencer and Mactas through the Trust) to fund a veritable "pleasure palace" out in the desert of Las Vegas to be run by Mr. Spencer's mistress, who is the head person of the dubious "charity" in this case – known as Universitas. It was represented to the fiduciary of the Charter Oak Trust that Universitas was a bona fide charity that provided scholarships to inner-city youth. The truth was that Universitas – really called Destination Universitas and not Universitas Education, LLC – was really not a charity at all, but rather a speculative venture to be created in the deserts of Las Vegas as a retreat for overworked and stressed-out business executives and world leaders.

3

Mr. Spencer and his agent Mactas planned to use the special "split-dollar" financing arrangement provided by the Charter Oak Trust to purchase two insurance policies on Mr. Spencer's life that Mr. Spencer and Mactas planned to sell to the financing source for the Charter Oak Trust, Grist Mill Capital, LLC, for a total of $1,800,000. The facts and the details of this transaction are not in dispute, nor is the cost of the purchase of the two policies from the Plan, which is $4,300,000 and is comprised of the premiums paid for the policies, plus the financing costs, plus 20% of the cost of the policies plus a percentage of the total death benefit as a placement fee for arranging the transaction. All of this was **unknown** to Nova, which only knew that all of the Plan documents prohibit this type of Life Settlement or STOLI transaction.[3]

The only problem with Mr. Spencer's plans and the illicit Mactas STOLI transaction was that Mr. Spencer died before the policies could be purchased from the Plan, and now the bogus charity – Universitas – has asserted its claim to the proceeds as Mr. Spencer's designated beneficiary under the Plan, despite breaking or ignoring every rule in the proverbial ERISA book as well as the Plan documents.

The Arbitrator totally exceeded and abused his power and authority, manifestly disregarded and ignored the law, violated the public policy of ERISA, Connecticut and the law thereunder, and otherwise imperfectly performed his duties on what can only be described as a clear-cut case of "No Award" for at least a dozen reasons:

1. According to Sash Spencer's insurance agent, Mactas, there was no meeting of the minds between the parties. If, as Mactas testified, Mr. Spencer would not have done the deal because of the 20% holdback provisions on any death benefit under Plan § 6.01, then there was and is no contract. No meeting of the minds means there was no agreement between the parties and the benefits would be rescinded just as would an insurance policy based on fraud and/or mistake.

---

[3] See, e.g., Mark Maremont & Leslie Scism, *Odds Skew Against Investors in Bets on Strangers' Lives*, Wall St. J. at A1 (Dec. 21, 2010).

4

2.      This supposition by Mactas, however, is not only rank speculation but total nonsense as well.  Spencer and Mactas were defrauding the Plan by doing a Life Settlement transaction.  Spencer negotiated the costs of the Life Settlement down to the penny; from 3% down to 2%, and from 2% down to 0%.  Spencer wanted to minimize the cost of the Life Settlement transaction but did not care about death benefits because if he died, his beneficiary would not receive the death proceeds under the Life Settlement transaction anyway; the ultimate purchaser and new owner of the policies would have been the beneficiary of all of the insurance proceeds of the policies.  Therefore, Spencer never intended to make Universitas the beneficiary of "his" money in life or in death.  There is no record of Mr. Spencer making any gifts to Universitas during his lifetime or as part of his will.  More importantly to this case, there is voluminous evidence that he intended to make Universitas the beneficiary of his illicit and illegal Life Settlement agreement, but not the beneficiary of any insurance policy on his life.  Mr. Spencer's "intent" was clear – he intended to live a long and prosperous life, so that any investment on any insurance policy on his life would ultimately be a bad investment for any purchaser of the policies.  If he had truly intended to make Universitas the beneficiary of his insurance policies, why not disclose that to his wife and his business associates, or even his attorney?  Obviously, he did not want to disclose either his illicit affair or his illicit STOLI transaction arranged surreptitiously by his insurance agent, Mactas.

3.      Mr. Spencer did not intend to die within two years.  He wanted to use other people's money – *i.e.*, the $1.8MM he negotiated to receive from Grist Mill Capital, LLC ("GMC") – to fund his mistress' project in the desert outside of Las Vegas.  This is fraud on the Plan because the Plan documents clearly prohibit any type of Life Settlement transaction and any death benefits under the Plan are therefore forfeited.

4.      Mr. Spencer's employer, Holding Capital, adopted into a welfare benefit plan by signing the Corporate Resolution and the Adoption Agreement.  Holding Capital and Mr. Spencer agreed to follow the rules of the Plan and indemnify the Plan for all costs, including attorneys' fees.

5.      Mr. Spencer and/or his agent, Mactas, lied on the Enrollment Documents and insurance forms.

6.      Holding Capital, Spencer, Mactas, and Universitas all failed to follow the rules of the Plan, including compliance with the Plan's claims procedures.

7.      Universitas failed to prove that Holding Capital or Mr. Spencer paid the Plan's enrollment fee of $1,500 or the annual Admin Fees of $1,500 for 2007 and 2008.

8.      Universitas and Holding Capital and their attorneys, agents, and advisors threatened litigation against the Plan numerous times in clear contravention of the Plan Documents.

9.     Universitas never submitted a complete claim form on a timely basis and because of this fact alone is barred from any recovery under the Plan.

10.    Universitas did not submit a timely Appeal, and it was sent to the wrong person at the wrong address.

11.    When Jack Robinson, Nova's general counsel, told Universitas' attorney Ivan Schinderman that he needed to submit a claim form, Schinderman said he was too busy "fending off the widow," Mary Spencer.  In fact, Universitas, in a written document, manifested an intent to disclaim its right to collect anything from the Plan in exchange for a $5,000,000 contribution from Mary Spencer.

12.    After Jack Robinson repeatedly informed Universitas and its agents, advisors, and attorneys that they needed to submit a claim form, Schinderman said he was too busy fending off Mary Spencer to worry about filing a claim form and Alex Sgoutas, representing Universitas, responded that instead of submitting the claim form, they needed more time to hire a new attorney to address the legal claims that Mr. Robinson had brought to their attention.  Behind the scenes, Sgoutas had conversations with Jim Donaghy of Holding Capital Group (Mr. Spencer's employer) contemplating threatening and bringing more litigation against the Plan.

Despite Universitas' best efforts to obfuscate the undisputed facts of this case, defame uninvolved parties, and to expand these proceedings beyond the scope of ERISA and the examination of whether or not Universitas is entitled to benefits under the Plan, as detailed below there is no question that Universitas is not legally entitled to any benefits under the Plan, and the Arbitrator should have decided as such as a matter of law.

For these and other reasons set forth herein, the Petition should be denied and instead the Award should be vacated in its entirety.

## Factual Background

The Plan is a welfare benefit plan that provides death benefits to the designated beneficiaries of employees whose employers participate in the Plan.  Normally, a participating employer makes cash contributions to the Plan each year and the Plan uses those contributions to purchase a life insurance policy on the life of the covered employee in an amount sufficient to pay the death benefit chosen by the employer at the time it enters the Plan.  However, the

6

employer may, at any time, change the amount of the death benefit by executing a new adoption agreement and, similarly, increase or decrease the amount of the annual contributions the employer makes to the Plan.

The Plan is at all times the owner and beneficiary of the life insurance policy issued on the life of the covered employee, meaning that neither the employer nor the employee has any privity with the life insurance company that issues the policy. If a covered employee dies while his employer is participating in the Plan, the gross policy proceeds are paid from the life insurance company directly to the Plan (as the beneficiary of the policy). After deducting various reimbursements, fees and costs agreed to by the employer and the employee at the time they enter the Plan, the Plan then pays out the net death benefit to the employee's designated beneficiary (normally a spouse, child, or a cared for and legitimate charity).

Due to a special funding arrangement that the Plan was able to offer employers, a third-party funding source (Grist Mill Capital, LLC ("GMC")) agreed to fund the contributions by the employers, meaning that the employers did not have to make any cash contributions to the Plan. All of the funds necessary to pay the premiums on the life insurance policies issued on the lives of the covered employees were paid by GMC on a "split-dollar" basis in return for the employer and the employee agreeing to reimburse the Plan and GMC for all premiums paid as well as pay other necessary funding fees, interest and other costs. This third-party funding arrangement allowed participating employers and covered employees to obtain valuable life insurance coverage through the Plan at no up-front cost to them.

As a result of this unique "split-dollar" funding arrangement, the employer in this particular case, Holding Capital Group, Inc. ("Holding Capital"), entered the Plan in December 2006 and chose to enroll its President and CEO Mr. Spencer in the Plan. When it enrolled in the

7

Plan in December 2006, Holding Capital chose a $10 million death benefit for Mr. Spencer's beneficiary. Universitas was designated as Mr. Spencer's *revocable* beneficiary. A few months later, in March 2007, Holding Capital and Mr. Spencer executed a new Adoption Agreement and chose a $20 million death benefit for Mr. Spencer's *revocable* beneficiary — Universitas.

However, in May 2008, for some reason Mr. Spencer changed the beneficiary designation for Universitas from revocable to *irrevocable*. Barely a month later, in June 2008, Mr. Spencer died unexpectedly. Soon thereafter, Nova and the Plan discovered that Universitas was a fake charity run by Mr. Spencer's former mistress.

Almost immediately after Mr. Spencer's untimely and unexpected death, Universitas retained an attorney, Ivan Schinderman, Esq. ("Schinderman"), to represent Universitas both with respect to its dealings with the Plan as well as its efforts to fend off competing claims to the death benefit by Mr. Spencer's widow. Once Mr. Spencer's widow discovered that her husband's mistress (whose existence and identity had been kept secret from the widow) was slated to receive a multi-million death benefit, the widow advised Nova and the Plan that she intended to protest any payment to Universitas and the mistress.

In July 2008, the Plan's general counsel (Attorney Robinson) sent a letter to Schinderman, Holding Capital, and counsel for the widow stating that because Mr. Spencer had designated Universitas as his *sole irrevocable beneficiary*, the Plan was obligated to pay any death benefit to Universitas notwithstanding the competing interests and demands of the widow. In that letter, a mistaken reference was made to a $30 million death benefit because, at the time, the Plan's general counsel did not know that although the Plan owned $30 million of life insurance coverage on Mr. Spencer's life, in March 2007 Mr. Spencer and Holding Capital had executed a new adoption agreement by which a $20 million death benefit was chosen.

8

Pursuant to Plan § 8.01, a claim for benefits under the Plan must be submitted to the Plan no later than 180 days after the end of the Plan Year in which the covered employee dies. The Plan Year ends on September 30th and Mr. Spencer died in June 2008. Thus, Universitas was required to file a claim for benefits with the Plan no later than 180 days after September 30, 2008 — or March 30, 2009. It is undisputed that although Universitas was represented by Schinderman from the time of Mr. Spencer's death in June 2008 until Schinderman's own untimely death in June 2009, neither Universitas nor Schinderman filed a claim for benefits by the March 30, 2009 claims deadline.

The Plan allowed Universitas to file a *provisional* claim for benefits in July 2009 (several months after the claims deadline had already passed) due to Universitas needing to retain new counsel after Schinderman's death the prior month. However, the Plan specifically and expressly reserved its right to deny any such claim on timeliness (and other) grounds.

But when Universitas filed its provisional claim in July 2009, the Plan was shocked to discover that instead of Universitas claiming a right to the entire death benefit as Mr. Spencer's sole irrevocable beneficiary, Universitas and Holding Capital had entered into an illegal agreement whereby Universitas and Holding Capital were to split the death benefit evenly. Both the terms of the Plan and governing law prevent an employer such as Holding Capital from receiving *any* benefits under a welfare benefit plan in general and under the Plan in particular.

Even more shocking was that, as part of this illicit and illegal agreement, Mr. Spencer's insurance broker (Bruce Mactas) was slated to receive an illegal $200,000 kickback if the death benefit exceeded $23 million. Having received a copy of this illicit and illegal agreement attached to Universitas' claim form, Nova (on behalf of the Plan) denied the provisional Universitas claim for benefits in its entirety for these reasons as well as for the most basic reason

9

that Universitas failed to file a timely claim for benefits. Universitas filed an appeal to Nova of the denial of its claim, which was also denied for the aforementioned reasons as well as for the additional reason that Universitas failed to file the appeal on time and failed to file the appeal at the correct address.

Universitas commenced an arbitration proceeding as required by Plan § 8.02(d) regarding the denial of its claim for benefits.[4] However, Universitas failed to pay the required filing fees with the American Arbitration Association ("AAA") to commence and prosecute the arbitration, such fees estimated to be approximately $23,000. Nova objected to Universitas being able to initiate and prosecute an arbitration seeking in excess of $30 million in death benefits plus interest and attorneys' fees without paying the required $23,000 fee, and sought to have the arbitration proceeding dismissed on that basis. Nova repeatedly informed the Arbitrator of the rules and law requiring Universitas to pay these fees. However, the Arbitrator denied Nova's motion.

Prior to conducting any hearings, on November 3, 2010, the Arbitrator issued an order that dealt with, among other things, bifurcation of the proceedings against the various respondents into two phases. The initial phase ("Phase I"), was to involve Nova; an individual, solely in his capacity as a trustee; and another entity, solely in its capacity as an administrator. The second phase ("Phase II"), to the extent it became necessary, was to involve veil piercing

---

[4] The governing arbitration provision states, in pertinent part, as follows:

> Any controversy or claim arising out of or related to a denial of benefits hereunder or any and all other disputes, claims or controversies (whether or not related to benefits) arising under this Plan & Trust shall be settled by binding arbitration before a single arbitrator in New York, New York, under the commercial arbitration rules of the American Arbitration Association. . . . This Agreement and the Plan shall be construed, regulated, and administered by and under the laws of the State of Connecticut.

Plan § 8.02(d).

type claims against certain other respondents should any Phase I award not be fully satisfied. Notably, the arbitrator specifically denied the Phase II parties motions to dismiss "without prejudice subject to renewal should Claimant prevail in the initial proceedings and **elect to proceed with arbitration rather than seeking judicial recourse**." See November 3, 2010 AAA Order attached hereto as Ex. B at ¶ 2 (emphasis added).

After the three-day Phase I hearing was held in December 2010, in which Universitas failed to present any evidence that it paid the required filing fees or filed a timely claim for benefits, the Arbitrator issued the Award on January 24, 2011. On January 25, 2011, Nova filed the Application to Vacate the Award with the Connecticut Superior Court for the Judicial District of Hartford. Nova's filing predated the Summons and Notice filed with the New York Supreme Court on February 11, 2011. Following removal of the New York filing to this Court, on March 11, 2011, Nova filed a Motion to Dismiss this action on the basis of the prior existing action pending in Connecticut. (See Doc. No. 3.) The Petition was filed several days later, and nearly two months after the Connecticut Application to Vacate was filed. Now, during the pendency of this action, Universitas seeks to simultaneously conduct Phase II of the Arbitration. See March 22, 2011 correspondence from Universitas' counsel to the Arbitrator attached hereto as Ex. C.

Based on these facts and the arguments below, Nova and the Plan request that the Court dismiss this action or, in the alternative, deny Universitas' Petition and instead vacate the Award.

## ARGUMENT

### Point I

### The Court Should First Resolve Nova's Motion to Dismiss

As noted, on March 11, 2011, Nova moved this Court to dismiss this action on the basis of the prior filing of Nova's Connecticut Application to Vacate. Rather than repeating the arguments set forth in that filing, Nova respectfully refers the Court to that submission. Nova

11

submits that resolution of its Motion to Dismiss should come first and could very well moot any need to further consider the Petition or Nova's cross-motion to vacate. Dismissal of this proceeding will not leave Universitas without a remedy, as the exact same issues will eventually be resolved by the District of Connecticut.

Thus, for all of the reasons addressed in the Motion to Dismiss, the Court should grant that motion and take no further action on the Petition.

## Point II

### Universitas' Attempt to Simultaneously Obtain Judicial Relief and Continue with the Arbitration Divests This Court of Jurisdiction Because the Award is Not Final

When the Arbitrator ordered the arbitration to be bifurcated into two phases on November 3, 2010, he effectively gave Universitas an option in the event that it prevailed in Phase I to proceed in one of two ways: (1) deem the Phase I Award to be final and seek to enforce it through a court proceeding with a potential Phase II to assess purported liability for any deficiency; or (2) immediately proceed to Phase II. The Arbitrator's November 3rd Order was clear, it was one or the other. See Ex. B. In the event that Universitas chose to immediately resume the Arbitration through Phase II, judicial action was foreclosed because the Phase I Award would effectively be an interim and not a final award. See, e.g., Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc., 157 F.3d 174 (2d Cir. 1998) (noting that under FAA awards are final when they "resolve all the issues submitted to arbitration"). The Award is not final because it did not resolve all issues submitted to arbitration, namely resolution of the liability of all parties named as respondents. It is those respondents who are potentially subject to a Phase II hearing. Indeed, confirming the interim nature of the Award, it is self-titled as an "Interim Award."

12

Contrary to the Arbitrator's Order, Universitas is now attempting to have its cake and eat it too. Not only has Universitas commenced the instant action, but Universitas is aggressively pushing for an immediate commencement of Phase II. See Ex. C. Universitas' efforts to resume the arbitration through Phase II highlights that the Award is not final and the Petition should be immediately dismissed as premature.

## Point III

## Universitas' Failure to Pay Filing Fees Renders Award a Nullity

Both parties agreed that the arbitration would be conducted "under the commercial arbitration rules of the American Arbitration Association," Plan § 8.02(d). Accordingly, both parties agreed to abide by the AAA's Flexible Fee Schedule. Universitas commenced an arbitration against Nova with the AAA in June 2010 (as amended in September 2010) seeking $30,677,276.75 in damages plus interest and attorneys' fees.

Based on Universitas' demand and applying the AAA Flexible Fee Schedule, Universitas should have paid $16,867.73 for the Initial Fee and Proceed Fee, plus a Final Fee of $6,000 when the first hearing was scheduled, for a total of $22,867.73. Yet, shortly after commencement of the arbitration, and before the Hearing was to commence, Nova learned that Universitas failed to pay the necessary filing fee in accordance with the AAA's Flexible Fee Schedule, purportedly on the basis of a hardship waiver. Nova objected to Universitas proceeding with this arbitration without fulfilling its obligations to pay all required fees, but the AAA refused to provide Nova with any papers filed by Universitas in support of its waiver request or any communication from the AAA to Universitas concerning the request. The AAA simply informed Nova that it had, on an *ex parte* basis, unilaterally permitted Universitas to proceed without paying the full fee. Nova moved to dismiss based, *inter alia*, on Universitas' failure to pay the requisite fees.

13

Subsequently, Nova learned from one of Universitas' submissions that the AAA had granted Universitas a "deferral" of its required filing fee. Nova has no idea what this "deferral" means—whether it means that Universitas will have to pay the full or partial fee at some later time or whether it will have to pay only if it wins an award. In either case, Nova still has not received the benefit of AAA Rule R-49 because that rule envisions up-front payment of filing fees as the norm with a very limited exception "in the event of extreme hardship," and, to Nova's knowledge, Universitas has not made any showing of hardship, let alone extreme hardship.[5]

It is fundamentally unfair for Universitas to enjoy all the benefits of arbitration without paying for them. Throughout, Universitas was represented by a prestigious and expensive 300-attorney national law firm, Loeb & Loeb. Obviously, there was no financial hardship in finding and hiring top-shelf counsel. In fact, the filing made by Universitas' counsel showed that under their retainer agreement, Universitas would be required to pay on a monthly basis an amount equal to the current fees being billed and defer the other half until the arbitration process was over. That same filing stated that the Loeb & Loeb billings to date were over $1,000,000, which means Universitas had the financial wherewithal to pay Loeb & Loeb at least $500,000. So, clearly $23,000 to the AAA for the arbitration process should not have been a problem. Moreover, if Loeb's bills for Lexis-Nexis and outside counsel were far more than the mere $23,000 required by the AAA, it should have been obvious to both Universitas and Loeb that Loeb pay the AAA arbitration fees up front rather than risk the "No Award" mandate that comes from failure to pay their share of the arbitration costs.

---

[5] AAA Rule R-49 states, in pertinent part, "The filing fee shall be advanced by the party or parties making a claim or counterclaim . . . The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." The AAA's Flexible Fee Schedule also states that "[i]f a Proceed Fee is not submitted within ninety (90) days of the filing of the Claimant's Demand for Arbitration, the [AAA] will administratively close the file and notify all parties."

14

Universitas materially breached the arbitration agreement and should not have been permitted to proceed further with the arbitration. The necessity to pay the requisite filing fees is a jurisdictional requirement in arbitration just as much as it is in state or federal court. See 28 U.S.C. § 1914(a) (requiring $350 civil filing fee in federal district court). "Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1984); see also Jarrett v. US Sprint Communications Co., 22 F.3d 256, 261 (10th Cir. 1994) ("The filing fee requirement, by contrast, is established by Congress as a prerequisite to a civil action and must be complied with, absent the granting of IFP status.").

Moreover, the AAA had no authority to decide the issue of whether Universitas should be allowed to materially breach its obligation to arbitrate. The AAA usurped the Arbitrator's role by, essentially, granting Universitas IFP (*In Forma Pauperis*) status without the procedural safeguards and requirements utilized by state and federal courts. Nova informed the Arbitrator of this in its motion to dismiss and the Arbitrator denied the motion.

Under these circumstances, Universitas' failure to pay the required filing fees should be deemed a material breach of the arbitration agreement by Universitas, rendering an award in favor of Universitas a nullity.

## Point IV

## The Arbitrator Ignored the Multiple Legal Arguments for Denying the Claim

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 9, a court may vacate an arbitration award "if the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Id. "An award is in

15

'manifest disregard of the law' where 'a governing legal principle is well defined, explicit, and clearly applicable to the case, and where the arbitrator ignored it after it was brought to the arbitrator's attention in a way that assures that the arbitrator knew its controlling nature.'" <u>Bear Stearns & Co., Inc. v. 1109580 Ontario, Inc.</u>, 318 F. Supp. 2d. 199, 202 (SDNY 2004) (citations omitted).

As detailed below, the Arbitrator's Award in favor of Universitas manifests an egregious application of the law and the Award in favor of Universitas must be vacated.

**A.    Universitas' Failure to Timely File a Claim Mandates Denial of any Death Benefit Under the Plan**

The primary reason for denying Universitas a death benefit under the Plan was that it failed to submit a claim before the deadline of March 30, 2009.  **Ex. 431; Tr. 986:8-12**.[6] Because it is undisputed that Universitas failed to file a claim by the deadline, Nova, as the Plan Trustee, Sponsor, and Fiduciary, was legally required to strictly follow the provisions of the Plan and deny the claim.  The Arbitrator was made aware of the law mandating this result yet clearly ignored it in rendering the Award.

Guiding this issue is the Connecticut Supreme Court's decision in <u>Voris v. Middlesex Mut. Assur. Co.</u>, 297 Conn. 589 (2010).[7]  There, the Court held that an insurance company properly denied a claim on the grounds that the claim was submitted after the deadline imposed in the policy and it was of no consequence *whether the late submission prejudiced the insurer*:

---

[6]  "Ex." refers to exhibits admitted into evidence during the arbitration hearing and "Tr." refers to the arbitration hearing transcript page and line(s).  Due to the number and volume of these citations, they are not submitted herewith but are referenced solely for the purpose of highlighting that the statements have a foundation.  Should the Court wish to review these materials, Nova will provide them as a supplement to this filing

[7]  Reference to Connecticut law is required because the Plan provides that it "shall be construed, regulated and administered by and under the laws of the State of Connecticut, where the Trust is created."  Plan § 13.06.

16

A failure to abide by the limitation of action condition in a policy stands on a much different footing than a non-compliance with the notice provisions… [T]he main purpose underlying the notice stipulations is to safeguard the insurer from prejudice in processing a claim. Therefore, where an insurer's interests have not been harmed by a late notice, the reason for the notice condition is lacking. By contrast, limitation periods of suits are designed to promote justice by preventing surprises through revival of stale claims, to protect defendants and courts from handling matters in which the search for truth may be impaired by loss of evidence, to encourage plaintiffs to use reasonable and proper diligence in enforcing their rights, and to prevent fraud… **The presence or absence of prejudice is not, nor should it be, a factor in deciding whether an insurer may effectively assert this defense under the policy**.

297 Conn. at 599-600 (emphasis added).

"Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." Allstate Life Insurance Co. v. BFA Ltd. Partnership, 287 Conn. 307, 313 (2008). When a document "operates in the nature of a contract, in that it establishes the parties' rights and obligations [courts] apply the rules of contract construction to the interpretation [of the document]." Cantonbury Heights Condominium Association, Inc. v. Local Land Development, LLC, 273 Conn. 724, 734 (2005).

Thus, courts may enforce claims limitations provisions in policies despite the fact that most insurance policies are contracts of adhesion. Arpin v. Aetna Cas. & Sur. Co., No. CV-91-0388584, 1994 WL 411309, at *2 (Conn. Super. Ct. Jul. 27, 1994). "Limitations on time within which a claim may be brought set forth in a policy raise different concerns that are analogous to those raised by statutorily imposed limitations on actions." Bilodeau v. Aetna Cas. & Sur. Co., No. CV-94-0534733S, 1996 WL 107030, at *4 (Conn. Super. Ct. Feb. 29, 1996). "There is no requirement that an insurance company prove it was prejudiced due to lack of notice under a claims made policy… [P]rejudice for an untimely report in [the case of a claims made policy] is not an appropriate inquiry …." Cabrera v. United Coastal Ins. Co., No. CV-04-0833416S, 2005 WL 1971216, at *6 (Conn. Super. Ct. Jul. 18, 2005).

17

Moreover, the filing of a timely written notice of claim is not a mere promise, or condition precedent to the _accrual of a claim_ for benefits under Plan § 8.01 but is a _condition precedent to entitlement to any benefits_ thereunder because that section specifically provides for denial of the claim and a loss of all benefits if the beneficiary fails to comply with its requirements.  See Gianetti v. Health Net of CT, Inc., 116 Conn. App. 459, 468 (2009) ("If the condition is not fulfilled, the right to enforce the contract does not come into existence.").

Indeed, this is the very reasoning espoused in McCarthy v. Travelers Indem. Co., No. CV-970345443-S, 2000 WL 372801 (Conn. Super. Mar. 29, 2000):

> [T]here is an established body of case law in this jurisdiction as well as others specifically dealing with the issue of compliance with proof of loss policy provisions, with the leading case in Connecticut being _Elberton Cotton Mills, Inc. v. Indemnity Ins. Co., 108 Conn. 707, 145 A. 33 (1929)_. The insured in that case submitted a proof of loss nine months after notice of loss, and the insurer claimed forfeiture on the ground that the policy required proof of loss within ninety days after notice. The court, relying on the great preponderance of authority as disclosed in the exhaustive discussions contained in _Hirsch-Fauth Furniture Co. v. Continental Ins. Co., 24 F.2d 216 (S.D. Fla. 1928)_, and _Clark v. London Assurance Corp., 44 Nev. 359, 195 P. 809 (1921)_, held that "if the furnishing of proof of loss within a stipulated time is made a condition precedent to liability on the part of the insurer, or if a forfeiture is provided for failure to file within that time, those provisions will ordinarily be given effect, but where the rendering of such proof within the specified time is not expressly made a condition precedent to liability, and no forfeiture is provided for on account of delay . . . _such delay merely postpones the time of payment and for bringing suit, and if proof of loss is subsequently given the insured may recover on his policy notwithstanding his delay, provided the time otherwise limited for bringing suit has not expired_." (Emphasis added.) _108 Conn. at 712-13_ . . . .  The above principles continue to be expressed in the great weight of authority as indicated recently in a leading insurance treatise: "Where a policy requires proofs of loss to be furnished within a certain time after loss has occurred, but does not specify forfeiture for failure to furnish them within the prescribed time . . . the insured may maintain an action even though he or she does not furnish proofs within the designated time, _provided he or she does furnish them_." (Emphasis added.) 13 G. Couch, Insurance (3rd Ed. 1999) 193:20, p. 193-31.

> What the above authority makes clear is that, although a delay in submitting the required proof of loss, absent an express contractual provision to the contrary, does not automatically result in forfeiture, the obligation of the insured to furnish

18

> such proof is not dispensed with--**the insured ultimately must provide a sworn proof of loss in order to recover, and do so within the time limitation designated in the policy for bringing suit.**

2000 WL 372801 at * 3-4 (emphasis added).

This is entirely consistent with the fundamental tenets of insurance law where, absent a waiver or excuse, untimely notice discharges the duty to pay benefits:

> Under Connecticut law, "absent waiver, an unexcused, unreasonable delay [by an insured] in notification [of a covered occurrence] constitutes a failure of condition that entirely discharges an insurance carrier from any further liability on its insurance contract."

Arrowood Indemnity Co. v. King, 605 F.3d 62, 77 (2d Cir. 2010) (quoting Aetna Cas. & Sur. Co. v. Murphy, 206 Conn. 409, 412, 538 A.2d 219 (1988)).

There is no dispute that Universitas never filed a written (let alone sworn) notice of claim with the Plan Administrator (*i.e.*, Nova) within 180 days after the end of the Plan Year, despite the clear and unambiguous language governing the claims process and denial of benefits. Universitas has not established any waiver by Nova of the contractual requirements. Nor has it otherwise provided an excuse for its untimely filing. National Publishing Co. v. Hartford Fire Ins. Co., 287 Conn. 664, 673 (2008) ("When an insured brings an action against an insurer for breach of the insurance contract, the insured bears the burden of proving that it complied with the terms of the contract, including the conditions."). Nevertheless, the Arbitrator, who was fully aware of these legal requirements, disregarded them and issued an award that flies in the face of the above cited well-established legal principles.

### 1. Plan § 8.01

Article VIII of the Plan is entitled, "Claims by Members or Beneficiaries," and the very first section, § 8.01, states that a claim must be filed on a form supplied by the Plan Sponsor (Nova) and provides a simple road map for determining the deadline. As Jack E. Robinson,

19

Esq., General Counsel of Nova, testified, Plan § 8.01 required claims for benefits to be filed with the Administrator (Nova) on forms supplied by the Plan Sponsor (Nova) "within one hundred eighty (180) days from the end of the Plan Year in which the death of incident of claim occurred." Plan § 2.21 defined "Plan Year" to mean "the 12-month period ending on September 30th of each year." **Tr. 1100:10-16**. As Robinson explained, since Spencer died on June 10, 2008, the pertinent Plan Year ended on September 30, 2008 and the deadline of 180 days later was March 30, 2009. **Tr. 1100:20-25**. Plan § 8.01 further provides that any claim application not filed by the deadline "will be considered untimely filed and **denied for that reason**." (Emphasis added.)

### 2. **Ivan Schinderman, Esq.**

Robinson testified that on several occasions he repeatedly told Ivan Schinderman, Universitas' attorney from at least the end of June 2008 until his death the following June, to read the Plan and make sure to file a claim by the deadline. **Tr. 687:5-688:2; 691:24-692:11**. He asked Schinderman when he would be filing a claim for the death benefit. Schinderman replied that he was "too busy fending off the widow Mary Spencer" who was threatening to contest Universitas' right to the death benefit under Florida law protecting surviving spouses. **Tr. 693:17-696:6.** Furthermore, Schinderman certainly had a copy of the Plan because he and Robinson discussed the issue regarding the 20% withhold of death benefit in Plan § 6.01, an issue raised as early as Robinson's letter of July 23, 2008 (**Ex. 83**), and Schinderman pulled the Plan out of his briefcase during a lunch with Robinson at the Harvard Club in New York City. **Tr. 1093:22-1094:19**.

### 3. **Insurance Agent Bruce Mactas**

Mactas testified that as part of the services he renders to his life insurance clients, he assists their beneficiaries in making claims after the clients die. **Tr. 36:7-18; 415:18-23**. In

20

testifying about **Ex. 92**, an email chain about Robinson's July 23, 2008 letter, he referred to "client issues" and under cross-examination clarified that he viewed Universitas as his client. **Tr. 187:4-19; 326:5-327:24.** As early as January 19, 2007, Mactas had a copy of the Plan. **Ex. 19**. He sent it to Spencer in May or June 2007. **Tr. 375:24-376:20.**

In performing his services for his clients, on June 13, 2008, three days after Spencer died, Mactas had his staff complete a claim form for the proceeds of the life insurance policies issued by Lincoln National Life Insurance Company ("Lincoln") and sent it to Nova's president (Wayne H. Bursey) to execute on behalf of the beneficiary of the policies (*i.e.*, the Plan). **Ex. 63; Tr. 414:14-416:18**. Mactas testified he obtained the form from Lincoln, and the form required the beneficiary to swear to the accuracy of the statements under penalty of perjury. **Tr. 415:15-17; 416:7-9**. Bursey signed the form before a notary public and sent it back to Mactas on June 16, 2008. **Ex. 413; Tr. 416:13-19; 419:3-7**. Mactas filed the form with Lincoln's brokerage general agent on July 10, 2008, a month after Spencer died. **Ex. 70; Tr. 418:22-421:13**. Thus, Mactas knew very well how to request a claim form, fill it out, have the beneficiary sign it under oath, and file it with the insurer or payor.

Despite performing these tasks for the Plan to make sure that Lincoln paid under the policies, Mactas admitted that he never once asked the Plan for its claim form for a death benefit under the Plan to be completed by Plan beneficiaries and that he never filed a claim form with the Plan before the March 30, 2009 deadline. **Tr. 446:18; 447:12**. He also acknowledged that the claim form he submitted to Lincoln did not constitute filing of a claim for a death benefit under the Plan. **Tr. 446:6-9.** On April 4, 2008, two months before Spencer died, Mactas asked whether he should fill out a new beneficiary form to make irrevocable Spencer's designation of

21

beneficiary and "file it with COT" [Charter Oak Trust]. **Ex. 55**. Thus, Mactas recognized there were Charter Oak Trust forms that he must file with the Plan.

Mactas remained actively involved with Universitas by communicating with the Plan, Universitas and its representatives, Holding Capital and its representatives, and Spencer's widow and her representatives after Spencer's death and past the March 30, 2009 deadline for filing a claim and, thus, could have and should have asked the Plan for a claim form and filed it before the March 30, 2009 deadline, which he should have calendared based on Plan § 8.01. **Ex. 65, 414, 72, 439, 84, 106, 425, 165; Tr. 441:18-442:2**.

Thus, both of Universitas' representatives had the Plan document no later than July 2008 and could have and should have obtained the claim form from Nova, helped Universitas complete it, and filed it before the March 30, 2009 deadline. Obviously, with all these insurance agents, advisors and attorneys involved representing Holding Capital, Universitas, and the widow and threatening litigation regarding Plan § 6.01, someone should have at least requested a claim form. Mactas asked Nova's Barbara Korfel to send the Plan document to Lincoln, but never once asked her to send him a claim form so Universitas could file a claim with the Plan.

### 4. Lack of Equivalent Substitutes for a Claim Form

Universitas cannot seriously contend that it filed any claim whatsoever before March 30, 2009. In light of its examination of Robinson, Universitas argued that Schinderman's February 25, 2009 letter to Robinson (**Ex. 418**) constituted a "claim" for death benefits under the Plan. However, that letter cannot conceivably be considered a claim for benefits. The letter is not signed by Universitas as the beneficiary, nor is it signed under oath. The word "claim" does not appear in the "Re" line. In fact, the letter is nothing more than a continuation of the debate over the 20% withhold, to which Robinson responds in the second paragraph of his letter dated March 2, 2009 (**Ex. 419**).

22

There is no other document that Universitas argued constitutes a written claim before March 30, 2009. Rather, it suggests in its examination of Robinson that the filing of a written claim on a form supplied by Nova was unnecessary because the Plan already had all of the information required by the form. **Tr. 829:4-839:16; Ex. 148, 424**. Robinson testified, however, that the Plan needed a claim to be signed by the beneficiary and that trust law required the claim to be signed under oath. **Tr. 827:15-828:6; 1101:15-19**.

Additionally, Robinson explained that clearly the Plan did not possess knowledge of all the information called for in the claim form because when Universitas eventually filed the belated provisional claim form on July 15, 2009, it wrote on the line for "Designated Beneficiary" the phrase, "PLEASE SEE ATTACHED AGREEMENT." **Tr. 927:7-24.** The attached Agreement was a Settlement Agreement and Releases dated November 11, 2008 in which Universitas and Holding Capital agreed to pay Mactas $200,000 if the net death benefit exceeded $23 million and then to split evenly the net death benefit between Universitas and Holding Capital. **Ex. 425**. Since Robinson was learning for the first time that Universitas was directing the Plan to pay portions of the death benefit to Mactas and Holding Capital based on a Settlement Agreement from November 2008, the Plan obviously did not know all the information called for in the claim form before the March 30, 2009 deadline. **Tr. 916:7-917:22.** Robinson testified that he was unaware of the November 2008 Settlement Agreement before seeing it as an attachment to the provisional claim form after it was filed on July 15, 2009. **Tr. 915:8-16; 1086:21-1087:7**.

Robinson also testified that it is important for the Plan to have all the necessary information about the death benefit claim in a single document to protect the Plan from later

conflicting claims.  **Tr. 1102:19-1103:9**.  Furthermore, it is important to have the beneficiary sign under the penalty of perjury to prevent fraud.  **Tr. 1108:17-1109:4**.

Consequently, the requirement of a written, sworn claim form submitted by the deadline is not a mere ministerial event that can be complied with in substance or through alternative means.  Following the letter of the Plan required the denial of the claim under these circumstances.

### 5. Allowance of a "Provisional" Claim

Robinson testified that after Lincoln paid the policy proceeds to the Plan in mid-May 2009 (but only after the Plan had sued Lincoln), Nova searched its records but could not find any claim form filed by Universitas.  **Tr. 889:6-23; 893:3-895:4**.  Likewise, Robinson could not find any claim form in his files.  Id.

Because Plan § 8.01 provides that any claim application not filed by the deadline "will be considered untimely filed and denied for that reason," Robinson was obliged to inform Universitas in a letter dated July 8, 2009 (**Ex. 424**) that it had failed to file a claim by the March 30, 2009 deadline and that failure to file a timely claim was sufficient grounds for denying Universitas any death benefit.  Nevertheless, because the Plan was not in business for the purpose of denying claims (in which case it would have eventually gone out of business), the Plan allowed Universitas to file a "provisional" claim by July 15, 2009 but reserved the right ultimately to deny the claim for untimeliness.  **Tr. 901:5-14; 976:21-977:9; Ex. 424**.  Robinson testified that this was not an exercise in futility because the Plan might have allowed the claim if Universitas demonstrated that it had completed a claim form and given it to Mactas or Schinderman but that it had not been forwarded to the Plan.  **Tr. 901:5-902:12**.

Robinson testified that it was not his job to calendar or keep track of the March 30, 2009 deadline.  **Tr. 878:15-879:22**.  He had reminded Schinderman several times to file a claim form.

24

**Tr. 687:5-688:2**.  Mactas testified he had decades of experience in filing claim forms after a client's death and had sold insurance in connection with so-called "419 plans."  **Tr. 66:15-17; 334:15-19**.  Thus, Universitas had two representatives who should have calendared the deadline and filed the claim form before the deadline.  Universitas should sue them for failing to do so, especially since they both read the Plan document where all of the required procedures for filing a claim for benefits are clearly spelled out.  Universitas argued incessantly over the 80% provision in Plan § 6.01 but now wants the Arbitrator to believe that it completely overlooked the claims procedure outlined in Plan § 8.01.  That does not make any sense, and Nova should not be held responsible for the professional negligence of Mactas and Schinderman in this regard.

### 6.    The Late Appeal

Universitas acknowledged that it sent its appeal of the denial of its death benefit claim to Robinson in care of Benistar at Benistar's Stamford, Connecticut office and has not presented any evidence that it sent its appeal to Nova in Simsbury, Connecticut.  **Ex. 223**.  Plan § 8.02(a) provides that if a claim for death benefits is denied, the claimant "may file a written appeal to the Administrator" within 60 days after denial of the claim.  There is no dispute that the Plan Administrator was Nova, Plan § 2.01, and Nova's only location is in Simsbury, Connecticut.

Plan § 8.01 provides that "[c]laims for benefits under the Plan shall be filed with the Administrator . . . ."  In accordance with that provision, Universitas sent its provisional claim form to Wayne H. Bursey, Nova Group, Inc., 100 Grist Mill Road, Simsbury, CT.  **Ex. 425**.  Additionally, at the end of Robinson's July 8, 2009 letter, he directed Universitas to file its claim with Bursey at Nova in Simsbury and the claim form he enclosed had a similar directive on its first page.  **Ex. 424** (NOVA 981).  On page 3 of Bursey's letter dated October 2, 2009 denying the claim, he set a deadline of December 1, 2009 for Universitas "to file a written appeal of this

25

decision to Nova." **Ex. 431**. That letter was written on Nova letterhead showing an address in Simsbury. Id.

Because Universitas and its lawyers ignored these instructions to file the appeal with Nova in Simsbury and rather sent it to Robinson in Stamford, the appeal sat on his desk through the first ten days or so of December 2009 while he was in Massachusetts campaigning for the Republican nomination for Ted Kennedy's Senate seat against the ultimate general election winner – Scott Brown. **Tr. 1127:16-1128:16.** Furthermore, Robinson did not have access to his email during this period because he did not yet have a Blackberry. **Tr. 1202:3-22**. Consequently, Nova did not receive Universitas' appeal until mid-December 2009, after Robinson returned to his office in Stamford, found the appeal on his desk, and forwarded it to Bursey in Simsbury. **Tr. 1128:12-1129:10**.

Universitas cannot blame its failure to file its appeal with Nova in Simsbury on Robinson's earlier letter of September 11, 2009 (**Ex. 427**). Robinson wrote that letter to stop Loeb & Loeb and Alex Sgoutas, Universitas' representatives, from threatening the Plan with litigation and/or conducting settlement negotiations directly with Bursey and others to the exclusion of Robinson, the attorney representing the Plan. Thus, he insisted that all such "communications" and "questions" be directed solely to him, as the Plan's counsel. He did not state that any appeal of a denial of death benefit should be directed to him. In fact, at that time, the claim was still pending, and no denial was issued until three weeks later. **Tr. 1126:7-1127:1**.

Accordingly, yet another ground for denial of the appeal was that it was not filed with Nova in Simsbury by the December 1, 2009 deadline. **Ex. 433**.

26

### 7.   **Additional Pertinent Legal Authority**

Denial of a death benefit to Universitas may seem harsh, but ERISA and Plan § 8.01 require that result.  Nova, as Plan Sponsor, Trustee, and Fiduciary, was required to follow the rules of the Plan.

In <u>Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan</u>, 129 S. Ct. 865, 875 (2009), the Supreme Court held that the plan administrator rightfully followed the plan documents and ignored the informal attempts to change the designation of the beneficiary.  In the present case, the legal issues surrounding delivery, or lack of delivery, of a claim form, and the Plan documents were presented to the Arbitrator and they were ignored.  The Arbitrator was also told that under ERISA, Universitas was not free to ignore informal attempts by Universitas to vary the Plan's requirements.

Nova relies on two principles of law enunciated in <u>Kennedy</u> that apply to all claims brought against any welfare benefit plan:

> 1.   Universitas' claim for benefits "stands or falls by 'the terms of the plan,' [ERISA] § 1132(a)(1)(B), a straightforward rule of hewing to the directives of the plan documents that lets employers establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits."
>
> 2.   " . . . ERISA forecloses any justification for enquiries into nice expressions of intent . . . ."

<u>Kennedy</u>, 129 S. Ct. at 875 (2009) (quotation marks omitted).

Again, these legal issues were explained to the Arbitrator in detail.  Nova explained to the Arbitrator that it denied Universitas' claim because Nova was obliged to follow the letter of the Plan documents.  For instance, Nova was required to enforce the requirement that a claim be submitted on its form and under oath by March 30, 2009.  The fact that Universitas may have contacted Nova soon after Mr. Spencer had been laid to rest is immaterial to the timeliness of its

27

claim and whether it was submitted in proper form. Indeed, Universitas was being counseled by its representatives, Mactas and Schinderman, both of whom had the Plan and were aware of the necessity that claims had to be properly and timely filed in order to obtain a death benefit. The deadline for claims and the form for the claims are bright line tests from which Nova could not deviate. The Arbitrator was repeatedly told this clear and well settled point of law, and he elected to ignore it.

Thus, Universitas' claim was properly denied on the grounds that it was submitted after the deadline imposed by Plan § 8.01, and its appeal was properly denied on the grounds that it was submitted after the deadline imposed by Plan § 8.02(a). In fact, under the Supreme Court's ruling in <u>Kennedy</u>, <u>supra</u>, Nova, as the Plan's Fiduciary, was obligated to "hew[] to the directives of the plan documents" and avoid "enquiries into nice expressions of intent" and, as a result, was compelled to deny Universitas' claim and appeal because they both were submitted too late under these clear deadlines established by the Plan.

To the extent Universitas attempted to argue that it had provided the Plan with the equivalent of a claim form before the March 30, 2009 deadline, there is no dispute that it never filed a written and sworn proof of claim with the Plan Administrator before March 30, 2009, as required by Plan § 8.01. The claim form itself requires that the proof of claim be made in writing and sworn to under penalty of perjury **by the beneficiary** and **in two places**. Ex. **424** (UNIV 983, 985). No such document existed or was filed before mid-July 2009.

Simply put, because Universitas failed to file a sworn proof of claim, no benefits are payable under the Plan. This was the very situation addressed in <u>McCarthy</u>, <u>supra</u>, where the plaintiff never submitted a sworn proof of loss. The court held "that at the very least the plaintiff's failure to submit a sworn proof of loss has prevented the loss from becoming payable."

28

2000 WL 372801 at * 4. All these points of law were provided to the Arbitrator in both pre- and post-hearing submissions, and he ignored them.

**B.      The Arbitrator Ignored the Plan Requirements of ERISA**

**1.      The Award manifests an egregious or patently irrational application of the law because the Arbitrator failed to apply ERISA's preemption provision**

The Award also manifests an egregious and patently irrational application of the law in the following respects: (1) the Arbitrator ruled in Universitas' favor on exclusively state law claims, despite it being well-established that ERISA bans consideration of such claims; and (2) the Arbitrator failed to apply the most deferential standard of review to Nova's decision to deny Universitas' claim—the arbitrary and capricious standard of review.

As an employee welfare benefit plan, the Plan is governed in part, as are all welfare benefit plans in the United States, by ERISA.[8]  The Plan is subject to certain provisions of ERISA even though it is not strictly speaking an "ERISA benefit plan" because it was not created, established, or maintained by an employer (*i.e.*, Holding Capital).

**a.      The Arbitrator manifestly disregarded the law by failing to apply ERISA and allowing Universitas to assert state law claims**

It is clear under the standard set forth in <u>Bear Sterns</u>, that the Arbitrator's Award in favor of Universitas manifests an egregious or patently irrational application of the law, and an award in favor of Universitas must be vacated.  318 F. Supp. 2d at 202.

That Universitas' state law claims have no basis is obvious and certainly capable of being readily and instantly perceived by one qualified to serve as an arbitrator.  Moreover, the Arbitrator appreciated the existence of ERISA's preemption provision ▬ a clearly governing legal principle, as is demonstrated by the extensive briefing by the parties on this very issue.  In

---

[8] All welfare benefit plans are covered by Part 5 of ERISA –the Administration and Enforcement Section of ERISA—and thus, as to the Plan, ERISA controls.

spite of the briefing on the issue, and Universitas ultimately conceding that ERISA does apply, the Arbitrator failed to rule on it. Finally, the ERISA preemption provision, which was ignored by the Arbitrator, is well-defined, explicit, and clearly applicable to this case.

ERISA's preemption provision is sweeping, providing that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a); see also Paneccasio v. Unisource Worldwide, Inc., 32 F.3d 101, 114 (2d Cir. 2008) (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 214 (2004) ("As to state common law claims, ERISA preempts those that seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA.")); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (common law causes of action based on alleged improper processing of a claim for benefits are preempted by ERISA).

ERISA limits Universitas to a single claim for benefits, and fully preempts all of Universitas' common law claims. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); Bd. of Trustees of Local 295/Local 851-IBT Employer Group Pension Fund & The Local 295/Local 851-IBT Employer Group Welfare Fund v. Callan Assoc., Inc., 175 F.3d 1007 (2d Cir. 1999) (claims for breach of contract and breach of fiduciary duty are preempted by ERISA); LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (conversion claim is preempted by ERISA); Saks v. Franklin Covey Co., 117 F. Supp. 2d 318 (S.D.N.Y. 2000) (stating "it has long been held that a plaintiff has no claim of breach of contract against a plan administrator for failing to award benefits, because such claims are squarely preempted by ERISA"); Nealy v. U.S. Healthcare HMO, 844 F. Supp. 966, 970, 971 (S.D.N.Y. 1994) ("as part of ERISA's enforcement scheme, most state laws relating to employee benefit plans are preempted").

30

To the extent that Universitas relies upon common law to support its breach of fiduciary duty claims, such reliance is also improper as ERISA's express preemption provisions clearly reach state law claims for breach of fiduciary duty. See Gabel v. Richards Spears Kibbe & Orre, 615 F. Supp. 2d 241 (S.D.N.Y. 2009) (ERISA preempts claim for breach of fiduciary duty); Watson v. Consol. Edison of N.Y., 594 F. Supp. 2d 399, 408-09 (S.D.N.Y. 2009) (ERISA preempts fraud and breach of fiduciary duty claims premised on fiduciaries' misconduct in administering ERISA plan).

Thus, Universitas' common law claims for declaratory judgment, breach of contract, breach of fiduciary duty and duty of loyalty, conversion, unjust enrichment, and accounting are preempted and must fail as a matter of law. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987). Accordingly, the Award must be vacated.

### b. The Arbitrator manifestly disregarded the law by failing to apply the most deferential standard of review to Nova's decisions and decision making process—the arbitrary and capricious standard of review

The Arbitrator's failure to apply ERISA, improperly and impermissibly allowing Universitas to bring state law claims, is further compounded by the Arbitrator's failure to apply the most deferential standard of review to Nova's decisions and decision making process—the arbitrary and capricious standard of review.

Under the arbitrary and capricious standard of review, a decision to deny benefits may be overturned only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.2d 438, 442 (2d Cir. 1995). Had the Arbitrator reviewed Nova's decision to deny Universitas' claim under the "arbitrary and capricious" standard, the only decision he could have rendered is one of no award to Universitas.

ERISA does not set forth a standard of review for actions challenging the denial of benefits. However, in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989), the

31

Supreme Court established the deferential standard of review for plan sponsors and administrators is the "arbitrary and capricious" standard: "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115 (emphasis added). Moreover, as explained in Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243 (2d Cir. 1999), a fiduciary may have discretion to interpret plan rules even if the plan does not specifically use language expressly stating this discretion because "magic words such as discretion and deference may not be absolutely necessary to avoid [de novo] standard of review." Id. at 251 (quoting Jordan v. Retirement Committee of Rensselaer Polytechnic Institute, 46 F.3d 1264, 1271 (2d Cir. 1995)). The use of language that is the "functional equivalent" will result in review of claim denials under the arbitrary and capricious standard." Kinstler, 181 F.3d at 252.

Plan § 8.01 gives subjective decision-making power to Nova to deny a claim for benefits, and thus provides Nova with the functional equivalent to "discretion." This Section provides in pertinent part that "[i]n the event the claim is denied, the reasons or the provisions of the Plan shall be cited." Id. Because no objective criteria are listed that control its determination of a claim, it follows that Nova may deny a claim for any reason, so long as that reason is explained. In addition, under the Plan, Nova is the Plan Sponsor, Named Fiduciary, Trustee, Named Trustee, and Administrator. Plan §§ 2.01, 2.16, 2.17, 2.20 and 2.24. Plan § 3.03 provides: "The Plan Sponsor shall be deemed to be the Administrator… and the Named Fiduciary of the Plan shall direct the administration of the Plan in all respects …." The Plan Sponsor may amend or terminate the Plan. Plan §§ 3.04, 3.06. Payment of benefits to beneficiaries is "upon the advice

of the Plan Sponsor," Plan § 7.01, and payment of benefits upon termination of the Plan is "at the direction and discretion of the Plan Sponsor." Plan § 7.02.

Furthermore, there are no limitations on Nova's discretion in processing and deciding claims for benefits. For example, approval of the Plan's Insurance Trustee (a financial institution separate from Nova) is not required for any function that Nova may exercise with respect to granting or denying a claim. Under these circumstances, the Arbitrator was required to apply an "arbitrary and capricious" standard of review to Nova's decision to deny Universitas' claim for benefits and its appeal under Article VIII of the Plan. See Peck v. Aetna Life Ins. Co., 406 F. Supp. 2d 271, 277 (D. Conn. 2007) (Because Aetna exercised discretion in denying claim, "[t]he court will therefore evaluate Aetna's denial under the arbitrary and capricious standard").

In Glenn, the Supreme Court elucidated its earlier decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989):

> We do not believe that Firestone's statement implies a change in the standard of review, say, from deferential to *de novo* review. Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion.
>
>         \*                    \*                   \*
>
> Nor would we overturn Firestone by adopting a rule that in practice could bring about near universal review by judges de novo – i.e., without deference – of the lion's share of ERISA plan claims denials, any ERISA plans grant discretionary authority to administrators that combine evaluation and payment functions.

Glenn, 554 U.S. at 115-16 (emphasis added).

But perhaps the most significant controlling case of the Supreme Court's analysis of the standard of review of a plan sponsor's or an administrator's decision to deny benefits was decided this year in Conkright v. Frommert, 130 S. Ct. 1640 (2010), which is doubly significant

33

in that the case originated from the Second Circuit. Firestone established the deferential standard

of review for plan sponsors and administrators in the "arbitrary and capricious" standard:

> It is undisputed that, under _Firestone_ and the terms of the Plan, the Plan
> Administrator here would normally be entitled to deference when interpreting the
> Plan.

Conkright, 130 S. Ct. at 1646.

Glenn made it clear that despite a systemic conflict that arose when the plan administrator

and claims payer roles were both played by the insurance carrier who was ultimately responsible

for paying the claims and suffering the loss, the Supreme Court reaffirmed the "arbitrary and

capricious" standard and deferential review of such an administrator's review of the denial of

claims:

> We held that, when the terms of a plan grant discretionary authority to the plan
> administrator, a deferential standard of review remains appropriate even in the
> face of a conflict.

Id.

Now the Supreme Court has spoken in Conkright, which stands for the premise that even

if the plan administrator makes a **mistake** in the denial or the calculation of a claim, the

administrator's decision is to still be given the utmost deference, and the Supreme Court rejected

the "one strike and you're out" approach utilized by the district court and the Second Circuit.

Conkright involved a deferred compensation or pension type of plan (_i.e._, similar to a

"Top-Hat Plan" which Robinson confirmed the Charter Oak Trust is not, **Tr. 1035:9-1036:17**).

There are certain "non-forfeiture" provisions in ERISA to protect participants in pension plans.

Those anti-forfeiture provisions do not apply to welfare benefit plans like the Charter Oak Trust,

see In re: Lucent Death Benefits ERISA Litigation, 541 F.3d 250 (3d Cir. 2008), or in "Top-Hat"

34

plans, see Bryan v. Pep Boys, No. 00-1525, 2001 WL 752645 (E.D. Pa. Jun. 29, 2001).  In

Bryan, the district court refused to apply federal common law to declare the non-compete void:

> The failure of ERISA to provide nonforfeitability coverage to Top Hat plans is
> not an "interstice" because it is the result of a deliberate decision to let executives
> use their positions of power to negotiate such protection for their plans on their
> own.  Since ERISA intentionally omits Top Hat plans from its nonforfeitability
> protection, federal common law must not be used to create nonforfeitability
> protection under ERISA.

Id. at *4.

Thus, if there is no ERISA "non-forfeiture" provision or vesting provision in a welfare

benefit plan, the plan can change or eliminate the benefit at any time (see Lucent, supra), or if

the plan provisions are not followed, the claim can be easily denied when the beneficiary does

not follow the rules (see, e.g., Bryan, supra, as well as Kennedy v. DuPont, 129 S. Ct. 865

(2009)).

In Lucent, even though the death benefit was attached to a pension plan, the district court

and the Court of Appeals ruled that there was no vesting of the death benefit and it could be

cancelled at any time:

> The pensioners contend that the pensioner death benefit is an accrued and vested
> pension benefit that is protected by ERISA from unilateral termination.  Lucent,
> on the other hand, argues that the pensioner death benefit is an unvested welfare
> benefit that it may terminate unilaterally.

Lucent, 541 F.3d at 254.

If the death benefit was considered part of the pension, it would be subject to vesting and

be nonforfeitable.  However, the Court of Appeals found otherwise:

> Instead, the pensioner death benefit provides "benefits in the event of . . . death."
> See 29 U.S.C. § 1002(1) (defining a welfare plan).  This fits readily within the
> definition of a welfare benefit.  As the Second Circuit Court of Appeals has
> explained, the fact that a welfare benefit appears in a larger plan that also
> provides pension benefits does not change the character of that welfare benefit.
> See Rombach v. Nestle USA, Inc., 211 F.3d 190, 193-94 (2d Cir. 2000).

35

Id. at 255.

The Court of Appeals found in <u>Lucent</u> the same as with this case, that the death benefits at issue constituted a welfare benefit plan rather than a "pension" plan and that there was no ambiguity in the documents on this crucial point:

> The Lucent plan thus is a welfare plan to the extent that it provides for the pensioner death benefit at issue in this case. No ambiguity in the plan prohibits us from reaching this legal conclusion since the plan language is not "subject to reasonable alternative interpretations."

Id. at 256 (citation omitted).

The significance of <u>Conkright</u> is that even in making a **<u>mistake</u>** in the administration of a **<u>pension</u>**-type benefit, the Supreme Court still held the most deferential standard of review to be the correct standard:

> We reject this "one-strike-and-you're-out" approach. Brief for Petitioners 51. As an initial matter, it has no basis in the Court's holding in *Firestone,* which set out a broad standard of deference without any suggestion that the standard was susceptible to ad hoc exceptions like the one adopted by the Court of Appeals. <u>See</u> 489 U.S., at 111, 115, 109 S.Ct. 948. Indeed, we refused to create such an exception to *Firestone* deference in *Glenn,* recognizing that ERISA law was already complicated enough without adding "special procedural or evidentiary rules" to the mix. 554 U.S., at ___, 128 S.Ct., at 2351. If, as we held in *Glenn,* a systemic conflict of interest does not strip a plan administrator of deference, see *id.,* at ___, 128 S.Ct., at 2350-51, it is difficult to see why a single honest mistake would require a different result.

<u>Conkright</u>, 130 S. Ct. at 1646-47.

Nova did not make a mistake in denying the Universitas claim for death benefits. Nova had not just one good reason, it had several good reasons for denying Universitas' claim and appeal, including late filings, an illegal attempt to share the death benefit with Holding Capital and Mactas, and fraud committed on the Plan by Mactas and Spencer in attempting to perform a prohibited Life Settlement transaction in a welfare benefit plan. Nova is not the insurer. Nova will not benefit at all from the payment or denial of this claim, as would Metlife in <u>Glenn</u>. Nova

36

has no conflicts and Nova made no mistakes in denying the Universitas claim. But even if it did have a conflict or even if it did make a mistake, <u>Conkright</u> entitles Nova to the most deferential standard of review – the "arbitrary and capricious" standard. Even the dissent in <u>Conkright</u> agreed that the correct standard of review was the "arbitrary and capricious" standard:

> In essence, the Administrator read the 1989 Plan to include the language that had been omitted--an interpretation that, as described below, see Part I-B, *infra*, the Court of Appeals found to be **arbitrary and capricious** and in violation of ERISA.

> The Court of Appeals concluded that, because the 1989 Plan said nothing about how the Administrator would adjust the previous benefits distributions, it was "**arbitrary and capricious**" for the Administrator to interpret the 1989 Plan as if it still incorporated the "phantom account."

<u>Conkright</u>, 130 S. Ct. at 1654 (emphasis added) (Breyer, J., dissenting).

Since Nova did not have a conflict, did not make a mistake, and had several meritorious reasons for denying the payment of an untimely-filed claim, the Arbitrator should have concluded that Universitas was not entitled to any death benefit and entered an award that Universitas was to take nothing, and would have to pay Nova's legal fees totaling approximately $425,000. Each of these legal points were explained to the Arbitrator in detail, repeatedly, and were obviously (and blatantly) ignored by the Arbitrator, thus requiring this application to vacate the Award.

The Arbitrator was required to apply the most deferential standard of review to Nova's decisions and decision-making process—the arbitrary and capricious standard of review. Nova denied Universitas' claim for benefits under the Plan and appeal for several reasonable, clearly delineated reasons, including late filings, an illegal attempt to share the death benefit with Holding Capital and Mactas, and fraud committed on the Plan by Mactas and Spencer in attempting to perform a prohibited Life Settlement transaction in a welfare benefit plan. Had the

37

Arbitrator reviewed Nova's decision to deny Universitas' claim under the "arbitrary and capricious" standard of review, the only possible conclusion he could have come to is that Universitas is not entitled to an award as a matter of law. However, even assuming the Court or the Arbitrator used a *de novo* standard of review, the failure to file a complete or timely claim form is fatal to any and all of Universitas' claims to benefits under a strict reading of the Plan documents, which is the essence of the *de novo* standard of review. Accordingly, the Award must be vacated.

> **2.    The Award manifests an egregious or patently irrational application of the law because the Arbitrator failed to apply well established contract principles fatal to Universitas' claim**

Nova denied Universtas' claim because Nova was obliged to follow the letter of the Plan documents, specifically the requirement that a claim be submitted on its form and under oath by March 30, 2009. The deadline for claims and the form of the claims are bright line tests from which Nova could not deviate and Nova rightfully ignored informal attempts by Universitas to vary the Plan's requirements. Furthermore, the Plan contains prohibitions against litigation and threats of litigation. Plan §§ 8.02(d), 13.07. Thus, Universitas' repeated threats of litigation provided additional valid grounds for denying its late-filed and improperly-executed claim.

Where the language of the contract is "clear and unambiguous, the contract is to be given effect according to its terms." Allstate Life Ins. Co. v. BFA Ltd. Partnership, 287 Conn. 307, 313 (2008). The operative language of Plan § 8.01 is clear and unambiguous as to the rights of the parties. Indeed, "[i]t is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties." Levine v. Massey, 232 Conn. 272, 279 (1995). Plan § 8.01 is clear that "[a]ny claim application or claim not filed within one hundred eighty (180) days from the end of the Plan Year in which the death or incident of claim occurred will be

considered untimely filed and denied for that reason." The "Plan Year" is defined in Plan § 2.21 as meaning "the 12-month period ending on September 30th of each year."

Spencer died on June 10, 2008. Thus, the end of that Plan Year was September 30, 2008 and the deadline to file a claim was March 30, 2009. Universitas did not submit a claim on forms supplied by the Plan Sponsor pursuant to Plan § 8.01 until July 15, 2009, three and a half months late. Moreover, the Plan requires the claim form to be sworn to by the beneficiary, and in two places, before any claim will be paid. No such document existed or was filed until mid-July 2009. Universitas has not established any waiver of the requirement of Plan § 8.01 by Nova. Nor has it otherwise provided an excuse for its untimely filing. See National Publishing Co. v. Hartford Fire Ins. Co., 287 Conn. 664, 673 (2008) ("When an insured brings an action against an insurer for breach of the insurance contract, the insured bears the burden of proving that it complied with the terms of the contract, including the conditions."). Thus, despite the clear and unambiguous language governing the claims process and denial of benefits, Universitas failed to file a claim by the deadline. As a result, Universitas is not entitled to any benefits. These points were expressly and repeatedly made to the Arbitrator, but he ignored them, therefore being totally derelict in his duties in making an award clearly in manifest disregard of all ERISA rules and Connecticut State law.

In addition, Universitas was instructed by Plan documents to submit any appeal of the denial of its claim to Nova in Simsbury, Connecticut by December 1, 2009 in accordance with Plan § 8.02(a), which permits the claimant to "file a written appeal to the Administrator" within 60 days of the claimant's receipt of denial of its claim. Nova did not receive the appeal until the week of December 15—two weeks after the deadline. Universitas' late submission of its claim and appeal constituted valid grounds for the denial thereof. See Voris v. Middlsex Mut. Assur.

39

Co., 297 Conn. 589 (2010) (insurance company properly denied a claim on the grounds it was submitted after the deadline in the policy, regardless of whether the late submission prejudiced the insurer). Accordingly, the Award must be vacated.

## C. Illegal Sharing of Death Benefit.

Another reason for denying Universitas a death benefit under the Plan was that in its provisional (and belated) claim form, Universitas disclosed its intention to split the death benefit evenly with Spencer's employer, Holding Capital, after making an illegal $200,000 payment to the insurance broker, Mactas, from the death benefit. **Ex. 431; Tr. 986:8-22**.

### 1. Draft July 2008 Settlement Agreement

By early July 2008, several weeks after Spencer died, Robinson was receiving communications from Schinderman, an attorney representing Universitas, and from Arthur Michaelson, an attorney representing Spencer's widow (Mary Spencer) and, at times, also Holding Capital, presenting conflicting demands for the death benefit and threats of litigation. **Tr. 689:7-14; 815:23-817:11**. Robinson received a copy of a draft Settlement Agreement dated July 10, 2008 in which Mary Spencer would receive the entire death benefit, less expenses, and then would make a charitable contribution of $5 million to Universitas. **Ex. 414; Tr. 1085:24-1086:25**. Mactas testified that Universitas was negotiating with Mary Spencer because Lincoln was conducting an investigation into Spencer's death since he died within the contestability period of the first two years after issuance of the policies and Mary was refusing to cooperate with Lincoln regarding a next-of-kin interview. **Tr. 423:3-25**.

By letter dated July 23, 2008, Robinson sought to end the barrage of conflicting interests, make it clear that Universitas was the sole beneficiary of the death benefit, warn that continued threats of litigation would result in a forfeiture of the death benefit, and state that the Plan would be willing to pay the death benefit to an escrow account but would not sign the draft Settlement

40

Agreement.  **Ex. 83; Tr. 815:9-819:18**.  Nevertheless, for another year, Robinson continued to receive communications from the conflicting interests even into September 2009 (**Ex. 429**), and the draft Settlement Agreement was never executed.

### 2. Illegal November 2008 Settlement Agreement

Unbeknownst to Robinson and Nova, negotiations among Universitas, Mary Spencer, and Holding Capital continued and culminated in an executed Settlement Agreement and Releases dated November 11, 2008.  **Ex. 106**.  The Settlement Agreement was between Holding Capital and Universitas, and Mary Spencer and Mactas signed to indicate their consent.  In the Settlement Agreement, Holding Capital and Universitas agreed to split the net Plan death benefit equally, after expenses and an illegal payment of $200,000 to Mactas if the net death benefit exceeded $23 million.  Holding Capital, Universitas, Universitas' principals, and Mary Spencer exchanged releases in connection with the Settlement Agreement.

The first time Robinson and Nova learned of the Settlement Agreement was eight months later when Universitas attached it (without the releases) to its provisional claim form submitted on July 15, 2009.  **Ex. 425; Tr. 1109:17-1112:14**.  Robinson and Nova were shocked to see this Settlement Agreement because it was the first time they learned that Universitas intended to illegally share the death benefit with Holding Capital and Mactas.  **Tr. 1109:17-1112:14**.

In response, Robinson wrote for Bursey's signature a letter dated July 30, 2009 to Universitas in which he explained that the Plan could not and would not pay any death benefit to be shared with the Employer and Mactas.  **Ex. 426**.  He explained that payment of any portion of the death benefit to Holding Capital, which was the Participating Employer in the Plan, was prohibited by law and by Plan §§ 5.05, 5.07, and 7.01.  He also explained that a $200,000 payment from the death benefit to Mactas may violate the law and constitute a conflict of interest.  Robinson also testified that the payment to Mactas would violate the prohibition in

41

paragraph 7 of the Disclosure, Acknowledgment & Certification Agreement (**Ex. 410**) against any "remuneration to the Agent of any kind" apart from the standard insurance commission. **Tr. 1111:6-1113:15**. The July 30, 2009 letter asked Universitas to provide further information about the Settlement Agreement and Releases and an irrevocable waiver by Mactas of any payment from the death benefit and stated that the Plan could not proceed to process the claim without the requested information and documentation.

Once Nova learned that Universitas intended to split the death benefit with Holding Capital and pay $200,000 from the death benefit to Mactas through an illegal settlement agreement, it could not turn a blind eye, pay the death benefit to Universitas, and thereby knowingly facilitate a direct or indirect transfer of assets of the Plan to Holding Capital and Mactas. **Tr. 738:19-739:10; 985:7-22.**

When the requested information and documentation had not been received a month and a half later, Robinson wrote on September 11, 2009 to Lanny Oppenheim, Esq. of Loeb & Loeb, who had been retained by Universitas, and set a deadline of September 22, 2009 for submission of the requested information and documentation. **Ex. 427**. On September 21, 2009, Oppenheim sent a letter responding in conclusory, single sentences to the nine enumerated points in Bursey's July 30, 2009 letter. With respect to the Settlement Agreement and Releases, he simply stated they "are not in effect." **Ex. 428**. Robinson replied the next day and asked for documentary proof that the Settlement Agreement and Releases were not in effect, particularly in light of communications he received as recently as September 8, 2009 from the law firm of Levett Rockwood, which was representing Holding Capital and asking to be copied on correspondence, that led him to believe the Settlement Agreement and Releases **were** still in effect. **Ex. 429**. Robinson asked for the documentary proof by October 2, 2009.

42

At 5:34 p.m. on Friday evening, October 2, 2009, Lloyd Rothenberg of Loeb & Loeb emailed to Robinson a Termination Agreement purporting to terminate the Settlement Agreement and Releases. **Ex. 165**. The Termination Agreement did not alleviate Robinson's serious concerns about whether Universitas intended to share the death benefit with Holding Capital and Mactas but rather raised further questions. First, Oppenheim's letter dated September 21, 2009 (**Ex. 428**), written a day before the deadline set in Robinson's letter dated September 11, 2009 (**Ex. 427**), stated, "The Settlement Agreement and Releases are not in effect." Second, the Termination Agreement later sent was "made and entered into effective as of the 20th day of September, 2009," a day before Oppenheim's letter. **Ex. 165**. Third, the signatures were affixed to the Termination Agreement on October 1 and 2, 2009, as indicated in the notary blocks.

The Termination Agreement was not addressed in the October 2, 2009 denial of the claim (**Ex. 431**) because the denial was sent out by Federal Express at the end of the day and before arrival of Rothenberg's email after the close of business. **Tr. 962:23-963:6; 969:23-972:8**. For the following reasons, though, the Termination Agreement did not rescue the claim from denial.

Under these circumstances, it appeared to Robinson that there had been no basis for Oppenheim to state on September 21, 2009 that the Settlement Agreement and Releases were not in effect but rather that he drafted the Termination Agreement to be effective "as of September 20, 2009" to cover up his misstatement. If the Settlement Agreement and Releases had truly not been in effect as of September 20, 2009, there should have been documentation of their termination on or before that date, particularly since Bursey's July 30, 2009 letter (**Ex. 426**) had raised serious concerns about them and Robinson's September 11, 2009 letter (**Ex. 427**) had reminded Oppenheim of this issue. So, Universitas had almost two months from Bursey's letter

43

and had nine days from Robinson's letter to prepare and execute the half-page Termination Agreement by September 20, 2009. Instead, the Termination Agreement was executed almost two weeks later in October and its effective date backdated. **Tr. 929:18-930:9**.

To this day, Robinson and Nova continue to doubt that the illegal Settlement Agreement and Releases were, in fact, terminated. In fact, as recently as one month before the arbitration hearing, Holding Capital, purportedly now known as Key Biscayne Investments, Inc., sent a letter dated November 12, 2010 to Nova designating Universitas' counsel, Loeb & Loeb, as its representative to inspect and audit the books and records of the Plan. **Ex. 435**. If the Settlement Agreement and Releases had actually been terminated and Holding Capital were not expecting a share of the death benefit, Holding Capital would have had no interest in inspecting and auditing the Plan's books and records or in assisting Universitas, whose right to the death benefit Holding Capital formerly contested. **Tr. 1124:18-1125:21**. Again, the legal issues were all presented to the Arbitrator, and were ignored.

### 3.    Pertinent Legal Authority

Nova properly denied benefits to Universitas because of Universitas' stated intent to illegally share the death benefit with Holding Capital and Mactas.

Universitas' intended splitting of half the death benefit with Holding Capital violates established principles of law as well as the Plan documents. On page 7 of its prehearing brief, Universitas relies on 29 U.S.C. §§ 1104(a)(1)(A), which appears in Part 4 of Title I of ERISA. ERISA § 406(a)(1)(D), which also appears in Part 4, provides that a fiduciary of an employee welfare benefit plan such as Nova "**shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan**." 29 U.S.C. § 1106(a)(1)(D) (emphasis added). Holding Capital fits the definition of a "party in interest,"

44

which includes "an employer any of whose employees are covered by such plan." 29 U.S.C. § 1002(14).

Moreover, the Internal Revenue Code forbids welfare benefit plans from sending any funds to the employer. IRC § 4976 specifically forbids any type of a reversion from a welfare benefit plan to the employer and penalizes it with a 100% excise tax. IRC § 4976(a) provides that the IRS imposes on an employer in a welfare benefit plan "a tax equal to 100 percent" of a "disqualified benefit." A "disqualified benefit" is defined to include "any portion of a welfare benefit fund reverting to the benefit of the employer." 26 U.S.C. § 4976(b)(1)(C). Thus, the Code effectively prohibits reversions to the employer because the excise tax equals the amount of the funds that are transferred from the plan to the employer.

The Plan would have no way of knowing if Universitas later split the benefits with Holding Capital. As a result, the transfer of Plan assets would go unreported to the IRS, and Holding Capital would have succeeded in skirting the prohibition and excise tax in 26 U.S.C. § 4976(b)(1)(C). The Plan simply could not aid and abet such tax evasion by turning a blind eye and paying Universitas the death benefit in reliance on the suspect Termination Agreement. Again, all of these points were made to the Arbitrator, and he ignored them.

## CONCLUSION

For the foregoing reasons, the Court should grant Nova's Motion to Dismiss and take no further action on the Petition.  In the alternative, the Court should dismiss the Petition as premature.  Lastly, and as the final alternative, the Court should deny the Petition and instead vacate the Award in its entirety.

Respectfully submitted,

NOVA GROUP, INC.


By:   _Joseph M. Pastore III_____
Joseph M. Pastore III (JP 1717)
FOX ROTHSCHILD LLP
One Landmark Square, 21st Floor
Stamford, CT 06901
Telephone:  (203) 425-9500

and

100 Park Avenue, Suite 1500
New York, New York 10017
Telephone: (212) 878-7900
E-mail:   jpastore@foxrothschild.com

*Its Attorneys*

46

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on April 5, 2011, a copy of the forgoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


<u>/s/ Joseph M. Pastore III</u>
Joseph M. Pastore III

# EXHIBIT 12

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC, | ) |
| | ) |
| Petitioner/Judgment Creditor, | ) |
| | ) |
| v. | ) |
| | ) |
| AVON CAPITAL, LLC, | ) |
| | ) |
| Respondent/Judgment Debtor, | ) |
| | ) |
| ASSET SERVICING GROUP, LLC, | ) |
| | ) Case No. 14-FJ-05-HE |
| Respondent/Garnishee, | ) |
| | ) |
| SDM HOLDINGS, LLC, | ) |
| | ) |
| Respondent/Garnishee, | ) |
| | ) |
| and | ) |
| | ) |
| AVON CAPITAL, LLC, a Wyoming | ) |
| Limited Liability Company, | ) |
| | ) |
| Intervenor. | ) |

## <u>REPORT AND RECOMMENDATION</u>

# Table of Contents

I.   INTRODUCTION. ........................................................................... 1

II.   BACKGROUND. ........................................................................... 4

    A. Universitas was the sole beneficiary to certain life insurance proceeds. ........................................................................... 4

    B. Universitas did not receive those proceeds. ........................................ 5

    C. The creation of the three Avon Capital, LLC entities. ........................ 8

    D. The trail of Avon proceeds. .................................................. 11

    E. Avon-CT's transactions. ...................................................... 13

        1. The Ridgewood credit facility agreement. .............................. 13

        2. The Ridgewood facility's funding of Charter Oak Trust policies and their resale. ........................................................ 16

    F. Avon-WY's transactions. ...................................................... 20

        1. The SDM purchase. ...................................................... 20

        2. Andrew Terrell consults for Avon-WY. .................................. 25

        3. Avon-WY's 2010 "unloading" of Avon-CT's life insurance policies. .............................................................. 26

III.   THIS COURT HAS SUBJECT MATTER JURISDICTION. .................................. 29

IV.   THE EFFECT OF THE REGISTRATION OF THE JUDGMENT. ............................ 33

V.   THE COURT DENIES THE MOTIONS TO STRIKE THE CHERNOW DECLARATIONS. ........................................................................... 34

VI.   THE COURT CONSIDERS UNIVERSITAS'S AND AVON-WY'S MOTIONS FOR SUMMARY JUDGMENT. ................................................................ 36

    A. Standard of review. .......................................................... 36

B. The Court grants Universitas's motion for summary judgment: Avon-WY and Avon-NV are alter egos of Avon-CT, the named judgment debtor. ................................................................ 38

    1. Fraud confirms this. ................................................. 42

        a. Lack or inadequacy of consideration. ........................... 43

        b. Close familial relationship or friendship among the parties. ............................................................ 44

        c. Retention of possession or benefit of the property transferred. ......................................................... 46

        d. Change in financial condition of transferor in relation to the transfer. ....................................................... 47

        e. Chronology of events surrounding the transfer. ........... 47

        f. Transfer takes place during the pendency or threat of litigation. ......................................................... 50

        g. Hurried or secret transactions. ................................. 51

        h. Conclusion. ....................................................... 53

    2. Undercapitalization confirms this. .............................. 54

    3. Intermingling confirms this. ..................................... 56

    4. Injustice confirms this. ............................................ 60

    5. Conclusion. .......................................................... 61

C. The Court denies Avon-WY's motion for summary judgment. ......... 62

VII. THE COURT DENIES SDM'S MOTION TO QUASH THE GARNISHMENT AND MOTION FOR PARTIAL SUMMARY JUDGMENT. ............................. 65

VIII. THE COURT DENIES UNIVERSITAS'S MOTION TO STRIKE SDM'S MOTION TO QUASH AND ITS REQUEST FOR SANCTIONS AGAINST SDM. ...................... 67

IX. CONCLUSION. ..................................................................... 68

X. RECOMMENDATIONS AND NOTICE OF RIGHT TO OBJECT. ..................... 69

# I.   INTRODUCTION.

Petitioner Universitas Education, LLC seeks enforcement of a $6,710,065.92 judgment entered in its favor on August 12, 2014 by the United States District Court for the Southern District of New York ("*Nova SDNY Litig*[*ation*].").  *See* Doc. 1.[1]  The Judgment was against Daniel E. Carpenter and his various entities, including "Avon Capital, LLC."  *Id.*  United States District Judge Joe Heaton referred all post-judgment collection matters to the undersigned Magistrate Judge consistent with 28 U.S.C. § 636(b)(3).  Doc. 8.

In November 2014, the Southern District of New York permitted Universitas to register the $6,710,065.92 judgment in this district.  Doc. 1, Att. 2.  After doing so, Universitas sought an examination hearing regarding Judgment Debtor Avon Capital's potential ownership interests in Garnishee SDM Holdings, LLC (SDM).  Intervenor Avon Capital, LLC, a Wyoming LLC (Avon-WY), sought a permanent injunction to prohibit Universitas from enforcing the judgment against SDM or any of Avon-WY's other assets.  Doc. 73.  This Court denied that injunction.  Doc. 92.  Instead, the Court allowed limited discovery "to locate and identify Avon Capital, LLC's assets," to "determine the relationship between three allegedly distinct Avon Capital,

---

[1]   Citations to a court document are to its electronic case filing designation and pagination.  Deposition testimony deviates from this practice by instead using the deposition page number.  Except for capitalization, quotations are verbatim unless otherwise indicated.

1

LLC entities," and SDM, "in aid of execution" of the judgment.  Doc. 158, at 2 (affirming Doc. 150).

Before the Court, now, are:

(1) Avon-WY's motions to strike two declarations, Docs. 193, 213, and SDM's motion to join Avon-WY's first motion to strike, Doc. 196;

(2) Universitas's motion for summary judgment to impose alter-ego liability on Avon-WY for the full amount of the judgment against Avon Capital LLC, Doc. 186;

(3) Avon-WY's motion for summary judgment dismissing Universitas's claims seeking to pierce the corporate veil, Doc. 194;

(4) SDM's motions to quash garnishment and for partial summary judgment, Docs. 191, 192; and

(5) Universitas's motion to strike SDM's motion to quash, Doc. 208.

In its first motion, Universitas argues that Avon-WY is an alter ego of the two other Avon Capital, LLC entities, and that all three "were operated as a singular Avon Capital, LLC," which is a named judgment debtor.  Doc. 187, at 18.  Universitas asserts Avon-WY's alter-ego status should compel the Court to pierce the corporate veil and reach Avon-WY's assets (namely, SDM) to satisfy the judgment.  *Id.* at 24.  Universitas asks this Court to transfer Avon-WY's ownership of SDM to Universitas to satisfy the judgment, *id.* at 32, and,

if the Court declines to do so, to "enjoin Avon-WY from transferring ownership of SDM elsewhere."  Doc. 201, at 10.

Avon-WY argues it is not a judgment debtor and that Universitas lacks evidence to establish that Avon-WY is "an alter ego of any judgment debtor." Docs. 195, 204.  In support of that contention, Avon-WY filed motions to strike two declarations by Benjamin Chernow, which Universitas included in its Motion for Summary Judgment, Doc. 187, Att. 1, and its Response to Avon-WY's Motion for Summary Judgment, Doc. 205, Att. 1.  *See* Docs. 193, 213.

SDM, in turn, seeks partial summary judgment.  Doc. 192.  It argues that SDM was "never properly served with the garnishment summons," that no claims remain against SDM, and that SDM is neither indebted to nor holds assets of the judgment debtor.  *Id.* at 5-10.  SDM seeks to join Avon-WY's motion to strike the first Chernow declaration, Doc. 196, and moves to quash the garnishment summons.  Doc. 191.  In response, Universitas has moved to strike SDM's motion to quash—in addition to seeking sanctions against SDM, accusing SDM of "improper motion practice."  Doc. 208, at 1.  Specifically, Universitas alleges that SDM's purpose in "filing the same argument three times [is] . . . 'to harass, delay, or increase the cost of litigation.'"  *Id.* at 2.

Having reviewed the parties' extensive submissions, the undersigned recommends the Court (1) DENY Avon-WY's motions to strike, (2) GRANT SDM's motion to join, (3) GRANT Universitas's motion for summary judgment

3

and find that Avon-WY is the alter ego of the two other Avon Capital, LLC entities involved here, (4) DENY Avon-WY's motion for summary judgment, (5) DENY SDM's motions to quash and (6) for partial summary judgment, and (7) DENY Universitas's motion to quash and its request for sanctions against SDM. The undersigned recommends the Court (8) ENJOIN Avon-WY from transferring, alienating, and/or concealing or encumbering its ownership of any interest in SDM; and (9) ENJOIN Avon-WY, Avon-CT, and Avon-NV from transferring, alienating, and/or concealing or encumbering any non-exempt property.

## II.  BACKGROUND.

### A. Universitas was the sole beneficiary to certain life insurance proceeds.

Judge Heaton has provided helpful background in this matter:

> Universitas was the sole beneficiary of several life insurance policies totaling $30 million in proceeds. *Universitas Educ., LLC v. Nova Grp., Inc.*, 784 F.3d 99, 100-01 (2d Cir. 2015). When the death benefits came due, however, Universitas's claim to those benefits was denied. *Id.* Universitas participated in binding arbitration with the trustee of the benefit plan, and obtained a favorable award. *Id.* The plan trustee sought to vacate the award in the U.S. District Court for the Southern District of New York, but the award was confirmed and judgment was entered for $30,181,880.30. *Id.*

Doc. 92, at 2.

4

## B. Universitas did not receive those proceeds.

The Southern District of New York turnover proceeding, referenced above, found that Daniel Carpenter fraudulently transferred $30 million of life insurance policy proceeds from the Charter Oak Trust, of which Universitas was the sole beneficiary.[2]  *See Universitas Educ., LLC v. Nova Grp., Inc.*, 2014 WL 3883371, at *2 (S.D.N.Y. Aug. 7, 2014) [hereinafter *Aug. 2014 Nova*].

---

[2]  A court may "take judicial notice of its own files and records, as well as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001).  The Court will not consider these documents for the truth of the matters asserted in them. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (noting that judicially noticed "documents may only be considered to show their contents, not to prove the truth of matters asserted therein").

Under Rule 201, a court may take judicial notice of adjudicative facts not subject to reasonable dispute at any point in the proceedings.  An adjudicative fact is a fact "concerning the immediate parties-who did what, where, when, how, and with what motive or intent." Fed. R. Evid. 201 advisory committee's note (quoting 2 Kenneth C. Davis, *Administrative Law Treatise* at 353 (1958)).  Adjudicative facts must, by definition, be relevant.  21 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5104 at 483-84 (1977).

The Court takes judicial notice from this proceeding and from two cases intertwined with the current action.  First, the Court relies on the turnover action (*Nova SDNY Litig.*) between Universitas and judgment-debtor Nova Group, Inc.  *See Universitas Educ., LLC v. Nova Grp., Inc.*, No. CIV-11-1590-LTS-HBP, 2012 WL 2045942 (S.D.N.Y. Jun. 5, 2012).  Second, the Court cites the criminal action against Carpenter, which the Second Circuit affirmed. *See United States v. Carpenter*, 190 F. Supp. 3d 260 (D. Conn. 2016), *aff'd sub nom., United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020).  Both offer adjudicative facts involving the immediate parties and who did what, when, where, how, and with what motive or intent.  Universitas and Avon-WY have also relied on courts' findings, depositions, and other materials from these proceedings.  *See e.g.*, Doc. 195, at 4 n.1 & Att. 5; Doc. 187, Att. 21.

These "fraudulent transfers" were made to a number of shell entities that were under Carpenter's control at all relevant times. *Id.* In fact, Carpenter controlled "hundreds of . . . entities" that he used "to hide assets from [Universitas]." *Id.* From May 2009 to October 2010, some of those entities were: Nova Group, Inc. (Nova); Charter Oak Trust; Grist Mill Capital, LLC (Grist Mill Capital); Grist Mill Trust Welfare Benefit Plan (Grist Mill Trust); Grist Mills Holdings, LLC (Grist Mill Holdings); Phoenix Capital Management, LLC (Phoenix); Caroline Financial Group, Inc. (Caroline Financial); Avon Capital, LLC; and Carpenter Financial Group (Carpenter Financial). *Id.* at *2. Of these, Nova, Grist Mill Capital, Grist Mill Trust, Grist Mill Holdings, Phoenix, Avon, and Carpenter Financial[3] are all either judgment debtors or alter egos of judgment debtors. Doc. 147, Att. 29, at 2-3.

The *August 2014 Nova* court also identified Wayne Bursey (President of Nova and Trustee of Charter Oak Trust) as "Mr. Carpenter's confederate in the fraudulent transfers." 2014 WL 3883371, at *2. And Bursey "was the only signatory on the Charter Oak Trust accounts." *Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 6123104, at *2 (S.D.N.Y. Nov. 20, 2013) [hereinafter *Nov. 2013 Nova*].

---

[3]   Carpenter Financial Group, LLC is also an alter ego of a judgment debtor. Doc. 147, Att. 29, at 2.

6

The *August 2014 Nova* court stated that "Avon was controlled by its managing member, Grist Mill [Capital], which is wholly owned by its members Grist Mill Holdings and Caroline Financial [ ]both of which were wholly owned by Mr. Carpenter." 2014 WL 3883371, at *3. Carpenter is Chairman of Caroline Financial. *Id.* Caroline Financial served as a member of both Grist Mill Capital and Grist Mill Holdings.[4] Doc. 205, Att. 2, ¶¶ 1, 25. And, as noted, Grist Mill Holdings also was a member of Grist Mill Capital. *August 2014 Nova*, 2014 WL 3883371, at *3. In his testimony, Carpenter admitted Grist Mill Holdings is his "alter ego for collecting commissions." *Id.*

During Carpenter's criminal trial, the trial court stated "[t]he evidence establishe[d] beyond a reasonable doubt that [Carpenter] conspired with . . . Don Trudeau, among others" to commit life insurance fraud.[5] *Carpenter*, 190 F. Supp. 3d at 299.

---

[4] The *Nov. 2013 Nova* court stated Grist Mill Capital's members were Caroline Financial Group, and Grist Mills Holdings, and that Bursey was a manager. 2013 WL 6123104, at *3. Grist Mill Capital's Articles of Organization list Jack Robinson and Bursey as its managers. Doc. 147, Att. 13. Robinson is an attorney and manager of Grist Mill Capital, and is affiliated with several of Carpenter's entities and served as general counsel of Benistar Admin Services (Benistar or BASI) "for a period of time." Doc. 187, Att. 6, at 42; *id.* Att. 12; *see also* Doc. 147, Att. 31. Robinson is also Nova's former attorney. *Nov. 2013 Nova*, 2013 WL 6123104, at *2.

BASI is one of the entities the *Carpenter* court found Carpenter controlled. 190 F. Supp. 3d. at 273. BASI provided administrative services to other Carpenter-controlled entities, and their employees "received their paychecks from BASI." *Id.*

[5] Trudeau is one of Carpenter's affiliates and served in different roles in

## C. The creation of the three Avon Capital, LLC entities.

On June 6, 2006, Avon Capital, LLC filed articles of organization with the Nevada Secretary of State, forming a Nevada limited liability company (Avon-NV).  Doc. 57, Att. 1, at 3-4.  Avon-NV's managing member was Grist Mill Capital.  *Id.* at 3.  Trudeau testified he did not have "any involvement" with Avon-NV.  Doc. 187, Att. 6, at 23, ln. 19.

On November 21, 2006, Bursey, as the organizer, filed articles of organization on behalf of Avon Capital, LLC with the Connecticut Secretary of State, forming a Connecticut limited liability company (Avon-CT).  Doc. 57, Att. 2, at 1.  At the time of incorporation, Bursey and Robinson were listed as its managers.  Doc. 147, Att. 17; Doc. 195, Att. 2.  Trudeau testified that he, Bursey, and Robinson served as managers of Avon-CT around November 2006.  Doc. 187, Att. 6, at 41, lns. 14-21.

On May 18, 2007, Avon Capital, LLC filed articles of organization with the Wyoming Secretary of State, forming a Wyoming limited liability company (Avon-WY).  Doc. 147, Att. 6.  Avon-WY was administratively dissolved in June 2009 for failure to maintain a registered agent, and Trudeau, acting as principal, applied to reinstate it on November 15, 2010.  *See id.* Att. 9; Doc. 57,

---

Carpenter's enterprises.  *See, e.g.*, Doc. 147, Att. 31 (listing him as director of BASI).  "Don Trudeau was the President of BASI, and [Carpenter]'s wife, Molly Carpenter, was its Chairman."  *Carpenter*, 190 F. Supp. 3d at 273.

Att. 6, at 3. Avon-WY was again administratively dissolved in July 10, 2011 for tax reasons, and Trudeau reinstated it on November 28, 2011. Doc. 57, Att. 6, at 2-3.

At the time of incorporation in 2007, and after its reinstatements, Caroline Financial was Avon-WY's manager.[6] Doc. 147, Att. 6; Doc. 57, Att. 6. Counsel for Avon-WY has stated that Trudeau served as a member and officer of Avon-WY before its 2010 reinstatement. Doc. 187, Att. 11; *see also* Doc. 171, Att. 4, at 2, lns. 2-3; Doc. 58. Trudeau testified he was "the managing member" after reinstating Avon-WY. Doc. 187, Att. 6, at 17-18. Caroline Financial also continued to serve as managing member after Avon-WY's reinstatement. *Id.* Att. 11; Doc. 147, Att. 8. Trudeau was the only authorized signatory for Avon-WY. Doc. 187, Att. 10, at 232, lns. 22-24.

Avon-WY was ninety-nine percent owned by Carpenter Financial and one percent owned by Caroline Financial. Doc. 171, Att. 4, at 2, lns. 17-25. Avon-CT was also ninety-nine percent owned by Carpenter Financial and one percent owned by Caroline Financial. Doc. 187, Att. 4, at 2, lns. 18-28. In 2010, Avon-NV was also ninety-nine percent owned by Carpenter Financial and one percent owned by Caroline Financial. *Id.* Att. 5. Avon-WY, Avon-CT, and Avon-NV each had its principal address at 100 Grist Mill Road, Simsbury, CT

---

[6]     Trudeau also stated that Caroline Financial was Avon-WY's managing member in July, 2010. Doc. 171, Att. 4, at 2, ln. 23.

06070.  *See* Doc. 92, at 5; Doc. 147, Atts. 6, 13; Doc. 57, Att. 1.[7]  Carpenter controlled both Caroline Financial and Carpenter Financial.  *August 2014 Nova*, *Aug. 2014 Nova*, 2014 WL 3883371, at *3.  Bursey listed the same Grist Mill address as his business and residential address.  Doc. 147, Att. 17.  Grist Mill Capital (managing member of Avon-NV), Grist Mill Trust, and Grist Mill Holdings also have the same address.  Doc. 92, at 5 n.4.  Trudeau testified Benistar has its offices at the same address.  Doc. 195, Att. 5, at 14, lns. 9-11.

In November 2013, Carpenter averred he served as chairman of Caroline Financial, which in turn served as the managing member of Avon-WY.  Doc. 147, Att. 8; Doc. 205, Att. 2, ¶ 1.  The *Nova* courts identified Caroline Financial as one of Carpenter's wholly owned and controlled "shell companies," one of the shell entities he used to hide assets from Universitas.  *Nov. 2013 Nova*, 2013 WL 6123104, at *5, *8; *Aug. 2014 Nova*, 2014 WL 3883371, at *2, *5, *8.

Carpenter testified he was "privy" to each of the three Avon Capital entities.  Doc. 147, Att. 5, at 144, lns. 12-16.  He "definitely knew about [Avon-CT]."  *Id.* lns. 15-16.  According to Carpenter, unlike Avon-WY, Avon-NV did not engage in any life settlement transactions.  *Id.* at 146, lns. 3-6.  He also asserted it never had any employees or office space.  *Id.* lns. 10-16.

---

[7]    On November 28, 2011, Avon-WY updated its principal address to 300 1st Stamford Place, Suite 201, Stamford, CT 06902, but retained its mailing address in Simsbury.  Doc. 57, Att. 6, at 2.

Carpenter testified because Wyoming had few prohibitions or regulations for life settlement transactions, he thought "it would be best" to have a Wyoming LLC as opposed to a Nevada or Delaware LLC for those transactions. *Id.* at 147, lns. 2-16. Trudeau similarly testified. Doc. 187, Att. 6, at 18-20. "Carpenter is listed as the signatory on both of Avon Capital's bank accounts." *Carpenter*, 190 F. Supp. 3d at 273.



## D. The trail of Avon proceeds.

Among the fraudulent transfers the *August 2014 Nova* court identified, was a November 11, 2009 $6,710,065.92 transfer from Grist Mill Capital to Avon Capital, LLC. 2014 WL 3883371, at *3. The Avon Capital, LLC account

11

was held at TD Bank, with an account number ending in 4689 (Avon-NV TD bank account).[8]  Doc. 56, at 4; Doc. 57, Att. 1, at 1.

That transfer, like the others the *August 2014 Nova* court outlined, "were without documentation or consideration, a clear sign of fraud."  2014 WL 3883371, at *3.  "Nova and Mr. Carpenter resisted all discovery efforts to determine the whereabouts of [proceeds] after the transfers, and such secrecy further indicates a fraudulent intent."[9]  *Id.*  The court assessed a judgment of that same amount ($6,710,065.92) against Avon Capital, LLC.  *Id.* at *13.

During the month of December 2009, the Avon-NV TD bank account had large-sum withdrawals and deposits to and from bank accounts also controlled by Carpenter.  *See* Doc. 147, Att. 22.  After the November 11, 2009

---

[8]     Carpenter opened that bank account (one of the two "Avon Capital, LLC' accounts maintained in 2009-2010) on May 20, 2009.  Doc. 147, Att. 13; *Carpenter*, 190 F. Supp. 3d. at 273 ("Mr. Carpenter is listed as the signatory on both of Avon Capital's bank accounts.").  Carpenter opened this not long after an unsuccessful attempt to open a Charter Oak Trust account at Bank of America.  *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 2, at 64 (S.D.N.Y. Oct. 21, 2013) (May 14, 2009 email from Carpenter to Jeffrey Roman at U.S. Trust, Bank of America, complaining "that I was not allowed to do wires any more at [Bank of America] on Avon Capital which is a Company that I created and which has control over millions of dollars of assets in several trust accounts").

[9]     The SDNY sanctioned Nova for its "dilatory conduct during the course of post-judgment discovery," "efforts to frustrate Universitas' enforcement of the judgment," noting the Second Circuit encouraged a sanction aimed at deterring Nova's "persistent and abusive litigation conduct."  *Universitas Educ., LLC v. Nova Grp., Inc.*, No. CIV-11-1590-LTS-HBP, 2016 WL 2944646, at *3-5 (S.D.N.Y. Mar. 31, 2016), *adopted*, Doc. 598 (S.D.N.Y. May 16, 2016).

$6,710,065.92 deposit from Grist Mill Capital, the Avon-NV TD bank account had a November 30, 2009 balance of $6,745,794.16. *Id.* at 1. On December 30, 2009, the balance was $938,454.59; and on December 31, 2009, the balance was $160,683.29. *Id.* at 1, 3. Some of the transfers in the month included a December 3, 2009 $6.5 million transfer to a TD bank account ending in 7136 (Grist Mill Holdings TD bank account),[10] two deposits late in the month (totaling $1,292,469.36) from a bank account ending in 4697 (Carpenter Financial TD bank account), and wire transfers to H. Thomas Moran. *Id.* at 1, 3; *see also Carpenter*, No. CR-13-226-RNC, Doc. 207, at 22 (Government Exhibit List) (identifying Grist Mill Holdings and Carpenter Financial TD bank accounts).

## E. Avon-CT's transactions.

### 1. The Ridgewood credit facility agreement.

Trudeau testified Avon-CT was "originally formed with specific capitalization and transaction structures in mind." Doc. 187, Att. 6, at 10, lns. 4-6. "[I]t was part of a joint facility with Grist Mill Capital, a $35 million facility." *Id.* lns. 13-14. He testified he thought "Ridgewood[11]" was the actual

---

[10]    Doc. 171, Att. 8 (Grist Mill Holdings' TD bank account statement for November 2009 showing the last four digits of 7136 as the account number); *Carpenter*, 190 F. Supp. 3d at 295 (identifying TD bank account ending in 7136 as belonging to Grist Mill Holdings).

[11]    "Ridgewood [Finance Inc.] was a portfolio company" that was "set up as a speciality finance lender. In this capacity, Ridgewood made loans to other

issuing entity." *Id.* lns. 20-21. "And so all of the assets and activities basically that were conducted in [Avon-CT] were subject to that pledge and credit agreement." *Id.* at 10-11; *see Carpenter*, 190 F Supp. 3d at 279 (outlining Ridgewood credit facility agreement). That agreement, signed by Carpenter as "Chairman of [the] Managing Member" of Avon-Capital LLC, stated the financing was "for the purpose of funding AVON CAPITAL LLC's underlying loan to AVON INSURANCE TRUST on financing premium of a Life Insurance Policy." Doc. 187, Att. 9, at  3, 1; *Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 3328746, at *2 (S.D.N.Y. July 2, 2013) ("Grist Mill [Capital], Avon Capital, Charter Oak Trust and Avon Insurance Trust are entities that are closely related to Nova Group. As collateral for this loan, Ridgewood Finance, Inc. took a security interest in the life insurance policies held by Charter Oak Trust and Avon Insurance Trust.").

"The parties agreed that Christiana Corporate Services, Inc. . . . would act as the [document custodian] and insurance trustee." *Carpenter*, 190 F. Supp. 3d. at 279. "If Ridgewood decided to fund the policy, it would issue a commitment letter to Bursey, who acted as the trustee of [Charter Oak Trust] and Kathy Kehoe, a Benistar employee."[12] *Id.* If Ridgewood authorized the

---

finance companies, often at high rates of interest." *Carpenter*, 190 F. Supp. 3d at 278-79.

[12]     Kathy Kehoe served as the Manager of the Trust Department of Benistar, since 2003. *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 337,

funding, it "would then direct Christiana to transfer the funds to an account in [Charter Oak Trust]'s name at PNC Bank . . . ." *Id.* at 280.

Trudeau testified that one of the Ridgewood facility's insureds was Rella Waldman, and that Trudeau was involved in that transaction. *See* Doc. 187, Att. 3, at 56; Att. 9. Trudeau further testified he was aware Avon-CT provided support services for Avon Insurance Trust. *Id.* Att. 3, at 57, lns. 14-16.

In a December 2006 letter from Robinson as Grist Mill Capital manager to Christiana, Robinson requested the creation of a custody account for Avon Capital, LLC. *Id.* Att. 12. Even though Avon-CT was the entity involved with the Christiana and Ridgewood transactions, Robinson used Avon-NV's tax identification number which ends in 6827, when opening the bank account. *Id.*; Doc. 57, Att. 1.[13]

The Avon-NV TD bank account records also show wire transfers toward the Waldman life insurance policy. *See* Doc. 187, Att. 13, at 1, 7-8 (reflecting a $44,150.00 outgoing wire to PNC Bank and fee for Waldman policy on Aug. 19, 2009); *id.* at 4, 9 (reflecting a $44,150.00 outgoing wire (including the wire transfer fee) to PNC Bank for the Waldman policy on Oct. 5, 2009).[14]

---

Att. 3, at 1 (S.D.N.Y. Nov. 20, 2013). She was also Assistant Secretary of Nova. *Id.* She currently serves as SDM's manager. Doc. 192, Att. 1, at 3; *see also* Doc. 187, Att. 19, at 64, lns. 7-9.

[13]    In its motion for summary judgment, Avon-WY erroneously states this tax identification number belongs to Avon-CT. Doc. 195, at 4, ¶ 2.

[14]    What Universitas identifies as Avon-NV's general ledger also reflects

### 2. The Ridgewood facility's funding of Charter Oak Trust policies and their resale.

As noted above, this action hinges on the fraudulent transfer from the Charter Oak Trust policies. These policies were stranger-oriented life insurances (STOLI) policies. The *Carpenter* court explained the nature of STOLI policies, life insurance providers' opposition to these policies, and Carpenter's creation of the Charter Oak Trust to serve "as a vehicle for obtaining [these] policies." 190 F. Supp. 3d at 273. Charter Oak Trust planned to "[re]sell life insurance policies on the secondary market, after [the lapse of] a contestability period."[15] *Id.* at 276.

---

holding investment accounts for "R. Waldman" (Account IDs 1320 and 1322) in the amounts of $1,002,475.00 and $626,300.00. Doc. 187, Att. 14, at 1, 8-9. Although the Avon Capital, LLC general ledger does not specifically state that it is Avon-NV's, the Court can reasonably infer so from the fact that the transactions listed on it reflect transactions that match those from Avon-NV's two bank accounts. *Compare* Doc. 187, Att. 14, at 2-4, *with* Doc. 147, Att. 22 (Avon-NV's TD bank account), at 4-6, *and id.* Atts. 15-16 (Avon-NV's People's bank account, *see infra* § II.G.). Avon-WY and SDM dispute the admissibility of this document, as it has not been authenticated and amounts to hearsay. Doc. 193, at 5-6; Doc. 197, at 15-17. The Court determines the ledger to be supplemental only for purposes of its findings herein.

[15]

> To induce people to participate in [Charter Oak Trust] as straw insureds, the agents used a sales pitch learned from discussions at the 100 Grist Mill Road offices. The prospective insureds were promised free life insurance for two years. They were told that if they died during the two-year period, the policy proceeds would be disbursed to their beneficiaries. After two years, the policy would be sold and the insured could potentially profit from the sale. No effort was made to attract people with an interest in buying long-term life insurance coverage then or later.

16

Insured Sash Spencer obtained two policies totaling $30 million, the first two policies ever to be placed in Charter Oak Trust. *Id.* at 292. Ridgewood funded both policies. *Id.* at 293. Spencer died in June 2008, within the contestability period. *Id.* Although the insurance provider investigated, the provider "was unable to determine that the two policies were procured for sale on the secondary market" and issued two checks to Charter Oak totaling $30,677,276.75 (the policies' proceeds plus interest), at Bursey's behest. *Id.* ("Mr. Bursey had admonished [the provider] that the trust had a 'fiduciary duty to pay death benefits to the Participant's designated beneficiary.'"). When Bursey told Carpenter about the checks, Carpenter wrote "Big day for all of us . . . check mail and speak only to me . . . only to me. . . . May you be in heaven before the Devil knows you're dead." *Id.*

The *Carpenter* court reviewed a "complex web of corporate entities, bank accounts, and numerous money transfers" to "determin[e] how the defendant and his co-conspirators used the $30 million in policy proceeds." *Id.* at 295. For example, on May 18, 2009, Bursey deposited the two checks from the insurance provider into a TD account in Charter Oak Trust's name, the "account ending in 4548" (Charter Oak TD bank account). *Id.* This account

---

*Carpenter*, 190 F. Supp. 3d at 280-81. "[Charter Oak Trust] was not widely marketed in order to reduce the risk that the true nature of the trust would be revealed." *Id.* at 280.

"had been set up by Mr. Bursey six days earlier." *Id.* Then, on May 21, 2009, Bursey transferred $8,677,276.75 from the Charter Oak TD bank account to a TD account belonging to Grist Mill Capital, the "account ending in 4712" (Grist Mill Capital TD bank account). *Id.* "Prior to this transfer, the [Grist Mill Capital TD bank account] was empty." *Id.* Then, on May 26, 2009, Bursey transferred another $2,186,566 from the Charter Oak TD bank account to the Grist Mill Capital TD bank account. *Id.* "After these two transfers, which were the only ones into the [Grist Mill Capital TD bank account] at the relevant time, the [Charter Oak TD bank account] contained just over $19.8 million." *Id.*

At the same time, the "$19.8 million remaining from the proceeds of the Spencer policies was kept in the [Charter Oak TD bank account], where the entire death benefit had originally been deposited." *Id.* at 296. On October 2, 2009, Bursey denied Universitas's claim to the proceeds. *Id.* at 294. On October 27, 2009, Bursey transferred $19,800,000 from the [Charter Oak TD bank account] to the [Grist Mill Capital TD bank account]." *Id.* Then, just "one day later, $19,000,000 was transferred to the Grist Mill Holdings account ending in 7136." *Id.*

Grist Mill Capital's appointed agent, Peter A. Goldman, testified he had been retained to try to "determine what happened to the $30 million." *Nov. 2013 Nova*, 2013 WL 6123104, at *7. He confirmed there had been $31 million

transferred from the Charter Oak Trust, but he could not explain why any transfers had been made to Grist Mill Capital. *Id.* He also reported Grist Mill Capital's general ledger recorded the $19.8 million as an "unknown deposit." *Id.*

Less than a month later, on November 11, 2009, Avon-NV managing member Grist Mill Capital transferred $6,710,065.92 to "Avon Capital, LLC,"[16] which was deposited to the Avon-NV TD bank account. *See* Doc. 56, at 4; Doc. 92, at 5. The *Carpenter* court also detailed a variety of transactions involving the balance of the Spencer policies, including the funding of additional life insurance policy premiums and the purchasing of real estate in Rhode Island. 190 F. Supp. 3d at 295-96.

---

[16] "Grist Mill Capital . . . and Avon Capital were financing companies that loaned money to other" Carpenter controlled entities, including "Benistar Admin Services, TPG Group, Grist Mill Trust, Grist Mill Capital, Avon Capital, and the Charter Oak Trust." *Carpenter*, 190 F. Supp. 3d at 273. "Mr. Carpenter acknowledged at trial that he controlled [Grist Mill Capital], and documents admitted into evidence show that he signed on its behalf as 'Chairman of Managing Member.' The structure of Avon Capital is less clear. Many of the documents bear Mr. Trudeau's signature. However, Mr. Carpenter is listed as the signatory on both of Avon Capital's bank accounts." *Id.*



**Spencer Policies Money Flow**

Bursey deposits two checks from Spencer policies totaling **$30,677,276**

May 18, 2009

**Charter Oak Trust** TD Account "4548"

May 21, 2009 **$8,667,276**

May 26, 2009 **$2,186,566**

Oct. 27, 2009 **$19.8 million**

**Grist Mill Capital** TD Account "4712"

Oct. 28, 2009 **$19 million**

Nov. 11, 2009 **$6,710,065**

**Grist Mill Holdings** TD Account "7136"

**Avon-NV** TD Account "4689"

### F. Avon-WY's transactions.

Much transpired between the first time Avon-WY was administratively dissolved, on June 17, 2009, and when Trudeau applied to reinstate it on November 15, 2010. *See* Doc. 147, Att. 9; Doc. 57, Att. 6, at 3.

#### 1. The SDM purchase.

On December 30, 2009—while administratively inactive—Avon-WY closed on the acquisition of one hundred percent of the membership interest in SDM. Doc. 147, Atts. 20-21. The total purchase price was $4,395,502.60. *Id.* Att. 19, at 2. The assignors were Jane M. Moran and H. Thomas Moran, II. *Id.* Att. 21. Trudeau served as the authorized signatory for Avon-WY on the Assignment of Membership Interest document and on the Membership Purchase Agreement. *See id.* Atts. 20-21. Trudeau testified that Carpenter "authorized [him] to enter the transaction . . . and make this investment on

behalf of Avon Capital, LLC." *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 487, Att. 1, at 280, lns. 11-16 (S.D.N.Y. Sept. 25, 2014).

The purchase agreement required payment of $2,197,751.30 by December 30, 2009, and the balance by January 30, 2010.  Doc. 147, Att. 20, at 1, ¶ 1(a)-(b).  It also required Avon-WY to pay a pre-existing debt Thomas Moran owed to Kirkpatrick Bank.  *Id.* at 2, ¶ 2; *id.* at 4, ¶ 5.6(b).  The agreement bound Avon-WY to a pre-existing servicing contract with Asset Servicing Group (ASG).  *Id.* at 3, ¶ 4.5; *id.* at 14, ¶ 8.2.2.  And, it identified Heritage Group Agency, Inc. and ASG as Thomas Moran's affiliates.[17]  *Id.* at 4, ¶ 5.6; *id.* at 14, ¶ 8.2.2(d).

Although Avon-WY was the signatory to the purchase agreement, a series of payments to Moran came from the Avon-NV TD bank account.  *See also* Doc. 147, Att. 22, at 3-4.  Carpenter and Amanda Rossi[18] served as the authorized signatories on the Avon-NV TD bank account.  *Id.* Att. 14.

---

[17]  Carpenter testified Avon-WY was involved in acquiring "a block of business known as SDM."  Doc. 147, Att. 5, at 148, lns. 7-9.  According to Carpenter, Trudeau introduced him to Thomas Moran, who was the signatory for the purchase agreement on behalf of SDM.  *Id.* lns. 20-21; *Id.* Att. 20, at 25.  And Trudeau testified he signed the agreement at Carpenter's behest.  *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 487, Att. 1, at 280, lns. 11-16 (S.D.N.Y. Sept. 25, 2014).

[18]  Amanda Rossi is Secretary of Nova.  Doc. 147, Att. 14; *see also Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 57892, at *6 (S.D.N.Y Jan. 4, 2013).  Also, the *Carpenter* court identified Ms. Rossi as a Benistar employee. 190 F. Supp. 3d at 294.

Related payments from the Avon-NV TD bank account include:

- Two December 31, 2009 payments of $777,741.30 and $514,469.36 to Thomas Moran, Doc. 147, Att. 22, at 3 (A March 30, 2010 email identifies the $514,469.36 as "received" by Kirkpatrick Bank, *id.* Att. 23 (per SDM Purchase Agreement, *id.* Att. 20, ¶¶ 2, 5.6));

- A January 4, 2010 payment of $25,000.00 to The Heritage Group, *id.* Att. 22, at 4;

- A January 5, 2010 payment of $175,334.85 to ASG, *id.*;

- A January 5, 2010 payment of $332,766.30 to "Hme, Llc," *id.* (A March 30, 2010 email from an ASG address to Trudeau and

---

[Ms.] Rossi [was] listed as a "Trustee" of Charter Oak Trust in a TD Bank account statement from December 2009 . . . [She was also] listed as a signatory . . . on several bank accounts to which Universitas alleges that Nova Group improperly transferred the insurance proceeds at issue here. It appears, however, that Mr. Bursey—not Ms. Rossi—authorized the deposits to these accounts. At her deposition, Ms. Rossi testified that she was employed only by Benistar . . . , Carpenter Financial [ ,] USB Group, Inc. She further testified that she performed office-manager work for these three entities, and that she worked as an executive assistant to Mr. and Mrs. Carpenter.

*Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 3487350, at *5 (S.D.N.Y. July 12, 2013) (citations omitted), *subsequently vacated on other grounds*, 784 F.3d 99 (2d Cir. 2015). In part because Bursey signed the deposit slips and endorsed the checks that Nova improperly deposited, the S.D.N.Y. determined Rossi was not "a controlling officer of Nova" because "she did not actually participate in one of the central transactions at issue." *Id.* at *10.

Andrew Terrell, cc'ing Thomas Moran, identifies this as a portion of the purchase price, *id*. Att. 23); and

- A January 7, 2010 payment of $373,033.83 to Thomas Moran, *id*. Att. 22, at 4.

On June 9, 2010, the Avon-NV TD bank account was closed and its balance of $953,238.84, minus the twenty-five dollar wire transfer fee, was deposited into the only other Avon Capital, LLC bank account of record at this time: a People's United Bank account ending in 3286 (Avon-NV People's bank account). Doc. 147, Atts. 15-16. People's United Bank sent that account's statements to Daniel Carpenter at the Grist Mill address; and Carpenter signed a check to ASG from this account at least once. *Id.* Atts. 15-16; *id.* Att. 27, at 17.

Litigation ensued over the balance due under the Purchase Agreement, and the parties settled. *See* Doc. 187, Att. 19, at 63, lns. 4-6; Doc. 147, Att. 19; *Moran v. Avon Capital, LLC*, No. CIV-10-393-HE, Doc. 58 (W.D. Okla. Feb. 17, 2011) (Stipulation of Dismissal). Payments to Moran, presumably in satisfaction of the SDM Purchase Agreement, continued to come from the Avon-NV People's bank account, of which Carpenter was the signatory. Doc. 147, Att. 25 (including the $75,000.00 Nov. 30, 2010 payment to Thomas Moran and near-monthly $100,000.00 payments thereafter until July 2011).

23



**Avon-NV payments (on behalf of Avon-WY) for SDM Purchase**

ASG sent Avon-WY monthly invoices. *See* Doc. 147, Att. 27, at 1, 5-6, 10-11, 18-19. ASG sent these invoices to Avon Capital, LLC, at 2187 Atlantic Street, Stamford, CT. *Id.* This is the address Avon-WY listed in the Purchase Agreement. *Id.* Att. 20, at 20, ¶ 10.1. No other Avon Capital, LLC entity used this address for its mailing or principal address. And at least one invoice identified Don Trudeau as the contact. *Id.* Att. 27, at 15.

Regular payments to ASG came from the Avon-NV TD bank account until its closure. *Id.* at 7, 14. After the closure of the Avon-NV TD bank account, payments continued, coming instead from the Avon-NV People's bank account. *See, e.g., id.* at 20-21. Carpenter signed a check dated December 9, 2010 from "Avon Capital, LLC" to ASG. *Id.* at 17.

24

Most of the above transactions occurred while Avon-WY was "Inactive-Administratively Dissolved." *Id.* Att. 8. And these transactions continued after Trudeau reinstated Avon-WY in November 2010. *See, e.g.*, *id.* Att. 27, at 15-17.

### 2. Andrew Terrell consults for Avon-WY.

Trudeau also testified that Andrew Terrell, principal of Clermont Capital, provided consulting services for Avon-WY. Doc. 187, Att. 19, at 41, lns. 15-22; *id.* at 42, ln. 2.[19] Trudeau did not know how Terrell received compensation for his services but he did not think the compensation came from Avon-WY. *Id.* Att. 19, at 42, lns. 21-23. Terrell testified that in 2010 he had a consulting contract with Avon, "but sometimes [he] was paid by a different entity." *Id.* Att. 18, Ex. 17, at 11, lns. 5-8 (sealed). Avon-NV's bank records shows Avon-NV made several payments to Terrell during the time he consulted for Avon-WY, and to Clermont Capital. *See, e.g.*, *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 610, Att. 9, at 13, 17 (S.D.N.Y. Nov. 18, 2016) (showing two $15,000.00 wires on March 18, 2010 and May 28, 2010 to "Andrew G. and Maria G. Terrell").[20]

---

[19]  *See also* Doc. 187, Att. 14, at 1, lns. 14-15 (Avon-NV's general ledger showing $359,270.00 owed to Clermont Capital).

[20]  *See also* Doc. 187, Att. 14, at 2, 4-5, 23 (showing Avon-NV's general ledger, which includes three $15,000.00 payments for "Consulting Fees" to Andrew Terrell from the TD bank account in February, March, and May of 2010, and from the Avon-NV People's bank account in June 2010); *id.* at 2-3,

### 3. Avon-WY's 2010 "unloading" of Avon-CT's life insurance policies.

The *Carpenter* court outlined other transactions involving Avon-CT and Avon-WY. After the 2008 financial crisis, the market for selling Charter Oak Trust policies dried up. *Carpenter*, 190 F. Supp. 3d at 289. Trudeau had served as the point person in selling these policies on the secondary market. *Id.* at 290. After an unsuccessful year of trying to find buyers, on March 16, 2010, Trudeau wrote Carpenter asking whether he wanted to "unload" two of Charter Oak Trust insureds' policies. *Id.* at 291. Carpenter replied, "we want to unload everything" and followed up ten days later, telling Trudeau to "please figure out if we have buyers or not." *Id.*

Ultimately, Carpenter and his associates devised a way to sell some of the Charter Oak Trust policies to an entity called Life Insurance Fund Elite (Life Elite). *Id.* The transactions were accomplished in the following way. First, Charter Oak Trust "transferred ownership of the policy to an entity known as Yates Worldwide Holdings Ltd." *Id.* Bursey signed these agreements on behalf of Charter Oak Trust, while Trudeau signed on behalf of Yates Worldwide.[21] "Next, Yates Worldwide transferred the policy to Tranen

---

14-15 (showing in Avon-NV's general ledger a credit to Clermont Capital for $100,000.00 in July 2010, $50,000.00 in November 2010, and a total of $100,100.00 in December 2010).

[21]    Yates was registered in the British Virgin Islands, and Avon Capital, LLC owned 50,000 shares. Doc. 187, Att. 24.

Capital Alternative Investment Fund, Ltd. [and] Mr. Trudeau signed these agreements on behalf of Yates Worldwide, [while] Ken Landgaard[22] signed on behalf of Tranen." *Id.*; Doc. 187, at 15. Then Tranen transferred the policy to Avon-WY. *Carpenter*, 190 F. Supp. 3d at 291; Doc. 187, at 15. Landgaard signed these agreements on behalf of Tranen, while Trudeau signed on behalf of Avon-WY. *Carpenter*, 190 F. Supp. 3d at 291; Doc. 187, at 15. "Finally, the policies were transferred from Avon[-WY] to Life [Elite]." *Carpenter*, 190 F. Supp. 3d at 291. The *Carpenter* court did not find Carpenter's testimony attempting "to distance himself" from these transactions credible, finding "[i]t is apparent that [Carpenter] knew of and was involved in the transfer of policies to Life [Elite]." *Id.* at 292.

The Government's Exhibit List from the *Carpenter* criminal action shows the Tranen-to-Avon purchase and sale agreements were dated November 12, 2010. *Carpenter*, No. CR-13-226-RNC, Doc. 207, at 20 (listed as "Life Insurance Purchase and Sale Agreement . . . from Tranen to Avon" for each of the eleven policies). At least nine Charter Oak Trust-to-Yates-to-Tranen transactions took place on November 12, 2010. *See id.* at 20-21 (listing "Life Insurance Purchase and Sale Agreement[s]" between Charter Oak Trust

---

[22]     Ken Landgaard, who operated Tranen Capital Alternative Investment Fund, served as one of several straw insureds recruited to participate in Charter Oak Trust. *Carpenter*, 190 F. Supp. 3d at 280.

(listed as COT) and Yates, Yates and Tranen, and Tranen and Avon).  Trudeau

transferred the policies to Life Elite on November 15, 2010—the very day he

first sought to reinstate Avon-WY.  *Carpenter*, 190 F. Supp. 3d at 291; *see id.*

Doc. 207, at 20 (listing Transfer Agreement and Life Settlements Purchase &

Sales Agreements between Avon Capital and Life Elite); Doc. 147, Att. 9; Doc.

187, at 14-15.



That same day, Trudeau also emailed Carpenter "describing the

structure of a sale" to Life Elite.  *Carpenter*, 190 F. Supp. 3d at 291.  And less

than an hour later, he emailed Carpenter a flow chart describing the entities

involved in the transaction.  *Id.*  The *Carpenter* court noted Carpenter

requested the "ELITe [sic] portfolio ASAP" in response to Trudeau's email

regarding the sale of policies to Life Elite on January 11, 2011; Carpenter knew

of the transfer of these policies; and that these transfers involved the

Ridgewood facility, except for two policies that never belonged to Ridgewood.

*Id.* at 292.  In fact, Carpenter was "more than just a willing participant in this conspiracy; he oversaw its development and execution." *Id.* at 299.  The evidence established that Carpenter "intend[ed] to defraud life insurance providers by using misrepresentations to induce them to issue STOLI policies." *Id.*  In doing so, he relied upon Avon-CT's Ridgewood facility,[23] and used Avon-WY as a conduit.  *Id.* at 291-92.  Carpenter did not challenge the district court's findings as to these transactions on appeal.  *See Bursey*, 801 F. App'x 1.

## III.   THIS COURT HAS SUBJECT MATTER JURISDICTION.

"[A] federal court must, sua sponte, satisfy itself of its power to adjudicate in every case and at every stage of the proceeding." *State Farm Mut. Auto. Ins. Co. v. Narvaez,* 149 F.3d 1269, 1270-71 (10th Cir. 1998) (quotation omitted); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94-95 (1998) (holding that a federal court must always satisfy itself first that it does in fact have subject matter jurisdiction before proceeding in any case, and that there is no such thing as "hypothetical jurisdiction"); *Gold v. Local 7 United Food & Comm'l Workers Union,* 159 F.3d 1307, 1309-10 (10th Cir. 1998) ("*Steel* requires that a federal court satisfy itself of subject matter jurisdiction before proceeding to the merits of a claim—even when the question of the merits is the easier one . . . ."), *abrogation on other grounds recognized*

---

[23]    "[I]t appears that Ridgewood did not know about [Charter Oak Trust]'s transfer of the policies." *Carpenter*, 190 F. Supp. 3d at 292.

by *Styskal v. Weld Cty. Comm'rs*, 365 F.3d 855 (10th Cir. 2004). Further, "the burden of proving jurisdiction is on the party asserting it . . . ." *State Farm Mut. Auto. Ins. Co.*, 149 F.3d at 1271 (internal citation and quotation marks omitted).

The doctrine of ancillary jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994). Federal courts typically exercise ancillary jurisdiction

> for two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent . . . and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.

*Id.* (internal citations omitted).

This case arguably "involves the second, less common purpose— ancillary jurisdiction over collateral proceedings." *K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d 963, 966 (9th Cir. 2014). Ancillary jurisdiction is reserved to "subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) ("[W]e have approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection

30

and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances.").

Ancillary jurisdiction's reach does not extend "beyond attempts to execute, or to guarantee eventual executability of, a federal judgment." *Id.* at 357. And *Peacock* "cautioned against the exercise of jurisdiction over proceedings that are 'entirely new and original' . . . or where 'the relief sought is of a different kind or on a different principle' than that of the prior decree." *Id.* at 358 (internal citations omitted).

*Peacock* involved new allegations of fraudulent transfer that the plaintiff attempted to raise under ERISA. *Id.* at 358-59. The alleged wrongdoing occurred after the entry of the ERISA judgment. *Id.* The Court held that the district court lacked jurisdiction of this "new action based on theories of relief that did not exist, and could not have existed, at the time the court entered judgment in the ERISA case." *Id.* at 359.

"[W]hen postjudgment proceedings seek to hold nonparties liable for a judgment on a theory that requires proof on facts and theories significantly different from those underlying the judgment, an independent basis for federal jurisdiction must exist." *Sandlin v. Corp. Interiors Inc.,* 972 F.2d 1212, 1217 (10th Cir. 1992). Here, Universitas asserts an alter-ego theory. "The cause of action based upon the alter ego theory is a closer case because in theory the court is merely trying to identify the true debtor on the judgment." *Id.* "Alter

31

ego in its accurate sense involves sometimes complex factual findings of gross undercapitalization or of owners' failure to observe separate corporate existence." *Id.*

"[A]n attempt to hold directors liable for a corporate judgment 'already obtained' is not within the ancillary jurisdiction of the court." *Id.* at 1218 (quoting *H. C. Cook Co. v. Beecher*, 217 U.S. 497, 498-99 (1910)). To be sure, this Court recognizes Universitas is "attempt[ing] to execute, or to guarantee eventual executability of, a federal judgment." *Peacock*, 516 U.S. at 357. And the Court acknowledges the facts underlying Universitas's contentions are not significantly different from those underlying the *Nova SDNY Litigation*, and the relief sought is not of a different kind than in that turnover action. But this Court recognizes the limitation on ancillary jurisdiction that *Sandlin* and *Peacock* set forth.

Avon-WY argues *Peacock* precludes this Court's exercise of ancillary jurisdiction. Doc. 204, at 19. Universitas argues "in any judgment-enforcement action otherwise governed by *Peacock* there may in fact be an independent basis for federal jurisdiction." *Shaw v. AAA Eng'g & Drafting Inc.*, 138 F. App'x 62, 68 (10th Cir. 2005) (quoting *Ellis v. All Steel Const., Inc.*, 389 F.3d 1031, 1033-34 (10th Cir. 2004)); *see* Doc. 201, at 7-8. And here, that independent basis for subject matter jurisdiction over Universitas's alter-ego claim is diversity of citizenship. Doc. 201, at 8 ("This is a dispute

32

between parties from different states with a matter in controversy exceeding $6 million, and thus this Court has subject matter jurisdiction over this proceeding."); *see also United States v. Vitek Supply Corp.*, 151 F.3d 580, 585-86 (7th Cir. 1998) (rejecting judgment debtor's argument that "federal courts cannot collect debts by piercing the corporate veils of judgment debtors" where an independent basis for jurisdiction exists); *C.F. Tr., Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 133 (4th Cir. 2002) ("[The *Peacock*] Court held only that federal jurisdiction over claims leading to an underlying judgment provides no *ancillary* federal jurisdiction over a subsequent, post-judgment alter ego claim.") (citation omitted).   Even assuming without deciding this Court cannot proceed exercising ancillary jurisdiction, this Court agrees—and Avon-WY does not argue otherwise—that diversity of citizenship provides an independent basis for this Court's jurisdiction.   *See also* 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3523 at 89 (2d ed. 1984) (stating that ancillary jurisdiction "include[s] those acts that the federal court must take in order properly to carry out its judgment on a matter as to which it has jurisdiction").

## IV.   THE EFFECT OF THE REGISTRATION OF THE JUDGMENT.

Under 28 U.S.C. § 1963, a judgment creditor may register one district court's judgment in an action for money damages by filing a certified copy of the judgment in any other district court, thereby giving the registered

judgment "the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." 28 U.S.C. § 1963. The act of registration serves not merely as a procedural device for the collection of the foreign judgment—registration creates an altogether "new judgment" to be given the same effect as any other judgment entered by the registering court. *Condaire, Inc. v. Allied Piping, Inc.,* 286 F.3d 353, 357 (6th Cir. 2002) (citing *Stanford v. Utley*, 341 F.2d 265, 270 (8th Cir. 1965)). Section 1963 grants by implication "inherent powers to the registering court to enforce those judgments." *Id.*; *see also Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 235 n.8 (1998) ("Congress has provided for the interdistrict registration of federal-court judgments for the recovery of money or property.").

## V.   THE COURT DENIES THE MOTIONS TO STRIKE THE CHERNOW DECLARATIONS.

The Court addresses Avon-WY's challenges (the first, sought to be joined by SDM) to Chernow's declarations. Docs. 193, 196, 213. Universitas submitted these declarations in support of its motion for summary judgment, and in support of its response to Avon-WY's motion for summary judgment. *See* Doc. 187, Att. 1; Doc. 205, Att. 1.

Avon-WY argues that the Chernow declarations are not based on Chernow's personal knowledge. Doc. 193, at 2-4; Doc. 213, at 3-4. A "declaration used to support or oppose a motion" for summary judgment "must

34

be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

Universitas responds that Chernow demonstrated his first-hand knowledge based on his review of the documents he introduces in the declarations.  Doc. 209, at 7; Doc. 205, Att. 1, at 1-2 (averring "personal knowledge").  It is not unusual for an attorney to make such declarations, and such declarations should come as no surprise to Avon-WY.  Indeed, Chernow submitted similar declarations in this matter in April and October of 2019.  Doc. 147, Att. 1; Doc. 171, Att. 1.  As Judge Heaton observed, neither Avon-WY nor SDM disputed Universitas's April 2019 allegations, which relied on Chernow's similar declarations.  Doc. 150, at 9 (citing Doc. 149).  And neither objected to Chernow's October 2019 declaration on this basis.

Should the Court agree with Avon-WY that the Chernow declarations contain "speculation," this Court is prepared to disregard its analysis of certain parts of those declarations, without needing to strike entire declarations.  *See United States v. TDC Mgmt. Corp., Inc.*, 827 F.3d 1127, 1134 (D.C. Cir. 2016) (deferring to the district court's evaluation of the admissibility of portions of a declaration, upon which it relied for "some factual analyses" and disregarded "legal conclusions and other deficiencies") (internal quotation marks omitted); *Servaas Inc. v. Republic of Iraq*, 686 F. Supp.2d 346, 353 (S.D.N.Y. 2010) ( "[A

35

court] need not 'conduct a line-by-line analysis' [of a declaration] and, instead, may 'simply disregard any material that does not comply with' the Federal Rules of Civil Procedure and/or Federal Rules of Evidence." (citation omitted)), *aff'd,* 653 F. App'x 22 (2d Cir. 2011), *as amended* (Feb. 16, 2011); *see, e.g.*, Doc. 193, at 7 (claiming the "declaration is wrought with speculation").

Avon-WY further argues that the declarations contain impermissible hearsay and conclusory statements. Doc. 193, at 4-6; Doc. 213, at 2-5. The Court will make its own conclusions based on the admissible evidence presented. *See Servaas*, 686 F. Supp. 2d at 353 ("[T]he Court will not make the suggested inferences simply because [Declarant] has suggested them," instead, the court will look at the evidence and "draw its own conclusions based on that evidence." (citations omitted)).

## VI.  THE COURT CONSIDERS UNIVERSITAS'S AND AVON-WY'S MOTIONS FOR SUMMARY JUDGMENT.

### A. Standard of review.

Parties may seek summary judgment in post-judgment proceedings. *See Env't Cleanup, Inc. v. Ruiz Transp., LLC*, 2017 WL 2080270 (W.D. Okla. May 12, 2017) (ruling on cross motions for summary judgment filed in post-judgment garnishment proceeding). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Evans v. Sandy*

*City*, 944 F.3d 847, 852 (10th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015) (internal quotation marks and citation omitted).

The Court views "facts in the light most favorable to the non-moving party and "draw[s] all reasonable inferences in [its] favor."  *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (citations and alternations omitted).  "Even so, the non-movant . . . must marshal sufficient evidence requiring submission to the jury to avoid summary judgment."  *Id.* (brackets and internal quotation marks omitted).

The Court treats cross-motions for summary judgment "separately[—]the denial of one does not require the grant of another."  *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  In evaluating the parties' cross-motions for summary judgment the Court looks beyond the pleadings and assesses the proof to determine whether there is a genuine need for trial.  *See Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986).

Universitas argues that Avon-WY is an alter ego of Avon-CT and Avon-NV, and that this Court should pierce the corporate veil of all three Avon Capital, LLC entities to satisfy the judgment. Doc. 187, at 17-32. Universitas asks for an alter-ego determination based on Avon Capital's fraudulent conduct, inadequate capitalization of both Avon-WY and Avon-CT, intermingling among all three Avon Capital entities, and the three entities' failure to keep corporate formalities. *Id.*

Avon-WY also seeks summary judgment, arguing that Avon-WY is not a judgment debtor named in the *Nova SDNY Litigation* judgment, that Universitas lacks admissible evidence to prove its alter-ego claim, and that Avon-WY is not an alter ego of any judgment debtor. *See* Doc. 195.

For the reasons stated in the following alter-ego determination, the Court grants Universitas's motion for summary judgment and denies Avon-WY's motion for summary judgment.

### B. The Court grants Universitas's motion for summary judgment: Avon-WY and Avon-NV are alter egos of Avon-CT, the named judgment debtor.

Universitas argues that Avon-WY is the alter ego of Avon-CT and Avon-NV. Because Avon-WY is an LLC formed in Wyoming, Wyoming law applies. *See Clemmer v. D.C. Grp.*, 2014 WL 1509274, *3 (W.D. Okla. Apr. 16,

2014) ("[T]he Oklahoma Supreme Court would most likely . . . look to the Restatement (Second) of Conflicts of Law to decide what substantive law to apply" to resolve the veil-piercing issue, which "provides that [t]he local law of the state of incorporation will be applied . . . .") (internal quotation marks and citations omitted).

Wyoming law requires the presence of certain "exceptional circumstances" to pierce an LLC's corporate veil. *See GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454, 462 (Wyo. 2014) (reaffirming the "essence" of the Wyoming Supreme Court's veil-piercing analysis). Wyoming law, in determining "whether the limited liability company has been operated as a separate entity, or whether the member has instead misused the entity in an inequitable manner to injure the plaintiff," applies a "fact-driven and flexible" two-prong test. *Id.* at 463.

This two-prong test pierces the corporate veil:

> (1) the limited liability company is not only owned, influenced and governed by its members, but the required separateness has ceased to exist due to misuse of the limited liability company; and (2) the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity.

*Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 799 (Wyo. 2019) (quoting *GreenHunter*, 337 P.3d at 462); *see also id.* at 800 ("[V]eil-piercing is

39

a fact-intensive inquiry generally not suited for summary judgment.") (quoting *Atlas Constr. Co. v. Slater*, 746 P.2d 352, 355 (Wyo. 1987) (citation omitted)).

"[T]he existence of one or more elements tending to support a showing of legitimacy[, however,] does not always preclude summary judgment." *Terrapin Leasing, Ltd. v. United States*, 1981 WL 15490, at *3 (10th Cir. Apr. 6, 1981) (affirming a veil-piercing summary judgment when "as a whole and in context, the undisputed facts about the operation of this corporation show that it was such a sham that a jury would not be permitted to find it a legitimate shelter against tax claims against its owner and manipulator"); *Oren v. United States*, 1992 WL 79110, at *2 (W.D. Mich. Jan. 7, 1992) ("Taking the facts as a whole in the light most favorable to the plaintiff," the court granted summary judgment to the defendant finding that "[a]lthough some individual facts do favor plaintiff's position, the facts taken as a whole are overwhelming and leave no question of material fact for a jury that the corporation was the [plaintiff's] alter ego.").

In applying the *GreenHunter* test, the Court considers:

1. the existence of fraud,

2. the adequacy of capitalization,

3. "the degree to which the business and finances of the company and the member are intermingled," *Mantle*, 437 P.3d at 799, and

40

4. whether there has been an "injustice or unfairness." *GreenHunter*, 337 P.3d at 464.

The Wyoming Supreme Court has further enumerated a litany of factors relevant to "justifying a disregard of the corporate entity." *Daniels v. Kerr McGee,* 841 F. Supp. 1133, 1136 (D. Wyo. 1993) (citing *AMFAC Mech. Supply Co. v. Federer,* 645 P.2d 73, 77-78 (Wyo. 1982) (citation omitted), *abrogated on other grounds by Texas West Oil & Gas Corp. v. First Interstate Bank of Casper,* 743 P.2d 857, 859 (Wyo.1987)).  These factors include:  whether a corporation is truly a separate entity; commingling of funds and other assets; failure to segregate funds of the separate entities; failure to adequately capitalize a corporation; the absence of corporate assets and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; and the use of the corporate entity to procure labor, services or merchandise for another person or entity. *Kloefkorn-Ballard v. N. Big Horn Hosp. Dist.,* 683 P.2d 656, 661 (Wyo. 1984).  And if the party making an alter-ego claim is "the victim of some basically unfair device" where the separate existence of the entity is "used to achieve an inequitable result," a court will also disregard that entity under Wyoming law.  *AMFAC,* 645 P.2d at 81 (listing, as an example, paying "off a

41

controlling shareholder" with the assets of an insolvent corporation "in preference to a general creditor").

### 1. Fraud confirms this.

Fraud is the only *GreenHunter* factor that by itself can justify piercing the veil. 337 P.3d at 463. Fraud can be actual or constructive. *Id.* Constructive fraud "consist[s] of all acts, omissions, and concealments involving breaches of a legal or equitable duty resulting in damage to another . . . ." *Id.* The party seeking to pierce the veil, however, must prove fraudulent intent. *Mantle*, 437 P.3d at 800. As Avon-WY argues, "[a]ctual fraud must be proven by clear and convincing evidence" while "[c]onstructive fraud must be proven by a preponderance of the evidence." Doc. 204, at 30 (citing *Mantle*, 437 P.3d at 786-89). "Clear and convincing evidence is 'proof which would persuade a trier of fact that the truth of the contention is highly probable.'" *Mantle*, 437 P.3d at 784 (citations omitted).

Among the other "badges of fraud" the Court can rely on to establish fraudulent intent are:

> a.   "[L]ack or inadequacy of consideration";
>
> b.   "close familial relationship or friendship among the parties";
>
> c.   "retention of possession or benefit of the property transferred";
>
> d.   "the financial condition of the transferor both before and after the transfer";

     e.    "the chronology of events surrounding the transfer";

     f.    occurrence of transfer during "threat of litigation"; and

     g.    "hurried or secret transactions."

*Mantle*, 437 P.3d at 789 (citation omitted).

Universitas argues that the Avon entities satisfy "every single badge of fraud." Doc. 187, at 24. It argues that "Avon Capital's actual fraud can be inferred through its fraudulent intent," which was already established from "the initial [fraudulent] transfers of insurance proceeds." *Id.* "[B]ecause of the virtual impossibility of proving actual fraudulent intent[,] . . . this court and [others] have come to rely on inferences and presumptions drawn from the surrounding circumstances." *Mantle*, 437 P.3d at 789 (internal quotation marks and citation omitted); *see also Universitas Educ., LLC v. Nova Grp., Inc.*, 2016 WL 1178773, at *3 (S.D.N.Y. Mar. 23, 2016) ("Judge Swain has noted that during discovery, [Nova and] Carpenter 'resisted all discovery efforts to determine the whereabouts of the Insurance Proceeds after the transfers, and such secrecy further indicates a fraudulent intent.'" (quoting *Aug. 2014 Nova*, 2014 WL 3883371, at *3)).

### a. Lack or inadequacy of consideration.

Universitas argues Carpenter "fraudulently transferred the insurance proceeds to Avon-NV" to then fund Avon-WY's SDM acquisition, so the payments were "a continuation of a fraudulent transfer." Doc. 187, at 22. The

*November 2013 Nova* court outlined the fraudulent conveyances that underlie Universitas's claim here. 2013 WL 6123104, at *8 ("[T]he evidence demonstrates that each entity that received Life Insurance Proceeds was controlled by Mr. Carpenter."). And these transactions stemmed from "a single purpose, to remove a portion of the Life Insurance Proceeds from the Charter Oak Trust . . . insulated from the reach of Mr. Carpenter's creditors (and of course, from [Universitas's] claim)." *Id.*

Avon-NV received no apparent consideration for its multiple payments on behalf of Avon-WY or Avon-CT. Avon-WY did not have a bank account until Trudeau opened one in 2012.[24] Avon-NV had no employees and appeared to receive no consideration for its payment of Avon-WY's obligations. *See* Doc. 147, Att. 5, at 146, lns. 10-12. This factor weighs in favor of a finding of fraud.

### b. Close familial relationship or friendship among the parties.

Universitas argues that the three Avon entities are part of the several Carpenter-operated entities whose business objectives furthered Carpenter's fraudulent scheme relating to insurance payments. Doc. 187, at 23-26. Carpenter testified that Nova is a shell corporation.[25] Counsel for Nova stated

---

[24] Avon-WY maintains it has more than one bank account, but cites only to the one Trudeau opened in 2012. Doc. 195, at 5 (citing *id.* Att. 3 and Doc. 187, Att. 8 (sealed exhibit 7)).

[25] *See Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 47, dep. pg. 76, lns. 3-4. Doc. 310, Att. 5, contains multiple depositions within

Universitas's money was transferred first to Grist Mill Capital, and then to Grist Mill Holdings, Avon Capital, Carpenter Financial Group, Phoenix Capital Management,[26] and then to Grist Mill Trust. *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 90-92. Each of these is a judgment debtor. And the *August 2014 Nova* court found Carpenter also controlled Nova, Charter Oak Trust, Caroline Financial, and "hundreds of other related entities."[27] 2014 WL 3883371, at *2.

As to Bursey, who acted under Carpenter's "direction and on his behalf," the two "had a particularly close relationship . . . ." *Carpenter*, 190 F. Supp.3d at 299, 301. Regarding Grist Mill Trust, Carpenter, and Bursey served as trustees, and Carpenter's wife, Molly, as signer. *Nov. 2013 Nova*, 2013 WL 6123104, at *4. And the *August 2014 Nova* court found Carpenter also controlled Grist Mill Trust. 2014 WL 3883371, at *2. These familial, and otherwise close, relationships point toward fraudulent intent. *See Mantle*, 437 P.3d at 789 (citation omitted).

---

one attachment, so for clarity the Court will refer to both the ECF page number and the accompanying deposition page number.

[26]     Carpenter testified he was Phoenix's sole officer and director. *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 42, dep. pg. 34, lns. 19-24.

[27]     *See also Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 37, dep. pg. 16, lns. 15-23 (The number of entities for which Caroline is the managing member and tax matters partner was "too numerous to mention.").

Universitas also argues that "Carpenter owns all three Avon entities" and controls each of their respective managers. Doc. 187, at 24. Carpenter Financial, for which Carpenter serves as Chairman, owns 99% of each of the three Avon entities. Carpenter's dominance over all of the entities involved also weighs in Universitas's favor as to a finding of fraud.[28]

### c. Retention of possession or benefit of the property transferred.

The October 2009 transfer of $19.8 million to Grist Mill Capital was classified as an "unknown deposit." *Aug. 2014 Nova*, 2014 WL 3883371, at *5. The subsequent transfers from the Avon-NV bank accounts also lack credible explanations. *Id.* at *10. After this flurry of transfers, Carpenter, through his control of Avon-WY's managing member Caroline Financial, retained the property (i.e. SDM). And Carpenter controlled Avon-NV and served as a signatory on its two bank accounts. This factor weighs in favor of a finding of fraud.

---

[28]     Also of note, through no fault of its own, the *August 2014 Nova* court misstated the identity of the Avon Capital entities, using them interchangeably. 2014 WL 3883371, at *3 ("Avon was controlled by its managing member, Grist Mill [Capital], which is wholly owned by its members Grist Mill Holdings and Caroline Financial Group, Inc., both of which were wholly owned by Mr. Carpenter."). Of the three Avon entities, Grist Mill Capital managed only Avon-NV. Doc. 57, Att. 1, at 3.

### d. Change in financial condition of transferor in relation to the transfer.

Carpenter controlled the financial affairs of his entities. *Id.* at *2. No one disputes that Carpenter opened the May 2009 Avon-NV TD bank account, which had a November 30, 2009 balance of $6,745,794.16, a December 30, 2009 balance of $938,454.59, and a December 31, 2009 balance of $160,683.29. He was a signatory on Avon-NV's two bank accounts. Those accounts received funds from the Charter Oak Trust bank account, and then were used to satisfy the obligations of Avon-WY and related Avon-CT/Ridgewood transactions. Avon-NV's change in its financial condition to satisfy Avon-WY's obligations weighs in favor of a finding of fraud.

### e. Chronology of events surrounding the transfer.

Avon-WY argues Universitas's position is "specious" because it cannot show a chain of custody linking Avon-WY to the judgment. Doc. 204, at 30-31. And because the fraud claim is based "on the actions of non-member and non-manager Carpenter." *Id.* at 30. As Judge Heaton noted, Avon-WY did not challenge Universitas's allegations that Avon-NV used Universitas's judgment funds to purchase SDM for Avon-WY. Doc. 150, at 9 (citing Doc. 149). The Avon-NV TD bank account received the funds in November 2009 from the Grist Mill Capital TD bank account, which had previously received the funds from

the Charter Oak Trust TD bank account.[29]  Charter Oak Trust held the Avon-CT/Ridgewood life insurance policies.  *Universitas*, 2013 WL 3328746, at *2.  And Carpenter controlled each of these entities.  Despite others holding titular authority, Carpenter made all significant corporate decisions; he "exercised ultimate authority over" the Avon entities' operations.  *Carpenter*, 190 F. Supp. 3d at 286.  In fact, "the formal corporate structure of the various Benistar Entities had little meaning for the people involved."  *Id.* at 274.

Less than two months after receiving the November 2009 deposit, the Avon-NV TD bank account began a series of transfers of funds to Moran and his related entities to satisfy the Avon-WY/SDM purchase agreement.  Doc. 147, Att. 22, at 3.  Also within weeks, monies from that account were transferred to the Grist Mill Trust, a Carpenter-controlled entity.  *Id.*

Avon-WY's argument that Universitas must trace the entirety of the purchase price to the Charter Oak Trust/Spencer funds "is illogical."  *Nov. 2013 Nova*, 2013 WL 6123104, at *12.  The *November 2013 Nova* court "decline[d] to presume that fraudulently conveyed funds, mixed with potentially legitimate funds, are traceable first to the legitimate funds."  *Id.*  This would "permit[ ] Carpenter and his affiliates to perpetuate their evasion of the legal obligation to pay the Life Insurance Proceeds to [Universitas] through manipulation of

---

[29]    *Carpenter*, 190 F. Supp. 3d at 296; *see also Nova SDNY Litig.,* No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 4, at 21.

money transfers," resulting in inequity.  *Id.* (citing *United States v. Henshaw,* 388 F.3d 738, 741 (10th Cir. 2004) ("[C]ourts exercise case-specific judgment to select the [tracing] method best suited to achieve a fair and equitable result on the facts before them.")).

Avon-WY also misstates Trudeau's involvement:  it states "Trudeau had no involvement with Avon-WY prior to his reinstatement of it in 2011."  Doc. 205, at 18, ¶ 92.  However, before the 2011 reinstatement, Trudeau had reinstated Avon-WY in November 2010, and served as an officer and member of Avon-WY even before its reinstatement.  Avon-WY's counsel previously told this to the Court.  Doc. 187, Att. 11.  This unusual chronology of events, involving Avon-WY's SDM purchase, funded by Avon-NV, and Avon-WY's 2010 transactions related to unloading the Charter Oak Trust Avon-CT/Ridgewood policies, weighs in favor of a finding of fraud.

Avon-WY also argues Universitas never asserted any cause of action against it in the turnover action.  Doc. 204, at 24.  When the Southern District of New York granted Universitas's motion to register the judgment here, it noted no opposition was filed to Universitas's motion.  Doc. 1, Att. 2.  That court granted the motion "for substantially the reasons stated in Universitas' memorandum in support of its motion."  Doc. 1, Att. 2, at 1.  Universitas's motion in turn relied upon Trudeau's February 2013 deposition testimony, where he stated that Avon Capital, LLC had an "indirect interest" in the SDM

49

policies, and "own[s] a portion of the death benefits." *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 487, Att. 1, at 275, lns. 14-20 (S.D.N.Y. Sept. 25, 2014); *id.* at 276, lns. 19- 25; *id.* at 277, lns. 2-3. Universitas cited the correct standard for registering a judgment in another district. *Id.* Docs. 485-87. As outlined above, Trudeau and Carpenter used the Avon entities near interchangeably. Because of the intentionally opaque and interchangeable structure of Avon Capital, LLC, Universitas reasonably relied upon Trudeau's testimony that Avon Capital, LLC owned at least a portion of SDM's policies. *See also Carpenter*, 190 F. Supp. at 273 (noting in 2016, that "[t]he structure of Avon Capital [was] less clear").

Avon-WY again challenges the Chernow declarations, which the Court addressed above. Doc. 204, at 5-6. In making its findings, the Court has taken judicial notice of the turnover action, the criminal trial, and various documents from the Southern District of New York and the District of Connecticut actions. Similarly, the parties have relied upon various documents and testimony in arguing their positions.

### f. Transfer takes place during the pendency or threat of litigation.

Universitas contends that "[e]very Avon Capital transaction occurred during the pendency of litigation," with Carpenter being "aware of pending litigation over the insurance proceeds when he initially fraudulently

transferred them from [Charter Oak Trust]." Doc. 187, at 25. "[Universitas] had made claim to the [life insurance] funds in June 2008, well before they were transferred out of the Charter Oak Trust account" and "Bursey, on behalf of Nova, acknowledged Nova's legal and fiduciary duty to pay to [Universitas] the [funds] prior to the arbitration." *Nov. 2013 Nova*, 2013 WL 6123104, at *11. The *November 2013 Nova* court found these facts indicated "that Nova knew of the possibility of a law suit to collect the Life Insurance Proceeds[ and] Nova must therefore have believed that it be unable to pay the benefit plan obligation to [Universitas] when it drained its bank account by transferring the Life Insurance Proceeds to Grist Mill [Capital]." *Id.* Additionally, "there was clearly a close association between the entities involved in this transfer, with Mr. Bursey moving the funds to an entity controlled by his brother-in-law, Mr. Carpenter." *Id.* The transfers occurred after Charter Oak Trust had wrongly denied Universitas's claim, and the awareness that it violated a legal and fiduciary duty, weigh in favor of a finding of fraud with respect to this factor.

### g. Hurried or secret transactions.

The transactions underlying the SDM purchase and the 2010 unloading of Charter Oak policies were both hurried and secreted. In its defense, Avon-WY first maintains it was "dormant" from June 17, 2009 to November 11, 2011.

Doc. 195, at 4-5, ¶¶ 4-5; Doc. 204, at 20, ¶¶ 4-5.[30]  Universitas argues "Trudeau reinstated Avon-WY the day before Avon-WY sold [the] fraudulently obtained" Charter Oak policies that required the Charter Oak Trust-Tranen-Yates transactions.  Doc. 187, at 32.

Avon-WY was *not* dormant after its administrative dissolution in June 2009.  Far from it.  Less than two months after receiving the fraudulent November 11, 2009 transfer, on December 30, 2009, Avon-WY executed the Purchase Agreement for SDM Holdings.  Doc. 195, Att. 3, at 3-6.  Trudeau, who served as Avon-WY's signatory to that agreement, did so at Carpenter's direction.  The use of the Avon-NV account, rather than one of a party to the transaction, suggests an intent to conceal or hide the source of funds.  And when Trudeau did reinstate Avon-WY in 2010, it was during a flurry of transactions related to unloading a series of Avon-CT/Charter Oak Trust-related policies in November 2010.

These hurried and concealed transactions also tip the scales toward fraudulent intent.  *See Mantle*, 437 P.3d at 789.

---

[30]    In its reply brief, Avon-WY acknowledges "that Avon Capital-WY incurred the obligation to purchase SDM <u>after</u> Avon Capital-WY was administratively dissolved" and that Trudeau was the only signatory for the purchase.  Doc. 214, at 12.

### h. Conclusion.

The Avon Capital, LLC trifecta (CT, NV, WY) earns *Mantle*'s badges of fraud, supported by clear and convincing evidence.  The close relationship of the involved parties, including both family (Bursey was Carpenter's brother-in-law[31]) and apparent friends is not in dispute.  Just as before, "[t]his was an inside transaction involving closely related entities."  *Nov. 2013 Nova*, 2013 WL 6123104, at *9.  Only Avon-NV held the purse strings for all of Avon-WY's transactions.

Avon-WY made the SDM purchase after a series of hurried and complex transactions revolving around Charter Oak Trust's October 2009 receipt of the Spencer insurance proceeds.  *See Mantle*, 437 P.3d at 789.  And Carpenter reaped the benefits of all the transactions.  The Avon-NV TD bank account received the fraudulent transfer in October 2009.  Less than two months later, the inactive Avon-WY signed the SDM deal.  The transactions "were hasty" and "not in the ordinary course of business." *Nov. 2013 Nova*, 2013 WL 6123104, at *10.  Carpenter used the Avon-NV TD bank account to satisfy Avon-WY's obligations, suggesting an intent to conceal the sources of funds. The next year, Carpenter and Trudeau schemed to use Avon-WY to act on Avon-CT's behalf to unload various Charter Oak Trust policies, duping

---

[31]     *Carpenter*, 190 F. Supp. 3d at 273.

Ridgewood in the process.  *Carpenter*, 190 F. Supp. 3d at 291-92.  The Avon entities' actions, taken together, amount to fraud—and could alone support piercing the veil of the three entities and persuade a trier of fact that the truth of the contention is highly probable.  *Mantle*, 437 P.3d at 784; *see GreenHunter*, 337 P.3d at 469.

### 2. Undercapitalization confirms this.

In analyzing undercapitalization, the Court considers "the degree of undercapitalization and the reason for it," such as whether the undercapitalization was by choice or a result of external forces.  *Mantle*, 437 P.3d at 799.  Inadequate capitalization is determined by "compar[ing] the amount of capital to the amount of business to be conducted and the obligations which must be satisfied."  *GreenHunter,* 337 P.3d at 463 (citation omitted).

Universitas argues neither Avon-WY nor Avon-CT had "the capital necessary to fulfill its business obligations," each having "entered into transactions requiring" substantial payments without having bank accounts or assets.  Doc. 187, at 27.  Avon-WY rebuffs this argument by dismissing Universitas's focus on pre-2010 operations.  Doc. 204, at 31-32.  And Avon-WY later states that it was adequately capitalized when Trudeau reinstated it, and incorrectly states Universitas does not dispute this.  Doc. 214, at 11. Avon-WY did not have a bank account upon reinstatement in 2010 and Avon-NV was

making Avon-WY's SDM payments under the purchase agreement at that time.

Avon-WY argues the Court should focus on "the time period following its reinstatement." Doc. 204, at 32. It contends that Universitas wrongly relies on relating to Avon-WY's operations prior to 2010 *before* it was "administratively restarted for an existence and purpose separate and distinct from prior operations." *Id.*

This is not so. Trudeau, an Avon-WY member in May 2010, reinstated Avon-WY in November 2010, in order to unload the Avon-CT/Charter Oak Trust policies. After reinstatement, Avon-WY still had the same financial obligations to SDM under the purchase agreement it entered into on December 2009, signed by Trudeau. Again, Avon-WY did not even have a bank account until Trudeau opened one in 2012. Yet, before that account was opened, Avon-WY satisfied a host of obligations through the two Avon-NV bank accounts, including the SDM-purchase payments to Moran and consulting fees to Terrell. And Avon-WY facilitated the unloading of the Charter Oak policies in 2010, which involved only Avon-CT and the Ridgewood facility. Neither Avon-WY nor Avon-CT have produced any bank account records for the 2009-2010 period. These factors also weigh in favor of piercing the corporate veil. *See also Kloefkorn-Ballard*, 683 P.2d at 661.

55

### 3. Intermingling confirms this.

Intermingling looks at business operations, assets, and finances, and requires an analysis of various aspects of the LLC, including commingled assets (such as using the LLC's property as the member's personal property) and separate bank accounts and business records. *GreenHunter,* 337 P.3d at 464; *see also Mantle*, 437 P.3d at 800 (relying on the following factors to support a finding of intermingling: using the same accounting department, having the same business addresses, having consolidated tax returns, lacking separate sources of revenue from the member, failing to have any independent employees from the member, and "the member manipulated the assets and liabilities such that the member reaped all benefits of the LLC's activities while the LLC was saddled with all losses and liabilities") (citation omitted).

Universitas argues "Avon Capital is a singular integrated entity." Doc. 187, at 28. Avon-WY calls this assertion "outlandish (and unsupported)." Doc. 204, at 32. It is not. As this Court has already found, there is plentiful intermingling among the three entities, each of which Carpenter controlled. Doc. 92, at 5-6.[32] In 2009-2010, all three entities listed the principal and/or

---

[32] Trudeau testified that his "interest lied in the operating business." Doc. 187, Att. 6, at 94, lns. 9-10. By "operating business," he meant "Avon Capital in its entirety, whether it's [Avon-CT] or [Avon-WY] or whatever, dealt with the assets of the one part of that." *Id.* lns. 13-15. This suggests Trudeau also treated the Avon entities interchangeably for operational purposes.

mailing address as 100 Grist Mill Road in Simsbury, CT. Maintaining the same addresses is "highly probative" evidence. *See Nov. 2013 Nova*, 2013 WL 6123104, at *9 (noting, in addition, that Carpenter "admits to having established and controlled hundreds of entities" sharing this office). In April 2016, Carpenter testified he was "privy" to each of the three entities. Doc. 147, Att. 5, at 144, lns. 14-16. He testified Avon-NV had no employees or office space. *Id.* at 146, lns. 10-16. The Southern District of New York has already adjudged Benistar to be an alter ego of the Judgment Debtors. Doc. 147, Att. 29, at 2. Avon-NV was set up by an individual who worked for Benistar. *Id.* Att. 5, at 144, lns. 19-25. Though that person was involved in the secondary market for life insurance, Avon-NV did not engage in any life-settlement transactions. *Id.* at 146, lns. 1-6.

Carpenter testified Avon-WY was formed because "Wyoming has the best laws in the country for doing life settlement transactions." *Id.* at 147, lns. 2-6. Carpenter stated he was unaware of who the members of Avon-NV were and that he could not recall if any of his entities were members of Avon-WY. *Id.* at lns. 17-22. He knew Avon-WY was involved in the acquisition of SDM, because Trudeau had introduced him to the previous owner of SDM, Moran. *Id.* at 148, lns. 4-23. The Southern District of New York found Carpenter's testimony about his denial of having a relationship with Nova incredible, as well as most of his testimony for other matters in that case, including his

explanations for the purpose of the 2009-2010 transfers of the Charter Oak Trust insurance proceeds.  *See Nov. 2013 Nova*, 2013 WL 6123104, at *2-5; *Aug. 2014 Nova*, 2014 WL 3883371, at *3.  Carpenter, as the signatory on the Avon-NV People's bank account, also signed at least one check to ASG to satisfy a payment Avon-WY owed.

Although Avon-WY vehemently argues it is a separate and distinct entity from Avon-CT and Avon-NV, the facts do not support this contention. Carpenter and Trudeau undertook an elaborate and complex series of actions. They orchestrated transactions among the three Avon entities that ignored legal formalities, which suggests the confusion and overlap was by design, at least in part to continue to hide assets from Universitas.  For example, from 2009-2010, two bank accounts that Carpenter opened using Avon-NV, serviced all three entities.  And Carpenter used the Avon entities interchangeably to suit his needs:  Avon-CT was set up for transactions related to the Ridgewood facility and the Charter Oak Trust, Avon-WY for life settlements, and Avon-NV served as the account holder for each.  Carpenter manipulated the assets and liabilities of the only Avon LLC with an account, Avon-NV.

Carpenter also identified himself as "Chairman of [the] Managing Member of Avon Capital, LLC" in signing the Ridgewood facility agreement, which pertained to Avon-CT.  Doc. 187, Att. 9, at 3.  But Avon-CT's managers were Trudeau, Robinson, and Bursey, while Avon-WY's managing member was

58

Caroline Financial, for which Carpenter served as Chairman. The interchangeable use of the Avon entities caused confusion and deception.

This confusion caused the *August 2014 Nova* court to identify all the judgment debtors as Connecticut or Delaware entities in the turnover action involving Avon Capital, LLC. 2014 WL 3883371, at *7. But, in the same action, Carpenter referred to himself as serving as Chairman of Caroline Financial, which in turn served as the managing member of Avon Capital. Doc. 205, Att. 2, ¶ 1. And again, that is true for Avon-WY—but *not* for Avon-CT. Similarly, the *August 2014 Nova* court identified the judgment debtor's managing member as Grist Mill Capital. 2014 WL 3883371, at *3. And that is true for Avon-NV—*not* for Avon-CT.

Avon-WY argues that it "kept its bank accounts and financial records entirely separate from those of its members" so it is not intermingled with Judgment Debtors. Doc. 204, at 32. This is untrue, at least to the extent that funds from Avon-NV's bank accounts satisfied Avon-WY's payment obligations to Moran for the SDM purchase agreement and satisfied Avon-CT's obligations on the Charter Oak Trust Waldman policy, as Universitas argues. Doc. 187, at 23. And Avon-WY fails to point to any bank account it maintained before 2012.

Avon-CT, Avon-NV, and Avon-WY are "not only owned, influenced and governed by its members, but the required separateness has ceased to exist

59

due to misuse of the limited liability compan[ies]." *Mantle*, 437 P.3d at 799 (quotation omitted); *see also Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 390-91 (4th Cir. 2018) (finding three distinct LLCs that operated as a "single economic entity" with funds "transferred freely among the LLCs" without explanation, including payment of expenses of one LLC by another, were alter egos of a sole member who "utterly dominated and controlled" them); *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) ("The effect of applying the alter ego doctrine . . . is that the corporation and the person who dominates it are treated as one person, so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound . . . .") (quoting *Shamrock Oil & Gas Co. v. Ethridge*, 159 F. Supp. 693, 697 (D. Colo. 1958)).  When looking at the undisputed facts of the three Avon's operations, as a whole, no rational juror could find otherwise.  *See Terrapin*, 1981 WL 15490, at *3; *Oren*, 1992 WL 79110, at *2; *see also Kloefkorn-Ballard*, 683 P.2d at 661.

### 4. Injustice confirms this.

Universitas argues that the Avon entities are "judgment-proof shells" that benefited from Carpenter's fraudulent transfers intended to hide money from Universitas, so affording them veil-piercing protection would result in injustice.  Doc. 187, at 21.  Before the *November 2013 Nova* court, and continuing through this and other related litigation, Universitas "has engaged

in wide-ranging discovery efforts in aid of execution of the Judgment, which have been met with vigorous opposition by Nova and its affiliates." 2013 WL 6123104, at *2. As to whether an injustice would result in this case if the Court did not apply the alter-ego doctrine, depriving Universitas of the fruits of its judgment against Avon would result in an injustice. "When, as here, the corporation is a mere dummy and the alter ego of a judgment debtor with no real existence apart from [that judgment debtor], the fiction of the corporation as a separate legal entity [cannot] be used to defeat the rights of the judgment creditor." *Shamrock Oil & Gas Co.*, 159 F. Supp. at 698. Undoubtedly, "the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity." *Mantle*, 437 P.3d at 799 (quotation omitted); *see also AMFAC*, 645 P.2d at 81(holding that when the party making an alter-ego claim is "the victim of some basically unfair device" where the separate existence of the entity is "used to achieve an inequitable result," a court will disregard that entity under Wyoming law); *Kloefkorn-Ballard*, 683 P.2d at 661.

### 5. Conclusion.

A reasonable jury viewing the evidence in the light most favorable to Avon-WY, and drawing all reasonable inferences in its favor, could not find Avon-WY, Avon-CT, and Avon-NV operated as anything but alter egos. The

Court grants summary judgment in favor of Universitas. *Dewitt*, 845 F.3d at 1306.

### C. The Court denies Avon-WY's motion for summary judgment.

Avon-WY's arguments against an alter-ego determination stress the separateness of the three Avon entities. Doc. 195, at 14-18. Avon-WY argues Universitas presents only "generalized claims" and fails to meet its burden to present "specific facts showing a genuine issue for trial." *Id.* at 10-11; Doc. 214, at 8-14. Avon-WY maintains Universitas presents no clear and convincing evidence supporting fraud, apart from relying on the bad acts of others. Doc. 195, at 16-17; Doc. 214, at 5.

Avon-WY argues it must be treated as distinct from its previous iteration.[33] Doc. 195, at 14. Avon-WY argues that Carpenter's involvement with Avon-WY was before it became "dormant" when it was administratively dissolved in June 2009. *Id.* It argues its current active state was "restarted" by Trudeau for "an existence and purpose separate and distinct from any event . . . prior to 2009." *Id.* But, Avon-WY cannot discount the probative evidence

---

[33]     Avon-WY's use of the two reinstatement dates in its briefs only adds to the confusion. Avon-WY sometimes argues it was dissolved in 2009 at which time it became dormant until being reinstated in 2011, leaving out the first reinstatement and second dissolution. *See* Doc. 195, at 4-5; Doc. 204, at 20. And other times, Avon-WY uses the 2010 reinstatement as the point in time when its activities became "separate and distinct" from prior operations. *See* Doc. 195, at 4-5, 14, 17, 18; Doc. 204, at 21.

of alter-ego liability, most notably the purchase of SDM with funds from the Avon-NV TD bank account.

Avon-WY offers as undisputed facts: Trudeau "had no involvement with [Avon-WY] prior to his reinstatement of it in 2011"; Avon-WY "had no liabilities when Don Trudeau administratively reinstated [it]"; and Trudeau reinstated it "for business operations with a purpose separate and distinct from the prior business operations that used the entity." *Id.* at 5 ¶¶ 6, 8-9; *id.* at 14. In making these allegations, Avon-WY cites Trudeau's 2013 testimony, which does not support these assertions. *See id.* Att. 5.

Next, in its reply brief, Avon-WY backtracks and acknowledges that Trudeau held ownership interests in Avon-WY after its first administrative dissolution in 2009, contrary to its prior insistence that he was not involved with Avon-WY before reinstatement. Doc. 214, at 11. Avon-WY also admits it "had an obligation to purchase SDM," and that Trudeau served as the signatory (seemingly admitting Avon-WY was not dormant after this dissolution and again conflicting with its previously stated undisputed facts). *Id.* at 12.

Avon-WY's arguments fail for the reasons outlined above. First, Universitas disputes the argument that Avon-WY became dormant in the period after its administrative dissolution and before it was reinstated by Trudeau for a "different purpose." *See* Doc. 205, at 21. As shown, Avon-WY

was in fact very active in the period between dissolution and reinstatement. The relevant period involves the transfers of $30 million of Avon-CT-related Charter Oak Trust life insurance proceeds to various entities, including to Avon-NV's bank account. Also included is the December 2009 SDM acquisition, which Avon-NV funded on Avon-WY's behalf. The Charter Oak Trust-Tranen-Yates transactions took place on November 12, 2010. The transfer from Avon-WY to Life Elite were completed November 15, 2010, the day Trudeau applied to reinstate Avon-WY.

Try as it might, Avon-WY cannot refute Carpenter's control of each of the Avon entities; Trudeau's involvement with Avon-WY (beyond bold factual misstatements that he was not involved until either 2010 or 2011); Trudeau's signing the SDM deal on Avon-WY's behalf in 2009 after the receipt of the Charter Oak Trust monies; the rapid reinstatement of Avon-WY and transactions in the latter half of 2010 timed in tandem with the Charter Oak Trust transactions; Avon-NV's payment of various SDM/ASG-related fees and payments to the Morans and related entities; and Avon-NV's payments to Avon-WY's consultant Terrell. Avon-NV also funded at least some of Avon-CT's activities, as the Avon-NV TD bank account shows. *See* Doc. 187, Att. 13, at 1, 4, 7-9 (reflecting two $44,150.00 Waldman policy payments in August and October 2009).

64

Viewing the factual record and making all reasonable inferences in favor on Universitas, the Court denies Avon-WY's motion for summary judgment. The evidence not only weighs in Universitas's favor, but is so one-sided that only Universitas can prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## VII. THE COURT DENIES SDM'S MOTION TO QUASH THE GARNISHMENT AND MOTION FOR PARTIAL SUMMARY JUDGMENT.

Because SDM's motion for partial summary judgment contains substantially similar language to its motion to quash garnishment, the Court will address the motions together. *See* Docs. 191-92.

SDM seeks to quash Universitas's writ of garnishment, arguing in part it "[d]oes not believe any further relief is sought against SDM." Doc. 191, at 2. SDM also argues it "was not properly served with all of the required documents." *Id.* at 5. Universitas responds that SDM has previously "entered an appearance in this proceeding identifying itself as a 'Garnishee'" so even if it was improperly served, it is "properly before the Court as a garnishee." Doc. 206, at 6. Universitas also argues "voluntary appearance is equivalent to service" and it "can occur at any point in the proceeding . . . ." *Id.* (citing *Wagoner v. Saunier*, 627 P.2d 428, 431 n.4 (Okla. 1981)).

SDM argues that its counsel's appearances were for *Respondent* SDM, primarily to respond to a motion for contempt and a motion to compel. Doc. 211, at 2, 8; Doc. 212, at 4-5. SDM waived service by its appearance, producing

65

documents, corresponding with Universitas's counsel, participating in a status conference, filing a joint status report, and winning relief in the form of sanctions. *See, e.g.*, Docs. 113, 115, 134, 137, 142, 148; *Hopper v. Wyant*, 502 F. App'x 790, 792 (10th Cir. 2012) ("'[A]n individual may submit to the jurisdiction of the court by appearance,' and voluntary use of certain court procedures may constitute constructive consent to the personal jurisdiction of the court." (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703-04 (1982))).

In addition to the arguments regarding lack of relief sought and service included in the motion to quash, SDM alternatively argues in its motion for summary judgment that SDM is not liable as a garnishee because it is not indebted to and does not possess assets belonging to the Judgment Debtor. Doc. 192, at 9-10.  SDM makes "the claim of exception on the part of the judgment debtor(s) . . . [that SDM] is neither owned by nor indebted to the actual judgment debtor(s): [Avon-CT] and/or [Avon-NV]." *Id.* at 10 (quoting *id.* Att. 1).  In determining the Avon entities are alter egos, the Court finds they are one and the same for purposes of their liability to Universitas.  *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 143 (2d Cir. 1991) (stating that once alter-ego status is established, "the previous judgment is then . . . enforced against entities who were, in essence, parties to the underlying dispute[ and] the *alter egos* are treated as one entity").  Because

Avon-WY owns one hundred percent of the membership interests in SDM,[34] SDM possesses assets of a judgment debtor.  *Id.*  The undersigned finds Universitas does seek relief against SDM, as SDM serves as Avon-WY's "most notable asset."  Doc. 92, at 4 n.2.  Viewing the factual record and making all reasonable inferences in favor of the nonmovant, the Court denies SDM's motion for partial summary judgment.

## VIII.  THE COURT DENIES UNIVERSITAS'S MOTION TO STRIKE SDM'S MOTION TO QUASH AND ITS REQUEST FOR SANCTIONS AGAINST SDM.

In seeking to strike SDM's motion, Universitas argues that every issue in the motion to quash is "also addressed in SDM's Motion for Summary Judgment <u>and</u> SDM's Opposition to Petitioner's Motion for Summary Judgment."  Doc. 208, at 1.  What else could SDM "hope to accomplish by filing the same argument three times, other than 'to harass, cause unnecessary delay, or increase the cost of litigation'"?  *Id.* at 2.  In fact, "Mr. Carpenter and his associates have a demonstrable history of filing motions solely to 'harass, cause unnecessary delay, or increase the cost of litigation.'"  *Id.* (citing *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP; *Universitas Educ., LLC v. Nova Grp., Inc.,* 2013 U.S. Dist. LEXIS 142481, at *11 (S.D.N.Y. Sept. 30, 2013) (indicating that Nova's "re-filing of the motion to dismiss was in bad faith and

---

[34]    *See* Doc. 57, Att. 3, at 2, ¶ 7.

with a motive to delay, harass, or needlessly increase the cost of litigation")). Finally, Universitas notes SDM is run by Kehoe, a Benistar employee. *Id.*

Despite the demonstrable history of filing motions to harass and delay on the part of a multitude of Carpenter-controlled entities, the Court notes SDM's counsel states it is acting in good faith and out of an abundance of caution. Doc. 191, at 1; Doc. 192, at 2. SDM's counsel was uninvolved in the turnover proceedings or any other apparent litigation in this matter. As such, the Court finds the denial of Universitas's motion to quash to be appropriate.

## IX. CONCLUSION.

Avon-WY and Avon-NV are alter egos of Avon-CT. Given this, Universitas may enforce the judgment it registered here against any of the three Avon entities. 28 U.S.C. § 1963 (A judgment has "the same effect as a judgment of the district court of the district where registered and may be enforced in like manner."); *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 143; *see also Condaire*, 286 F.3d at 357 (noting that registration under § 1963 equates to a "new judgment" and recognizing § 1963's grant of "inherent powers . . . to enforce [such] judgments"); *Sys. Div., Inc. v. Teknek Elecs., Ltd.,* 253 F. App'x 31, 37 (Fed. Cir. 2007) ("The exercise of [personal] jurisdiction over an alter ego is compatible with due process because a corporation and its alter ego are the *same entity . . . .*"); *Misik v. D'Arco*, 197 Cal. App. 4th 1065, 1072 (2011) ("[A]mending a judgment to add

68

an alter ego does not add a new defendant but instead inserts the correct name of the real defendant."). So, the Court may enjoin each of these entities from transferring, alienating, and/or concealing or encumbering any non-exempt property.

## X.    RECOMMENDATIONS AND NOTICE OF RIGHT TO OBJECT.

For the reasons discussed above, the undersigned recommends:

1.  The Court DENY Avon-WY's motions to strike, Docs. 193, 213.

2.  The Court GRANT SDM's motion to join Avon-WY's first motion to strike, Doc. 196.

3.  The Court GRANT Universitas's motion for summary judgment and find that Avon-WY and Avon-NV are alter egos of Avon-CT, the named judgment debtor, Doc. 186.

4.  The Court DENY Avon-WY's motion for summary judgment, Doc. 194.

5.  The Court DENY SDM's motion to quash, Doc. 191.

6.  The Court DENY SDM's motion for partial summary judgment, Doc. 192.

7.  The Court DENY Universitas's motion to strike SDM's motion to quash, Doc. 208.

8.   The Court ENJOIN Avon-WY from transferring, alienating, and/or concealing or encumbering its ownership of any interest in SDM.

9. The Court ENJOIN Avon-WY, Avon-CT, and Avon-NV from transferring, alienating, and/or concealing or encumbering any non-exempt property.

The parties are advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court on or before November 3, 2020, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72.  The parties are further advised that failure to make a timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein.  *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned in the captioned matter.

ENTERED this 20th day of October, 2020.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE